**No. 26-1483**

# In the
# United States Court of Appeals
## for the Seventh Circuit

James Tuccori, et al.,

*Plaintiffs-Appellees*,

v.

At World Properties, LLC & Anywhere Real Estate Inc.,

*Defendants-Appellees*,

v.

Aaron Bolton,

*Proposed Intervenor-Appellant*

Appeal from the United States District Court
for the Northern District of Illinois, No. 24-cv-150
The Honorable Lindsay C. Jenkins, Presiding

## PROPOSED INTERVENOR-APPELLANT'S ADDITIONAL APPENDIX


Eric F. Citron
Rachel G. Shalev
ZIMMER, CITRON & CLARKE
14 Ridge Square NW, Suite 328
Washington, DC 20016
(202) 796-4540

George A. Zelcs
Randall P. Ewing, Jr.
Steven M. Berezney
Ryan Z. Cortazar
KOREIN TILLERY LLC
205 North Michigan Ave., Suite 1950
Chicago, IL 60601
(312) 641-9750

John Daniel Tinder
Jed Glickstein
KAPLAN & GRADY
2071 N Southport Ave., Suite 205
Chicago, IL 60614
(866) 303-6619

Vincent Briganti
Margaret MacLean
Noelle Forde
LOWEY DANNENBERG, P.C.
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500

## CIRCUIT RULE 30(d) STATEMENT

In accordance with Circuit Rule 30(d), I hereby certify that all materials required by Circuit Rules 30(a) and (b) are included in the Required Short Appendix and the Additional Appendix.

Dated: July 15, 2026

*/s/ Eric F. Citron*

Eric F. Citron
*Counsel for Appellant*

**TABLE OF CONTENTS**


Class Action Complaint, Dkt. 1-2 (Jan. 5, 2024)……………………………………..…AA 1

Civil Cover Sheet, Dkt. 2 (Jan. 5, 2024)……………………………………………AA 40

Minute Entry, Dkt. 22 (June 5, 2024)……………………………..………………AA 41

Excerpt of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement, Dkt. 58 (Oct. 13, 2025)……..………………………………………AA 42

Excerpt of Exhibit A to Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement, Class Settlement Agreement, Dkt. 58-1 (Oct. 13, 2025)……………………………………………………………………………AA 54

Excerpt of Declaration of Paul T. Geske in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement, Dkt. 58-5 (Oct. 13, 2025)……………………………………………………………………..AA 57

Preliminary Approval Order, Dkt. 65 (Oct. 16, 2025) ……………………………..AA 59

Memorandum Opinion and Order on Plaintiffs' Motion to Consolidate, Dkt. 67 (Oct. 22, 2025)………………………………………………………………..….AA 7

Excerpt of Plaintiffs' Partially Opposed Motion and Memorandum for Leave to File *Instanter* First Amended Consolidated Class Action Complaint, Dkt. 97 (Feb. 23, 2026)… ……………………………………………………………….AA 75

Plaintiffs' Unopposed Motion and Memorandum for Preliminary Approval of Settlements with Brokerages Opting Into the Court Approved Class Settlement Agreement, Dkt. 98 (Feb. 23, 2026)………………………………..AA 83

Declaration of Paul T. Geske in Support of Plaintiffs' Motion for Preliminary Approval of Settlements with Brokerages Opting Into the Court Approved Class Settlement Agreement Dkt. 98-1 (Feb. 23, 2026)………………………..AA 92

Excerpt of Exhibit 4 to Geske Declaration, Opt-In Agreement Between Plaintiffs and Anywhere, Dkt. 98-1 (Feb. 23, 2026)…………………………..AA 97

Non-Party *Batton* Plaintiffs' Motion to Intervene, Dkt. 100 (Feb. 24, 2026)……………………………………………………………………..…………..AA 103

Excerpt of Notice of Filing of Anywhere Real Estate Inc.'s Response to the *Batton* Plaintiffs' Motion for Preliminary Injunction and Motion to Reassign, Dkt. 107 (Mar. 2, 2026) ………………………………………………………..AA 114

*Tuccori* Plaintiffs' Opposition to Motion to Intervene, Dkt. 110 (Mar. 2, 2026)........AA 121

Minute Entry, Dkt. 119 (Mar. 4, 2026)........AA 139

Notice of Appeal, Dkt. 124 (Mar. 11, 2026)........AA 140

Motion for Stay Proceedings Pending Appeal, Dkt. 130 (Mar. 18, 2026)........AA 143

Order Denying Aaron Bolton's Motion to Stay Pending Appeal, Dkt. 162 (May 7, 2026)........AA 160

Stipulation as to Second Amended Consolidated Complaint, Dkt. 166 (May 18, 2026)........AA 164

Excerpts, Plaintiffs' Second Unopposed Motion and Memorandum In Support of Preliminary Approval of Settlements with Parties Opting Into the Court Approved Class Settlement Agreement, Dkt. 168 (May 18, 2026)........AA 167

Hearing Date: 4/9/2024 10:30 AM
Location: Court Room 2102
Judge: Atkins, David B.

12-Person Jury

FILED
12/8/2023 4:55 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2023CH09928
Calendar, 16
25530114

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

**CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, CHANCERY DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, individually and on behalf of similarly situated individuals,<br><br>*Plaintiff*,<br><br>v.<br><br>AT WORLD PROPERTIES, LLC, an Illinois Limited Liability Company,<br><br>*Defendant.* | ) | Case No. 2023CH09928<br><br>**JURY TRIAL DEMANDED** |

**<u>CLASS ACTION COMPLAINT</u>**

Plaintiff, James Tuccori, individually and on behalf of other similarly situated individuals, brings this Class Action Complaint against Defendant At World Properties, LLC, d/b/a @properties Christies International Real Estate (hereinafter "Defendant" or "At World Properties") and alleges as follows based on personal knowledge as to his own acts and experiences, and as to all other matters, on information and belief, including an investigation by his attorneys.

**NATURE OF THE ACTION**

1. This lawsuit is brought against Defendant – the largest residential real estate brokerage firm in Illinois by both sales volume and total number of deals and the eighth largest by dollar volume in the United States – for engaging in a conspiracy that perpetuates anti-competitive measures in the real estate broker market that harm homebuyers by, among other things, inflating and concealing commissions paid to real estate brokers. Defendant's anti-competitive practices burden homebuyers nationwide with increased home prices and unnecessarily high costs.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

2. Defendant and its co-conspirators are members of the National Association of Realtors ("NAR"), a national trade association that offers advantages to its members, including access to the primary Multiple Listing Services ("MLSs") with detailed information on available properties. NAR and its members establish and enforces rules, policies, and practices that are adopted by NAR's 1,400+ local associations and their affiliated MLSs ("NAR MLSs"). According to its website, more than 1.5 million real estate professionals across thousands of different brokerages and real estate firms are members of NAR.[1]

3. The typical residential real estate transaction includes a real estate professional on the buy-side ("buyer-agent") and a sell-side broker ("seller-agent" or "seller-broker") that work for brokerage firms like Defendant and are paid commissions based on a percentage of the home's sale price. The seller-broker lists the seller's property on an MLS, while the buyer-agent searches the MLS to find properties to propose to their buyer. The vast majority of residential real estate transactions are facilitated through listings made available on an MLS.

4. Both the supply side and the demand side of the housing market depend on MLSs. In order to effectively market and sell a property, a seller-broker has little choice but to list that property on an MLS because that is where buyer-agents search for properties. Similarly, in order to understand the marketplace and determine which homes are listed for sale, a buyer-agent has little choice but to search an MLS for properties. In this way, MLSs are the digital gateway to homebuying and selling and few sales occur outside of the use of MLSs.

5. Seller-brokers and buyer-agents utilize MLSs to share and obtain information about properties for sale. An MLS is a searchable database that is essentially a marketplace for properties that are listed for sale. According to the Department of Justice ("DOJ") MLSs are a joint venture

[1] https://www.nar.realtor/

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

among competing brokers to facilitate the publishing and sharing of information about homes for sale in a geographic area.[2]

6. MLSs are regional by nature and serve certain geographic areas. According to the DOJ, membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area. In each area an MLS serves, the MLS will include or "list" the vast majority of homes that are for sale through a residential real estate broker in that area. In most areas, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.

7. There are hundreds of MLSs in the United States, which are tailored to specific regions. For example, the Midwest Real Estate Data is an MLS that covers the Chicago Metro Area and is NAR-associated, requiring NAR membership for access. A substantial number of MLSs, including most large regional MLSs require NAR membership for access to listings.

8. To be a member of NAR, real estate brokerage firms such as Defendant must adhere to NAR's regulations and guidelines, including those which apply to broker commissions.

9. Defendant is heavily intertwined with NAR, which is also headquartered in Chicago. NAR frequently names brokers from large residential real estate firms such as Defendant to serve in leadership positions concurrently with their position as real estate brokers. For example, in 2020, Mabel Guzman, then a broker with At World Properties LLC, was named a member of NAR's Leadership Team.[3] These individuals guide NAR's strategic direction and policymaking

---

[2] See DOJ Backgrounder Q&A: National Association of REALTORS®, available at: https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recommend,commission%20offered%20to%20buyer%20brokers.

[3] Former CAR President Named 2020 NAR Vice President of Association Affairs, available at: https://chicagorealtor.com/former-c-a-r-president-named-2020-nar-vice-president-of-association-affairs/

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

in such areas as legislation, professional standards, and business services—influencing the NAR rules that apply to their industry.

10. NAR has promulgated anti-competitive regulations related to broker commissions that include mandatory (i.e. non-negotiable) up-front unilateral allocation of a portion of the sale price toward buyer-agent commissions (the "Mandatory Commission Rule").[4] This rule eliminates competition between buyer-agents with respect to their commission rate and the quality of their services. This lack of competition leads to homebuyers paying inflated commission rates and receiving lower quality services. This Mandatory Commission Rule overcompensates buyer-agents at the homebuyers' expense.

11. Moreover, during the relevant time period, NAR and its co-conspirators such as Defendant exacerbated the anti-competitive effect of its Mandatory Commission Rule through other rules which prohibit buyer-agents from making home purchase offers contingent upon a reduction of the buyer-agent's commission ("Non-Modification Rules")[5] and prohibit the disclosure to buyers of the commission to be paid to buyer-agents ("Commission Concealment Rule").[6]

12. The result is that the amounts of buyer-agents' commissions are inflated, and this fact is opaque and ill-understood by the homebuyers whose home prices fund those commissions.

---

[4] 2023 Handbook on Multiple Listing Policy, National Association of REALTORS®, at p. 41 MLS Policy Statement 7.31 available at: https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*6co9sx*_gcl_au*ODk0MjQ3MzYxLjE3MDE2NjYyNjQ. (hereinafter "NAR MLS Handbook 2023")

[5] Code of Ethics and Arbitration Manual 2023, National Association of REALTORS®, at Standard of Practice 16-16 available at: https://cdn.nar.realtor/sites/default/files/documents/2023-coe-standards-of-practice-2022-12-28.pdf (hereinafter "NAR Code of Ethics 2023")

[6] NAR MLS Handbook 2023 at p. 40, Policy Statement 7.23

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

13. These anti-competitive rules permit Defendant and other NAR members to sustain buyer-agent fees at artificially high levels which would not exist in a competitive marketplace.

14. Defendant and the members of NAR further protect and promote their conspiracy by exerting control over and manipulating the MLSs, which constitute the gateway to homebuying and selling. As set forth above, NAR offers its members access to NAR MLSs that are widely used to facilitate homebuying and selling.

15. NAR MLSs permit buyer-agents to filter searches for properties by commission amount, and during the relevant time period, NAR ethics rules permitted buyer-agents to show these filtered properties with high commissions to buyers ("MLS Manipulation Practices").[7] Naturally, this conflict of interest led to buyer-agents promoting properties that will maximize their commission, which lowers demand for properties that offer lower commissions and thus eliminates competition from discount brokers. This harms homebuyers, who receive diminished, biased services from buyer-agents who prefer that the homebuyers only purchase homes that offer high commissions.

16. Defendant and the members of NAR also protected and promoted their conspiracy by exerting control over and manipulating the homebuying experience. During the relevant time period, the NAR ethics code permitted and encouraged buyer-agents to advertise their services as "free," despite the fact that buyer-agents are in fact paid a commission from the sale price of the

[7] 2018 Handbook on Multiple Listing Policy, National Association of REALTORS®, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4 available at: https://www.nar.realtor/sites/default/files/documents/2018-HMLP-v1.pdf (hereinafter "NAR MLS Handbook 2018")

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

home that the buyer pays.[8] Current NAR regulations also limit physical access to houses for sale to only NAR members, further reducing competition from unaffiliated brokers.[9]

17. This anti-competitive behavior has led to buyers paying inflated fees for misrepresented "free" broker services, overpaying for properties (whose purchase price necessarily includes the inflated commissions that cannot be reduced), and receiving overpriced and biased broker services. This collusion, which begins at the very gateway to homebuying (the MLSs) and extends through the homebuying process, also drives competitors out of business.

18. These rules and practices, adopted and enforced by NAR members including Defendant constitute agreements among real estate brokers who would otherwise be competing. Defendant's implementation of these agreements is clearly anti-competitive, is an unreasonable restraint on trade, and benefits only Defendant and other NAR members.

19. Since late 2020, when the Department of Justice sued NAR for antitrust violations, NAR has begun walking back from certain anti-competitive rules discussed herein. However, the harms caused to American homebuyers for decades have not been remedied, nor have the billions in ill-gotten commissions been disgorged. During the relevant time period and prior to NAR's rules and policies receiving challenges however, the rules, regulations and practices that further the conspiracy remained materially consistent.

20. Defendant wields significant market power, as the eighth largest real estate brokerage by dollar volume in the United States and the largest in Illinois with nearly $30 billion worth of sales volume in 2022. Defendant's prominent market position means that its involvement

---

[8] Code of Ethics and Arbitration Manual 2018, National Association of REALTORS®, at p. 10 Standard of Practice 12-2, available at: https://www.nar.realtor/sites/default/files/documents/2018-CEAM-v1.pdf (hereinafter "NAR Code of Ethics 2018")

[9] NAR MLS Handbook 2023, at p. 41 MLS Policy Statement 7.31.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

is crucial to the success of the conspiracy with NAR and other brokers. Defendant has consented to engage in, facilitate, and execute this conspiracy, playing a significant role within NAR and mandating its affiliates to comply with NAR's anti-competitive agreements as a prerequisite for accessing the benefits of Defendant's brand and infrastructure, including MLSs.

21. Defendant's and its co-conspirators' advancement of the conspiracy has markedly diminished competitive practices in the buyer-agent service sector, negatively impacting homebuyers. This conspiracy has empowered Defendant and other market participants to elevate and stabilize buyer-agent fees at levels that are unnaturally high compared to those supported by a competitive market, thus harming homebuyers. Among other anti-competitive effects, the conspiracy allows brokers to favor properties that offer higher commissions by overlooking or concealing lower commission options that might better suit the buyers' requirements.

22. The result of the conspiracy has been inflated buyer-agent commissions, higher average cost of homes, and lower quality services provided to homebuyers as a result of buyer-agents who are incentivized to avoid lower commission properties and receive supracompetitive commissions regardless of their experience or the level of services they provide.

23. Plaintiff and the other Class and Subclass members have suffered significant monetary damages, each incurring thousands of dollars in excess commission fees, due to Defendant's engagement in the conspiracy.

24. Defendant's participation in the conspiracy has unreasonably restrained trade in violation of Section 1 of the Sherman Act (15 U.S.C. § 1), as well as Illinois antitrust and consumer protection laws, and the common law. Accordingly, Plaintiff, on his own behalf and on behalf of the Class and Subclass members, brings suit against the Defendant for these infractions, seeking treble damages, an order for injunctive relief, and reasonable attorneys' fees.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

## PARTIES

25. Plaintiff, James Tuccori, is a resident and citizen of Illinois. In 2018, Plaintiff purchased a home in Chicago using a buyer-agent affiliated with At World Properties, LLC. The home Plaintiff purchased was listed on a local MLS service that, on information and belief, was run by associations with boards of directors comprised entirely of NAR members who must adhere to NAR's guidelines and policies.

26. Defendant, At World Properties, LLC, is an Illinois limited liability company organized under the laws of Illinois with its principal place of business in Cook County, Illinois. At World Properties also has several offices in Cook County and transacts business in Cook County.

## JURISDICTION AND VENUE

27. This Court may assert personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States because Defendant is organized under the laws of this state, Defendant is doing business within this state, and because Plaintiff's claims arise out of Defendant's unlawful in-state actions, as Defendant's conduct as alleged herein emanated from its offices located within this state.

28. Venue is proper in in the Circuit Court of Cook County pursuant to 735 ILCS 5/2-101, because Defendant is doing business in Cook County and thus resides there under 735 ILCS § 5/2-102(a), and because the transactions or occurrences, or some part thereof, out of which Plaintiff's and the putative Class and Subclass members' claims arose occurred in Cook County.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

## COMMON FACTUAL ALLEGATIONS

**A. Broker Compensation in Real Estate Transactions is Opaque for Buyers.**

29. For the vast majority of residential real estate transactions, brokers and agents on the buy and sell sides are paid based on a percentage of the property's sale price.

30. State laws control who can represent sellers and buyers in real estate transactions. There are two types of licenses: (1) for real estate brokers (or brokerage firms such as Defendant), and (2) for individual agents (such as Defendant's employees). Only licensed brokers can legally be paid for representing buyers or sellers in real estate deals, according to state law. So all real estate contracts and payments are made to brokers, not agents. Brokers then pay their agents and are legally responsible for their agents' actions.

31. A typical home sale begins with a homeowner (seller) entering into a contract with a seller-broker whereby the seller typically agrees to pay the seller-broker 6% in total commissions for facilitating the sale of the home. When the seller-broker lists the house on the MLS, they typically make a unilateral offer of 3% commission to any buyer-agent that can bring a buyer to the table to complete the sale.

32. When the house is purchased, the buyer pays the purchase price into an escrow account where it is then paid to the seller, less the commissions, which are paid to the seller-broker and the buyer-broker.

33. Because the escrow company distributes the commission, buyers often don't realize that they're effectively sharing the commission cost with the seller. Moreover, during the relevant time period, as part of the conspiracy alleged herein, NAR's Code of Ethics encouraged buyer-

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

agents to represent that their services are "free."[10] In reality, however, buyers pay for these "free" services through higher purchase prices and elevated commission rates.

**B. Home Buying in America Runs Through NAR and its Conspirators Like Defendant, Who Dominate the MLSs.**

34. According to its website, NAR is the largest trade group in the U.S.[11] It includes over 1.5 million members in the real estate field including real estate agents, brokers, managers, and appraisers. Being a NAR member carries benefits like insurance, access to property listings on preferred MLSs, training, and more.

35. NAR promulgates and enforces rules and policies that its members follow in real estate transactions. On a yearly basis, NAR issues its Handbook on Multiple Listing Policy which requires, *inter alia,* that NAR members align their policies with those set by NAR's board of directors. Regional brokerages and MLSs abide by these rules, and real estate agents must likewise obey them.

36. In 2020, NAR reported that nearly 90% of buyers used a broker to buy a home.

37. Both the supply and demand side of the residential real estate market rely on MLSs. Buyer-agents use MLSs to find real estate listing information. And if a seller's broker doesn't list a property on an MLS, many buyer-agents will not show it to their clients.

38. Numerous additional entities, including NAR-affiliated MLSs, real estate brokerages, and local realtor associations, although not listed as defendants in this case, have actively engaged with Defendant and NAR as co-conspirators. In particular, each of the local realtor associations responsible for owning and managing NAR MLSs consented to, adhered to, and executed the "Mandatory Commission Rule." This rule mandates that a seller-broker must

---

[10] NAR Code of Ethics 2018, at p. 10 Standard of Practice 12-2.

[11] https://www.nar.realtor/

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

define a fixed, unilateral commission for the buyer-broker, which is to be disbursed upon the sale of the property, either as a specific dollar value or as a percentage of the sale price.

39. The NAR MLSs, along with others, have been active co-conspirators in the offenses detailed herein, executing actions that promote these violations. This includes the adoption of the Mandatory Commission Rule within their respective rules and regulations.

40. Defendant specifically complied with and implemented the Mandatory Commission Rule in Illinois. In addition, other brokers in Illinois have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

41. Defendant is liable for the acts of its co-conspirators, whether named or not named as defendants in this Complaint.

42. Defendant and its co-conspirators have significant market power. They collectively control the primary MLSs and have a major share of many local and national markets. For instance, with respect to Illinois, Defendant self-describes as "a driving force in Chicago real estate and beyond" and otherwise markets itself as "one of the nation's largest brokerage firms."[12]

43. Defendant and its co-conspirators dominate the buyer-agent services market. The relevant geographic market is the set of regions in which MLSs in which Defendant participates are active. This market includes the market for services provided to homebuyers by residential real estate brokers with access to MLSs in which Defendant operates. Defendant and its co-conspirators, by controlling the MLSs, can enforce the Mandatory Commission Rule and other anti-competitive NAR rules on Class members, Subclass members, and other market participants. Access to MLSs is vital for brokers to compete and work with homebuyers in those areas.

[12] https://www.atproperties.com/chicagoland/pages/about-us

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

Defendant, through its co-conspirator franchisees and other affiliates, provides a significant portion of the residential real estate broker services in the following areas: Texas, Illinois, Iowa, Wisconsin, Michigan, Indiana, and Washington, D.C.

44. Buyer-brokers operating in regions covered by the primary MLSs would face overwhelming obstacles if they tried to compete outside of the MLSs. Due to Defendant's and its co-conspirators' dominance over the MLSs, brokers not involved in the conspiracy would have to create a new listing service to rival the conspirators or try to compete without one. Seller-brokers not using an MLS would miss out on most potential buyers, while buyer-agents not using an MLS would miss out on most sellers. Essentially, without access to a listing service, brokers cannot compete effectively.

45. To effectively rival a NAR MLS, any new listing service must offer as extensive a range of listings. Brokers and their agents, who benefit from high buyer-agent commissions, have little reason to join a new service that could lead to increased competition and reduced commissions. Moreover, many buyers would hesitate to hire agents from such a service, especially since buyer agents on NAR MLSs claimed their services were free to buyers and fully paid by sellers during most of the relevant time period. Consequently, seller-brokers on alternative services would find it hard to attract agents and their clients. Also, buyer-agents would be wary of using a service with fewer property options. Hence, a listing service trying to compete with a NAR MLS would likely struggle to gather enough listings to be profitable and challenge the established MLSs. The current lack of competitive listing services indicates significant entry barriers.

46. To further limit competitive pricing pressure, NAR recommends that MLSs include non-compete clauses as a vital part of their agreements with third-party listing websites like Zillow seeking MLS data access. According to NAR's list of "critical components," such non-compete

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

agreements should ensure that the third-party website agrees not to rival brokerage firms like Defendant or MLSs by either turning into a licensed brokerage or offering cooperation and compensation deals. NAR also recommends that these agreements should prevent the third-party website from using the data in ways that mirror the functions of an MLS. Therefore, as part of the conspiracy, NAR advises MLSs to actively work to stop third-party websites from emerging as competitors.

**C. Defendant and its Conspirators Have Adhered to NAR's Anti-competitive Rules, Regulations, and Standards of Practice.**

47. NAR suppresses competition in a number of ways, primarily through requiring buyer-agents and seller-brokers to conform to NAR's regulations as a condition of membership. NAR's Handbook, Code of Ethics, and Standards of Practice enforce various rules, policies, and practices on all NAR members, including NAR MLSs and Defendant.

48. As NAR's Code of Ethics specified during the relevant time period: "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."[13]

49. Furthermore, the NAR's Handbook on Multiple Listing Policy stipulates that association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program.[14]

---

[13] NAR Code of Ethics 2018, at p. 241 Section 2.

[14] NAR MLS Handbook 2018 at p. 161; NAR MLS Handbook 2023, at p. 169.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

50. NAR empowers its MLSs to fine, suspend, and revoke the membership of MLS users that do not comply with NAR regulations. Given the commercial necessity of access to the NAR MLSs, brokers and agents are compelled to adhere to these mandatory provisions. Without access to local MLSs, a broker or agent would be incapable of listing or viewing properties for sale in the centralized database.

51. To ensure that its rules are being followed, NAR also conducts examinations of the governing documents of its local realtor associations to verify their adherence to its rules. Further, NAR obligates its local realtor associations to prove their compliance with these rules by periodically submitting their governing documents to NAR for evaluation.

52. NAR offers many benefits to its realtor associations and the MLSs they own, including professional liability insurance. To qualify for this insurance, however, realtor associations and their MLSs must adhere to the mandatory provisions in the Handbook on Multiple Listing Policy. NAR withholds these insurance benefits from realtor associations and MLSs that fail to comply with its mandatory provisions. Indeed, NAR's Handbook currently reads: "[t]hose associations or multiple listing services found by the National Association to be operating under bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."[15]

53. During the relevant time period, NAR's rules and policies have included numerous collusive and anti-competitive requirements: (i) the Mandatory Commission Rule; (ii) rules preventing the disclosure to buyers of the total broker commissions in a home sale ("Commission Concealment Rules"); (iii) policies limiting the ability of sellers and seller-brokers to change the commissions offered to buyer-agents after a purchase offer is made ("Non-Modification Rules");

[15] NAR MLS Handbook 2023, at p. 8 Policy Statement 7.17

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

(iv) policies that allow and encourage buyer-agents to inform homebuyers that their services come at no cost ("Free-Service Rule"); (v) guidelines enabling buyer-agents to filter MLS listings based on commission levels ("MLS Manipulation Practices"); and (vi) a policy restricting access to key-holding lockboxes to NAR members only ("Lockbox Policy").[16]

54. NAR and its affiliates maintain a defined arrangement: Members can join the MLS and receive benefits from NAR and NAR MLSs, but only if they commit to follow and implement the anti-competitive restraints outlined in NAR's rules, practices, and policies. As a result, the implementation and enforcement of these guidelines by NAR and NAR MLSs constitute coordinated actions among parallel competitors, forming agreements among (should-be) rival real estate brokers. These agreements diminish price competition among brokers, resulting in increased costs and lesser service quality for American homebuyers.

55. Defendant has played a pivotal role in the conspiracy described above by, among other things: mandating that its employees, franchisees, and the agents working under them adhere to NAR rules, including the anti-competitive rules listed above; and exerting influence over local realtor associations by, for instance, requiring adoption of NAR's rules, such as the Mandatory Commission Rule.

56. Defendant's rules and policies require its franchisees and agents to (1) adhere to NAR's Code of Ethics; (2) become members of and follow local realtor association rules; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

---

[16] Numerous of these anti-competitive rules were implicated in the DOJ's investigation of NAR. https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recommend,commission%20offered%20to%20buyer%20brokers.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

**D. The Mandatory Commission Rule, Commission Concealment Rule, and Anti-Modification Rule are Unreasonable Restraints on Trade.**

57. During the relevant time period, and to this day, the Mandatory Commission Rule reads: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants."[17]

58. The Mandatory Commission Rule has further stated throughout the relevant time period that: "multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[18]

59. This practice has been widely, if not universally, adopted. Indeed, nearly every MLS in the U.S. requires listing brokers to extend a blanket offer of compensation to buyer-agents.

60. The Mandatory Commission Rule prevents buyer-agents from competing on terms such as price and service quality. Therefore, the Mandatory Commission Rule curtails competition in the market for buyer-agent services, adversely affecting homebuyers in various ways.

61. Moreover, because NAR and its members provide blanket, unilateral, unconditional commissions, brokers have little incentive to compete in terms of service quality to earn higher commissions. For instance, new brokers who have only recently obtained their licenses can charge the same rates as seasoned, highly skilled brokers. Similarly, when broker commissions are based on a percentage of the gross selling price, a buyer-agent assisting in an $800,000 home purchase

---

[17] NAR MLS Handbook 2018, at p. 65 Section 5; NAR MLS Handbook 2023, at p. 69 Section 5.

[18] NAR MLS Handbook 2018, at p. 35 Section 5; NAR MLS Handbook 2023, at p. 40 Section 5.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

could earn potentially double compared to one assisting in a $400,000 home purchase, irrespective of whether the higher compensation matches the level and nature of services rendered.

62. This practice has drawn the ire of consumer watchdog organizations. Indeed, the Consumer Federation has called brokers "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive."[19] But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."[20]

63. The Mandatory Commission Rule lacks any pro-competitive rationale. Before the early 1990s, all brokers either represented sellers or were subagents of those representing sellers. Under this almost universal sub agency system brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers. Because nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing (i.e., seller's) broker, the seller's broker, who received payment from the seller, would then remunerate the subagent assisting the buyer.

64. But with the advent of brokers representing buyers directly, payment of buyer-agents' commissions from the total commission is no longer justified. Real estate industry insiders have conceded that the practice of seller-brokers dictating the fees that buyer-agents charge to their own clients should be recognized as potentially fixing market prices. There is no pro-competitive justification for allowing seller-brokers to determine the default commissions charged by

---

[19] Testimony of Stephen Brobeck, *Residential Real Estate Brokerage Services: a Cockamamie System that Restricts Competition and Consumer Choice*, CONSUMER FED'N OF AM., at 3-4 (July 25, 2006), available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf.

[20] Stephen Brobeck and Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., at 4 (June 2006), available at https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

competing buyer-agents to their clients. Rather, removing inter-broker compensation would reduce brokers' ability to impede price competition, likely resulting in a significant decrease in broker commissions.

65. The reason for the Mandatory Commission Rule is clear: to maintain high broker commissions for NAR members at the expense of homebuyers. In the absence of the Rule, buyers rather than sellers would negotiate buyer-agent commissions, and brokers would compete with one another by offering lower commission rates and/or higher quality services.

66. The Commission Concealment Rules protect the Mandatory Commission Rule and exacerbates its anti-competitive effects. These rules bar disclosure of the offered buyer-agent commission to potential buyers.

67. The Commission Concealment Rules are laid out in several places in NAR's current Handbook and in those during the relevant time period, including Policy Statement 7.23, which states: "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."[21]

68. Hence, while buyer-agents are aware of the commission they'll receive if their client buys a property, NAR MLSs keep this fee hidden from the homebuyers who ultimately pay the commission through the property's purchase price.

69. At the same time, NAR rules require brokers to share pricing information among themselves. This kind of unilateral information sharing agreement is collusive and further diminishes the incentive for buyer-agents to compete on pricing, whether by offering rebates or

[21] NAR MLS Handbook 2018, at p. 34 Section 1 Policy Statement 7.23; NAR MLS Handbook 2023, at p. 40 Section 1 Policy Statement 7.23

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

accepting reduced commissions. It also promotes and facilitates the setting of consistently high commission rates by brokers, leading to increased costs for buyer-agent services. Moreover, because buyers are unable to view commission offers, they are unable to identify when they are being steered towards a property with a high commission. As explained below, this type of steering leads to higher prices and diminishes the quality of services provided by buyer-agents to homebuyers.

70. NAR's ethical rules explicitly forbid buyer-agents from attempting to decrease the buyer-agent commissions listed on MLSs when submitting purchase offers ("Non-Modification Rules"). Therefore, even if a homebuyer were able to access sufficient information to negotiate a reduced buyer-agent commission, NAR's rules wouldn't allow such negotiations. Although NAR frequently claims in litigation that brokers can purportedly negotiate their fees at any point in the transaction, NAR's Standard of Practice 16-16 currently states:

> REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[22]

71. In other words, a buyer-agent cannot even present an offer to a seller that is conditional on the seller reducing the buyer-agent commission without violating the NAR's ethics rules. This does nothing but unreasonably restrain homebuyers to the benefit of NAR members such as Defendant.

72. When buyer-agents do try to alter buyer-agent commissions, NAR advises them to initiate these modifications before they even show the property to prospective buyers. By obliging

---

[22] NAR Code of Ethics 2018, at Standard of Practice 16-16; NAR Code of Ethics 2023, at Standard of Practice 16-16.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

buyer-agents who are open to reducing their commissions to seek these reductions before showing the property to a potential buyer, NAR effectively shuts down most negotiation over the buyer-agent commission. To adhere to this, a buyer-agent would have to independently approach a seller-broker to negotiate a cut in their own commission, even before their client has viewed the potential home. In practice, this is unlikely to occur because it would require buyer-agents to proactively approach seller-brokers and negotiate commissions where no buyer has yet been identified. As NAR knows, this will be seen by most individuals as a speculative waste of time.

73. NAR's rules also limit the negotiation of the buyer-agent commission by stipulating that once the seller has received purchase offers, the seller-broker is not allowed to unilaterally alter the buyer-agent commission originally offered on the MLS. This is outlined in NAR Standard of Practice 3-2, which states:

> Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction.[23]

74. Consistent with NAR's rule, the Midwest Real Estate Data Rules and Regulations, for example, state that a listing broker may only offer a buyer-agent compensation that differs from the compensation indicated on the listing if the seller-broker "informs the other broker in writing or in accordance through the Service in advance of his producing an offer to purchase . . . ."[24]

---

[23] NAR Code of Ethics 2018, at Standard of Practice 3-2; NAR Code of Ethics 2023, at Standard of Practice 3-2.

[24] Section 5: Division of Commissions, Rules and Regulations, Midwest Real Estate Data, MRED Quick Reference Guide. (Revised Feb. 2019), https://ww2.mredllc.com/wp-content/uploads/2018/07/MRED-Rules-and-Regulations.pdf.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

75. NAR further restricts negotiation by deeming it unethical for a buyer-agent to suggest that the buyer directly negotiate with the seller to lower commissions. Given that most homebuyers have little to no understanding of this market and are under the impression that the buyer-agent's services are "free," this limitation additionally curbs negotiations concerning buyer-agent commissions.

**E. The Free-Service Rule and MLS Manipulation Practices Allow Defendant and its Co-Conspirators to Dominate the Homebuying Process and Improperly Steer Homebuyers to Higher-Commission Properties.**

76. During the relevant time period, Defendant and its brokers also adopted NAR's Free-Service Rule, which encouraged buyer-agents to mislead buyers into thinking that the buyer-agent's services are free when actually they are not.

77. During the relevant time period and until January 2021, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer-agents governed by NAR are technically paid out of funds paid to the seller-broker, those buyer-agents can misleadingly tell their buyer clients that their services are "free." As a result, homebuyers think they are paying nothing for buyer-agent services, when in reality the buyer-agent's commissions are incorporated into the purchase price of the home.

78. Because buyers were led to believe that they were not paying for brokerage services, they were not inclined to negotiate for a lower buyer-agent commission or seek out or discover appealing rebate offers or other discounts from buyer-agents. As such, NAR's Free-Service Rule contributed to elevated costs for services rendered by buyer-agents.

79. NAR's MLS Manipulation Practices are yet another set of rules that hinder competition and contribute to elevated commissions.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

80. During the relevant time period, NAR's MLS Manipulation Practices enabled buyer-agents to curate MLS listings according to the amount of buyer-agent commissions being offered. Additionally, some MLSs even allow buyer-agents to exclude homes from potential homebuyers when they offer lower commissions, despite meeting the buyer's search requirements.

81. For instance, during the relevant time period, Policy Statement 7.58 in NAR's Handbook read: "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers."[25]

82. The MLS Manipulation Practices, adopted by Defendant and NAR MLSs during the relevant time period, aid in steering by enabling buyer-agents to selectively hide from potential homebuyers those property listings that offer lower buyer-agent commissions. This practice, which has since been repealed,[26] diminished the quality of services provided by buyer-agents and increases the cost of these services for homebuyers.

**F. The Lockbox Policy Shuts out Competitors.**

83. Further reducing competition for buyer-agent services, NAR and its member brokers also restrict physical access to listed properties through the use of lockboxes that are available only to real estate brokers who are part of a NAR MLS. These brokers, with the consent of the sellers, store keys to the homes listed for sale in lockboxes, enabling them to grant potential buyers access to the properties while ensuring their security. Access to these lockboxes is controlled by real estate brokers using either a numerical code or a digital Bluetooth 'key' which is not provided to non-members of NAR.

84. NAR and NAR MLSs have implemented a set of rules (outlined in the NAR

[25] NAR MLS Handbook 2018, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4.

[26] NAR MLS Handbook 2023, at p. 23 Policy Statement 7.58; P. 87 Section 18.2.4.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

Handbook, Policy Statement 7.31) that limit lockbox access solely to real estate brokers who are members of NAR and subscribe to the NAR MLS.[27] Brokers not affiliated with NAR are denied access to these lockboxes, preventing them from showing their clients homes listed for sale, which in turn diminishes competition in the realm of buyer-broker services.

**G. The Conspiracy Harms Homebuyers.**

85. These rules and practices have collectively functioned to sustain elevated commission rates and deteriorate the quality of services that homebuyers receive from buyer-brokers. These regulations have led to increased buyer-broker commissions despite technological advancements and other changes that should have noticeably decreased commissions. Additionally, they have considerably hindered the capacity of more cost-effective alternatives to foster a more competitive market.

86. There is no pro-competitive benefit to the conspiracy. Defendant and its co-conspirators have effectively maintained and significantly raised the financial costs of buyer-broker commissions, despite the diminishing role of such buyer-brokers due to the emergence of third-party listing websites. NAR data indicates that many homebuyers now prefer to search for prospective homes independently through online services, rather than with a broker's help, and buyer-brokers are increasingly engaged only after their client has identified the desired home. Yet, despite the reduced involvement of buyer-brokers, buyer-agents still receive the same artificially high commission due to the conspiracy among Defendant and other brokers.

87. The conspiracy between Defendant and other brokers has had many anti-competitive effects, including:

a. Homebuyers have incurred elevated buyer-broker commissions and total

---

[27] NAR MLS Handbook 2018, at p. 36 Policy Statement 7.31; NAR MLS Handbook 2023, at p. 41 Policy Statement 7.31.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

commissions, which are integrated into the purchase price of their homes;

b. Seller-brokers are disinclined to offer commissions below market rate for fear that the seller's house will not be shown;

c. The engagement of a buyer-broker has become disconnected from the determination of the broker's commission; while the homebuyer hires the buyer-broker, the home seller determines the buyer-broker's compensation;

d. There has been a suppression of price competition among brokers for retention by homebuyers;

e. Home buyers' competitive ability has been hindered due to their inability to compete for home purchases by reducing the buyer-broker commission;

f. The quality of services provided by buyer-brokers has declined, as they are motivated to direct their clients towards homes offering higher commissions;

g. The quality of buyer-broker services has further deteriorated due to obstacles that impede buyer-brokers from presenting and receiving purchase offers that lower the buyer-broker commission, thereby making these offers more appealing and acceptable to sellers; and

h. Brokers have significantly increased their profits by obtaining inflated buyer-broker commissions and total commissions.

88. Defendant and its co-conspirators have not only maintained but, in terms of inflation-adjusted dollars, significantly increased the fees charged by buyer-brokers, a situation that markedly contrasts with trends in other industries. In almost every consumer sector — including bookselling, retail, home appliances, insurance, banking, and stock brokering — the emergence of technology and the proliferation of internet and discount sellers has tremendously benefited customers financially. Economists refer to this reduction of transaction costs as "disintermediation." The real estate brokerage market, worth approximately $70 billion annually, is particularly suited for such a transformation. Yet, despite the technological advancements that have diminished the role of brokers and the considerable fluctuations in housing market prices, brokerage fees have not adapted to these changes. This resilience, or "stickiness" in commissions

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

is attributable to the collusive conspiracy alleged herein.

89. There is also a notable discrepancy between buyer-broker costs and the commissions they earn. In a competitive market, pressure from and among competitors forces prices toward the marginal cost of goods (or services) sold. However, this pattern is not evident in real estate brokerage fees. For instance, the costs incurred by buyer-brokers are generally consistent, and have trended downward with technology, irrespective of the home's price. As noted by the Wall Street Journal, “many, if not most, of the services that Realtors provide don’t vary with the sales price, so the percentage fee should fall as home price rises.” Contrary to this expectation, broker commissions remain disconnected from the amount, quality, and value of the services provided.

90. Even if there were any plausible pro-competitive effects of Defendant’s and its co-conspirators’ conspiracy, those effects would be substantially outweighed by the conspiracy’s anti-competitive effects.

91. There is considerable economic evidence that Defendant’s and its co-conspirators’ conspiracy has inflated buyer-broker commissions and total commissions to well above a competitive level nationwide.

92. The conspiracy among Defendant and its co-conspirators has consistently kept broker commission rates at exceptionally stable and elevated levels over the past two decades. This trend persists despite the emergence of the internet and the reduced role of buyer-brokers. From 2000 to 2017, the average national commission rate remained consistently high, between 5% and 5.4%, irrespective of varying market conditions.

93. Housing prices in many areas have risen significantly recently, surpassing the rate of inflation. Given that commissions are calculated as a percentage of a home’s sale price, the real

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

dollar value of commissions has substantially increased alongside the price of homes. "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics." [28]

94. As the Consumer Federation of America points out: "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[29]

95. The typical total broker commissions (i.e., the combined commission for the seller-broker and buyer-broker) in regions with NAR MLSs range from 5% to 6%, markedly higher than in countries with competitive residential real estate brokerage markets. In their 2002 study "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," economists Natalya Delcoure and Norm Miller observed: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%."[30]

96. Delcoure and Miller also noted variations within countries. For instance, in the

---

[28]*Comments of Stephen Brobeck, Executive Director Consumer Federation of America Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues*, CFA, 2 n.4 (June 5, 2018), https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC-publicworkshop-on-competition-issues.pdf.

[29] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.

[30] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INTL. REAL ESTATE REV. 12, 14 (2002).

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

United Kingdom, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5- 0.75%; in low priced areas [for homes] as high as 3.5%."[31] Ultimately, they concluded that, "[b]ased on global data . . . [total] US residential brokerage fees should equal something closer to 3.0%."[32] That is approximately <u>half</u> of what such fees are now.

97. Indeed, economists Chang-Tai Hsieh and Enrico Moretti have proposed that competition could potentially eliminate over half of the current commission rates. [33]

98. The conspiracy to restrict price competition for commissions has had a significant negative economic impact. The Consumer Federation of America noted, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[34] This suggests that the current uniform commission rates are maintained by the lack of individual negotiation and competition.

99. The extent and significance of the overcharges at issue in this case have resulted in a tremendous economic burden for the putative class members and other consumers. Experts have estimated that consumers could save approximately $30 billion or more each year if there were price competition among brokers. [35]

**H. Due to Defendant's Concealment of the Conspiracy and Plaintiff's Reasonable Lack of Knowledge Thereof, the Statute of Limitations has Been Tolled.**

100. In the years leading up to the filing of this Complaint, Defendant continuously engaged in anti-competitive behavior. This includes the implementation and enforcement of the

---

[31] *Id.* at 17.

[32] *Id.* at 29.

[33] *See* Chang-Tai Hsieh & Enrico Moretti, *Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry*, 111 J. POL. ECON. 1076, 1116 (2003).

[34] Brobeck & Woodall, *Supra* n.6.

[35] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure (Abridged)*, 5 CORNELL REAL ESTATE REV. 26, 26 n.1 (2007).

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

Mandatory Commission Rule and other anti-competitive NAR rules. Defendant continues many of these practices to this day.

101. As a result of its conspiracy, Defendant has consistently charged and collected, and continues to charge and collect, excessive buyer-broker commissions and total commissions. These were paid by Plaintiff and the other Class and Subclass members in connection with their purchase of residential real estate. Every instance of paying these inflated commissions by the Plaintiff and the Class and Subclass members during the class period resulted in harm to them and created a new cause of action. Plaintiff and the other Class and Subclass members had no knowledge of Defendant's unlawful conspiracy and could not have discovered it by the exercise of due diligence until, at the earliest, November 19, 2020, the date the DOJ announced the settlement of its antitrust claims against NAR.

102. It was reasonable for Plaintiff and the Class and Subclass Members not to suspect Defendant of engaging in illegal anti-competitive conduct. Plaintiff and the members of the Class and Subclass, as typical homebuyers, lack extensive knowledge or insights about the real estate industry and are not familiar with NAR's operations. Furthermore, as explained above, NAR's policies, rules, and practices explicitly forbid revealing the total broker commissions to homebuyers and encourage buyer-brokers to convey to their clients that they are receiving the brokers' services at no cost. Consequently, the average homebuyer is not aware that they are incurring costs for buyer-broker services, much less that Defendant is conspiring to uphold excessively high broker commissions.

103. For these reasons, the statutes of limitation applicable to Plaintiff's and the other Class and Subclass members' claims have been tolled with respect to the claims asserted herein.

104. Additionally, or alternatively, application of the doctrine of fraudulent concealment

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

tolled the statutes of limitation on Plaintiff's and the Class and Subclass members' claims until at least November 19, 2020.

105. Defendant actively concealed the conspiracy by, for example, prohibiting the disclosure of total commissions to homebuyers and encouraging brokers to represent to homebuyers that their services are free of charge.

106. Moreover, Defendant's anti-competitive behavior was intrinsically self-concealing given NAR's strict control over its regulated MLSs, agents, and brokers. A reasonable buyer, under the circumstances, would not have had grounds to suspect exposure to anti-competitive actions. The policy that prevents NAR MLSs from disclosing to prospective buyers the commission a buyer-broker will receive for a home purchase on the MLS naturally hides the conspiracy's existence. Similarly, practices that allow buyer-agents to falsely claim their services are complimentary to buyers, and actions by the Defendant to filter MLS listings based on buyer-broker commission levels and exclude homes offering lower commissions, are also inherently self-concealing.

## CLASS ALLEGATIONS

107. Pursuant to 735 ILCS 5/2-801, Plaintiff brings this action on his own behalf and on behalf of a Class (the "Class") and Subclass (the "Subclass") of similarly situated individuals defined as follows:

> **Nationwide Class:** All persons who, from March 17, 2000 through the present, purchased in the United States residential real estate listed on a NAR MLS in a transaction with a buyer-agent and/or seller-agent employed by or otherwise affiliated with Defendant or any of its franchisees, subsidiaries, agencies, or otherwise affiliated entities.
>
> **Illinois Subclass:** All persons who, from March 17, 2000 through the present, purchased in the state of Illinois residential real estate listed on a NAR MLS with a buyer-agent and/or seller-agent employed by or otherwise affiliated with Defendant or any of its franchisees, subsidiaries, agencies, or otherwise affiliated entities.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

108. Expressly excluded from the Class and Subclass are any members of the judiciary assigned to preside over this matter and their staff; Plaintiff's counsel and Defendant's counsel; any officer, director, or employee of Defendant and its affiliates; and any immediate family members of such officers, directors, or employees.

109. On information and belief, there are at least tens of thousands, if not hundreds of thousands, of members of the Class and Subclass, making the members of the Class and Subclass so numerous that joinder of all members is impracticable. Although the exact number of Class and Subclass members is unknown to Plaintiff, the members can easily be ascertained through Defendant's records.

110. Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the other members of the Class, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the other members of the Class and Subclass.

111. Plaintiff's claims are typical of the claims of the other members of the Class and Subclass, in that the factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class and Subclass are the same. Plaintiff and the other members of the Class and Subclass have all suffered similar harms and damages as a result of Defendant's collection of unlawfully excessive commissions.

112. There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Class include, but are not limited to:

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

a. Whether Defendant conspired with its co-conspirators as alleged herein;

b. Whether the conspiracy harmed competition as alleged herein;

c. Whether homebuyers were harmed as a result of Defendant's anti-competitive conduct as alleged herein;

d. Whether buyer-agent commissions were inflated as a result of the conspiracy;

e. Whether the quality of buyer-agent services was diminished as a result of the conspiracy;

f. Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

g. Whether Defendant committed deceptive acts under the ICFA by representing to the members of the Subclass that buyer-agent fees were free, paid by the seller, or otherwise not ultimately paid by the buyer;

h. Whether Defendant should be enjoined from engaging in such conduct in the future;

i. The appropriate class-wide measures of damages; and

j. Whether Defendant should be ordered to disgorge all unlawful fees collected by it or on its behalf during the applicable limitations period.

113. This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and joinder of all members of the Class and Subclass is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision making.

114. Absent a class action, most members of the Class would find the cost of litigating their claims to be prohibitive and would have no effective remedy. Unless the Class is certified,

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

Defendant will retain the monies it received from the members of the Class as a result of its unfair and deceptive conduct.

**COUNT I**
**Section 1 of the Sherman Act, 15 U.S.C § 1**
**(On Behalf of the Plaintiff and the Class)**

115. Plaintiff realleges and incorporates by reference each of the foregoing allegations as though stated herein.

116. Beginning in at least 2000, Defendant engaged in a continuing contract, combination, or conspiracy to unreasonably restrain interstate trade and commerce in violation of Section 1 of the Sherman Act, 15 U.S.C § 1.

117. The misrepresentation as to the payment of brokerage commissions and the increased price of houses sold is an actual and proximate cause of harm to homebuyers. The contract, combination, or conspiracy alleged herein has consisted of continuing agreements among Defendant and its co-conspirators to set, raise, and maintain the level of broker commissions.

118. In furtherance of the contract, combination, or conspiracy, Defendant and its co-conspirators have committed one or more of the following overt acts:

a. participated in the establishment, maintenance, and implementation of the Mandatory Commission Rule and other anti-competitive NAR rules;

b. participated in the establishment, maintenance, and implementation of rules by NAR associations and MLSs that implemented the Mandatory Commission Rule and other anti-competitive NAR rules; and

c. used their control over the NAR MLSs to force affiliated brokers, members, and franchisees to implement and adhere to the Mandatory Commission Rule and other anti-competitive NAR rules in the areas in which the NAR MLSs operate.

119. Defendant's conspiracy has caused buyer-agents to conceal total commissions, to misrepresent to buyers that buyer-agents' services are free, to steer homebuyers towards high

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

commission listings, and to diminish the value of buyer-agent services by restraining competition on buyer-agent commission fees in the home buying process. Defendant's conspiracy has also had the effect of excluding non-NAR-affiliated brokers from competing in the market for buyer-agent services by restricting access to lockboxes, which is required in order for buyer-agents to show houses for sale to their clients.

120. Defendant's conspiracy has also reduced competition among buyer-agents, thereby requiring buyers to pay inflated prices for their homes and inflated buyer-agent commissions. Reduced price competition among buyer-agents has also reduced the quality of broker services provided to homebuyers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

121. Plaintiff and the other Class Members paid inflated home purchase prices and broker commissions throughout the class period in connection with the purchase of residential real estate listed on the NAR MLSs. Absent Defendant's conspiracy, Plaintiff and the other class members would have paid lower prices for their homes and lower commissions.

122. Plaintiff and Class Members also received diminished services from buyer-agents as a result of the conspiracy. Absent this conspiracy, Plaintiff would have received improved services in negotiating and reducing the purchase prices of their homes.

123. As a direct and proximate result of Defendant's past and continuing violations, Plaintiff and Class Members have been injured in their business and property.

124. Plaintiff and the members of the Class are entitled to an injunction against Defendant, preventing and restraining the violations alleged herein, and to damages as permitted by law for the injuries they suffered as a result of Defendant's anti-competitive conduct.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

125. Accordingly, with respect to Count I, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

**COUNT II**
**Commission-Fixing Conspiracy in Violation of the Illinois Antitrust Act**
**740 ILCS 10/1 *et seq.***
**(On Behalf of Plaintiff and the Illinois Subclass)**

126. Plaintiff realleges and incorporates by reference each of the foregoing allegations as though stated herein.

127. Beginning at least in 2000, Defendant engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Illinois for the purpose and with the effect of fixing, controlling, or maintaining the commissions paid to Defendant's buyer-agents. Defendant's conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Illinois.

128. Defendant's agreement to uphold NAR rules, policies, and procedures related to buyer-agent compensation is *per se* unlawful under 740 ILCS 10/3(1) because Defendant and its co-conspirators agreed to fix the commissions to be paid to buyer-agents. Defendant's commission-fixing conspiracy was not reasonably necessary to any separate, legitimate business purpose, transaction, or collaboration.

129. Defendant's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services within Illinois.

130. As a result of Defendant's unlawful conduct, Plaintiff and other members of the Subclass have been harmed by paying inflated prices for their homes and inflated buyer-agent commissions and by receiving lower quality or fewer services.

131. By engaging in the aforementioned conduct, Defendant intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

the Illinois Antitrust Act, 740 ILCS 10/1 *et seq*.

132. Plaintiff and the other Illinois Subclass members seek damages as permitted by law for the injuries they suffered as a result of Defendant's anti-competitive conduct.

133. Accordingly, with respect to Count II, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

**COUNT III**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.***
**(On Behalf of Plaintiff and the Illinois Subclass)**

134. Plaintiff realleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

135. Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act provides in relevant part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

136. Plaintiff and the other members of the Subclass are "consumers" within the meaning of Section 1(e) of the ICFA, because Defendant's business activities involve trade or commerce, are addressed to the market generally, and implicate consumer protection concerns.

137. Defendant's conduct in misrepresenting its buyer-agents' services as being provided free of charge to buyers is a deceptive practice in violation of Section 2 of the ICFA.

138. As explained above, Defendant misrepresented to Plaintiff and the other Subclass members that:

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

a. Its buyer-agents' services are provided free of charge to buyers;

b. Buyer-brokers' commissions are paid by the seller; and

c. Buyer-brokers' commissions must be paid uniformly regardless of the broker's experience, skill, or contribution to the homebuying process.

139. Additionally, Defendant deceptively omitted and concealed the amounts of buyer-agent commissions offered to potential buyer-agents on MLSs and concealed that its listing software steered buyers toward properties with higher buyer-agent commissions.

140. Defendant intended that Plaintiff and the other Subclass members rely on its misrepresentations. Indeed, Defendant knowingly and intentionally made the deceptive representations as to buyer-agent commissions in order to maintain the commissions at an artificially elevated rate.

141. Plaintiff and the other Subclass members did actually rely upon and were actually deceived by Defendant's misrepresentations. Plaintiff and the other members of the Subclass would have acted differently had they known that Defendant's buyer-agent were inflated, such as by, among other things, seeking out buyer-agents with discounted commissions or negotiating lower commission rates.

142. As a direct and proximate result of Defendant's anti-competitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiff and the Illinois Subclass Members have been harmed and suffered actual damages through payment of higher prices for their homes and inflated buyer-agent commissions in exchange for lower quality of services.

143. Further, Defendant's violations of the Sherman Act, 15 U.S.C § 1, and the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, constitute unfair business practices under the ICFA. Defendant's actions unfairly imposed additional, unlawful costs on Plaintiff and the other Subclass members in the form of elevated home prices and excessive buyer-agent commissions.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

Defendant's actions are thus oppressive, unethical, and unscrupulous, and have caused substantial injury to consumers.

144. Plaintiff brings this claim on his own behalf and on behalf of the other Subclass members pursuant to Section 10a of the ICFA, which permits Plaintiff to bring a private cause of action for the above violations and entitles Plaintiff and the other Subclass members to actual damages, injunctive relief, as well as costs and reasonable attorney's fees.

145. Accordingly, with respect to Count III, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiff and the Class)**

146. Plaintiff realleges and incorporates by reference each of the foregoing allegations as if fully set forth herein.

147. Defendant received benefits from Plaintiff and the Class members and unjustly retained those benefits at their expense. For example, Plaintiff and the Class Members paid supracompetitive commissions to agents employed by Defendant or its co-conspirators. Defendant's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to overpayments for buyer-agent commissions by Plaintiff and the Class members.

148. Additionally, Defendant promulgated and enforced anti-competitive rules, including the Mandatory Commission Rule, Commission Concealment Rules, Free-Service Rule, Non-Modification Rules, MLS Manipulation Practice and Lockbox Policy in order to raise, set, and maintain high commission rates and otherwise reduce competition in the market for buyer-agent services for its own gain, providing Defendant with economic, intangible, and other benefits.

FILED DATE: 12/8/2023 4:55 PM 2023CH09928

149. Defendant unjustly retained those benefits at the expense of Plaintiff and Class members because Defendant's conduct damaged Plaintiff and Class members, all without providing any commensurate compensation to Plaintiff and the Class.

150. The benefits that Defendant derived from Plaintiff and Class members rightly belong to Plaintiff and Class members. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

151. Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiff and Class members all unlawful or inequitable proceeds it received, and such other relief as the Court may deem just and proper.

152. Accordingly, with respect to Count IV, Plaintiff, individually and on behalf of the proposed Class, prays for the relief set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on his own behalf and on behalf of the other Class and Subclass members, prays that the Court enter an order:

A. Certifying the Class and Subclass proposed above, appointing Plaintiff as class representative of the Class and Subclass, and appointing the undersigned counsel as Class counsel;

B. Declaring that Defendant's actions, as set forth in this Complaint, violate Section 1 of the Sherman Act, 15 U.S.C. § 1;

C. Declaring that Defendant's actions, as set forth in this Complaint, violate the Illinois Antitrust Act and the Illinois Consumer Fraud and Deceptive Business Practices Act;

D. Awarding Plaintiff and the other members of the Class and Subclass all available damages and/or restitution in an amount to be determined at trial;

E. Awarding Plaintiff pre- and post-judgment interest;

F. Awarding Plaintiff his costs of suit, including reasonable attorney's fees and expenses;

G. Awarding Plaintiff and the Class and Subclass a permanent injunction to permanently enjoin and restrain Defendant from maintaining or re-establishing the same or similar anti-competitive rules, policies, or practices as those challenged in this action in the future; and

H. Awarding such further and additional relief as the Court may deem just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff requests a trial by jury of all claims that can be so tried.

Dated: December 8, 2023

Respectfully submitted,

JAMES TUCCORI, individually and on behalf of similarly situated individuals

By: */s/ Paul T. Geske*
One of Plaintiff's attorneys

Evan Meyers
Paul T. Geske
Brendan Duffner
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
emeyers@mcgpc.com
pgeske@mcgpc.com
bduffner@mcgpc.com

*Counsel for Plaintiff and the putative Class and Subclass*

ILND 44 (Rev. 04/13/16)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

James Tuccori, individually and behalf of similarly situated individuals

**(b)** County of Residence of First Listed Plaintiff: Cook County, Illinois
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Evan Meyers, Paul T. Geske, Brendan Duffner, McGuire Law P.C., 55 W. Wacker Drive, 9th Fl., Chicago, IL 60601

## DEFENDANTS

At World Properties, LLC

County of Residence of First Listed Defendant: Cook County, Illinois
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*

Robert J. Palmersheim, Molly K. McGinley, Honigman LLP, 155 N Wacker Dr Ste 3100, Chicago, IL 60606

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1 U.S. Government Plaintiff
- ☒ 3 Federal Question *(U.S. Government Not a Party)*
- ☐ 2 U.S. Government Defendant
- ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

**CONTRACT**
- ☐ 110 Insurance
- ☐ 120 Marine
- ☐ 130 Miller Act
- ☐ 140 Negotiable Instrument
- ☐ 150 Recovery of Overpayment & Enforcement of Judgment
- ☐ 151 Medicare Act
- ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- ☐ 153 Recovery of Veteran's Benefits
- ☐ 160 Stockholders' Suits
- ☐ 190 Other Contract
- ☐ 195 Contract Product Liability
- ☐ 196 Franchise

**REAL PROPERTY**
- ☐ 210 Land Condemnation
- ☐ 220 Foreclosure
- ☐ 230 Rent Lease & Ejectment
- ☐ 240 Torts to Land
- ☐ 245 Tort Product Liability
- ☐ 290 All Other Real Property

**TORTS**

**PERSONAL INJURY**
- ☐ 310 Airplane
- ☐ 315 Airplane Product Liability
- ☐ 320 Assault, Libel & Slander
- ☐ 330 Federal Employers' Liability
- ☐ 340 Marine
- ☐ 345 Marine Product Liability
- ☐ 350 Motor Vehicle
- ☐ 355 Motor Vehicle Product Liability
- ☐ 360 Other Personal Injury
- ☐ 362 Personal Injury - Medical Malpractice

**PERSONAL INJURY**
- ☐ 365 Personal Injury - Product Liability
- ☐ 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- ☐ 368 Asbestos Personal Injury Product Liability

**PERSONAL PROPERTY**
- ☐ 370 Other Fraud
- ☐ 371 Truth in Lending
- ☐ 380 Other Personal Property Damage
- ☐ 385 Property Damage Product Liability

**CIVIL RIGHTS**
- ☐ 440 Other Civil Rights
- ☐ 441 Voting
- ☐ 442 Employment
- ☐ 443 Housing/ Accommodations
- ☐ 445 Amer. w/Disabilities Employment
- ☐ 446 Amer. w/Disabilities Other
- ☐ 448 Education

**PRISONER PETITIONS**
- ☐ 510 Motions to Vacate Sentence

**Habeas Corpus:**
- ☐ 530 General
- ☐ 535 Death Penalty
- ☐ 540 Mandamus & Other
- ☐ 550 Civil Rights
- ☐ 555 Prison Condition
- ☐ 560 Civil Detainee - Conditions of Confinement

**FORFEITURE/PENALTY**
- ☐ 625 Drug Related Seizure of Property 21 USC 881
- ☐ 690 Other

**LABOR**
- ☐ 710 Fair Labor Standards Act
- ☐ 720 Labor/Management Relations
- ☐ 740 Railway Labor Act
- ☐ 751 Family and Medical Leave Act
- ☐ 790 Other Labor Litigation
- ☐ 791 Employee Retirement Income Security Act

**IMMIGRATION**
- ☐ 462 Naturalization Application
- ☐ 463 Habeas Corpus - Alien Detainee (Prisoner Petition)
- ☐ 465 Other Immigration Actions

**BANKRUPTCY**
- ☐ 422 Appeal 28 USC 158
- ☐ 423 Withdrawal 28 USC 157

**PROPERTY RIGHTS**
- ☐ 820 Copyrights
- ☐ 830 Patent
- ☐ 840 Trademark

**SOCIAL SECURITY**
- ☐ 861 HIA (1395ff)
- ☐ 862 Black Lung (923)
- ☐ 863 DIWC/DIWW (405(g))
- ☐ 864 SSID Title XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS**
- ☐ 870 Taxes (U.S. Plaintiff or Defendant)
- ☐ 871 IRS—Third Party 26 USC 7609

**OTHER STATUTES**
- ☐ 375 False Claims Act
- ☐ 376 Qui Tam (31 USC 3729 (a))
- ☐ 400 State Reapportionment
- ☒ 410 Antitrust
- ☐ 430 Banks and Banking
- ☐ 450 Commerce
- ☐ 460 Deportation
- ☐ 470 Racketeer Influenced and Corrupt Organizations
- ☐ 480 Consumer Credit
- ☐ 490 Cable/Sat TV
- ☐ 850 Securities/Commodities/ Exchange
- ☐ 890 Other Statutory Actions
- ☐ 891 Agricultural Acts
- ☐ 893 Environmental Matters
- ☐ 895 Freedom of Information Act
- ☐ 896 Arbitration
- ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- ☐ 950 Constitutionality of State Statutes

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☐ 1 Original Proceeding
- ☒ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation

## VI. CAUSE OF ACTION (Enter U.S. Civil Statute under which you are filing and write a brief statement of cause.)

15 U.S. Code § 1. Plaintiff alleges Defendant's actions violated § 1 of the Sherman

## VII. Previous Bankruptcy Matters (For nature of suit 422 and 423, enter the case number and judge for any associated bankruptcy matter previously adjudicated by a judge of this Court. Use a separate attachment if necessary.)

## VIII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

**DEMAND $**

CHECK YES only if demanded in complaint:

**JURY DEMAND:** ☒ Yes ☐ No

## IX. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE ____________ DOCKET NUMBER ____________

**X. This case** (check one box) ☒ Is not a refiling of a previously dismissed action ☐ is a refiling of case number _____ previously dismissed by Judge_____

DATE January 5, 2024 SIGNATURE OF ATTORNEY OF RECORD /s/ Robert J. Palmersheim

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF NextGen 1.7.1.1**
**Eastern Division**

James Tuccori
Plaintiff,
v.
At World Properties, LLC
Defendant.

Case No.: 1:24−cv−00150
Honorable Lindsay C. Jenkins

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, June 5, 2024:

MINUTE entry before the Honorable Lindsay C. Jenkins: The parties report that following their mediation, they have reached a tentative agreement for settlement, but additional time is needed to finalize that agreement. The case remains stayed, and the parties are to file a joint status report as to the progress of their settlement by August 5, 2024. Mailed notice. (jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, individually and on behalf of similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiffs*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Related with: |
| AT WORLD PROPERTIES, LLC, an Illinois Limited Liability Company, | ) | No. 24-cv-02399<br>No. 24-cv-03160<br>No. 24-cv-3356 |
| *Defendant*. | ) | No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |

**PLAINTIFFS' *UNOPPOSED* MOTION FOR PRELIMINARY APPROVAL OF CLASS SETTLEMENT, CERTIFICATION OF SETTLEMENT CLASS, APPOINTMENT OF CLASS REPRESENTATIVES AND SETTLEMENT CLASS COUNSEL, AND APPOINTMENT OF SPECIAL MASTER FOR MEDIATION**

Dated: October 13, 2025

Myles McGuire
Evan Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

[additional counsel listed on signature page]

# I. INTRODUCTION

Plaintiffs James Tuccori, Courtney Foregger, Kevin Cwynar, Dawid Zawislak, Michael D'Acquisto, and Alejandro Lopez a/k/a Aleandro Lopez (collectively, "Plaintiffs") hereby move for preliminary approval their proposed Class Settlement Agreement with the Settling Defendants.[1] Plaintiffs and Class Counsel are pleased to report that this Settlement could favorably resolve on a nationwide basis Plaintiffs' claims for damages and injunctive relief against thirteen Defendants named in seven related cases before this Court.[2] This Settlement comes after numerous mediations and months of complex negotiations overseen by the Hon. James F. Holderman (Ret.), former chief judge of the Northern District of Illinois.

The claims in each of the related cases arise out of an alleged antitrust conspiracy among the National Association of REALTORS® ("NAR") and real estate brokers and franchisors. Plaintiffs allege that the NAR promulgated anticompetitive rules designed to keep brokers' commissions artificially elevated, and that the Defendants and their co-conspirators adopted, implemented, and enforced those unlawful restraints in residential real estate transactions. This conspiracy allegedly impaired competition in the market for residential real estate broker services nationwide to the detriment of homebuyers, who unwittingly paid the inflated commissions as part of their respective home purchases.

With the assistance of Judge Holderman, Plaintiffs have negotiated an early "icebreaker"

---

[1] Unless stated otherwise, capitalized terms used in this Motion are intended to be interpreted in accordance with the definitions in Parties' Settlement Agreement, a true and accurate copy of which is attached hereto as Exhibit A.

[2] The related cases include: *Tuccori v. At World Properties, LLC*, 1:24-cv-00150; *Maslanka et al. v. Baird & Warner, Inc.*, No. 1:24-cv-02399; *Hartz v. Real Estate One, Inc.*, No. 1:24-cv-03160; *Wallach et al. v. Silvercreek Realty Group LLC*, No. 1:24-cv-3356; *Zawislak et al. v. Equity Realtors L.L.C. d/b/a Equity Real Estate et al.*, No. 24-cv-9039; *Lopez v. NextHome, Inc. et al.*, No. 24-cv-11735; and *Lopez v. Jennifer Ames Chicago, Inc.*, No. 1:25-cv-04207.

settlement. The Settlement establishes a Global Settlement Fund that will pool payments from the initial Settling Defendants and grow over time through an opt-in procedure. The Settling Defendants have committed to contribute a total of $3,202,000.00 if the Settlement is finally approved, and Class Counsel have already secured agreements from several additional Defendants to opt in and make material contributions to the Settlement following approval. Thus, preliminarily approving this Settlement now will deliver significant value to the Settlement Class by encouraging further opt-in settlements that will continue to grow the Global Settlement Fund going forward.

In light of this relief, as well as other considerations discussed below, the proposed Settlement readily satisfies the prerequisites for preliminary approval under Federal Rule 23(e) and applicable precedent. Accordingly, Plaintiffs respectfully request that the Court preliminarily approve the proposed Settlement, certify the proposed Settlement Class for settlement purposes, appoint Plaintiffs as the Class Representatives for the Settlement Class, appoint Plaintiffs' undersigned attorneys as Class Counsel, and appoint Judge James F. Holderman (Ret.) as Special Master for Mediation.

## II. BACKGROUND

### A. Summary Of Plaintiffs' Claims And Allegations.

The claims in this Litigation arise out of alleged anticompetitive conduct in the market for residential real estate broker services. (*See, e.g., Tuccori* Class Action Compl. ¶¶ 1-24, Dkt. 1-2). Plaintiffs claim that the Defendants conspired with the NAR and its members such as real estate brokerages, real estate franchisors, and other real estate companies, to artificially stabilize real estate broker commissions at elevated rates in violation of Section 1 of the Sherman Antitrust Act and certain state antitrust and consumer protection laws. (*Id.* ¶¶ 2, 10-18, 21-22, 34-46).

Specifically, Plaintiffs allege that the Defendants and their alleged co-conspirators agreed to implement and follow certain anticompetitive restraints governing residential real estate transactions, and that this agreement constituted an unlawful conspiracy in restraint of trade. (*Id.* ¶¶ 38-84). These anticompetitive restraints include certain NAR rules, policies, and practices that:

i. required every seller broker, when listing a property on an multiple listing service ("MLS"), to make a blanket unilateral offer of compensation to any buyer broker who may find a buyer for the home;

ii. required that identical compensation terms be simultaneously offered to every buyer broker without regard to their experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer;

iii. concealed the disclosure of the commission due to the seller broker and the portion of the commission earmarked for the buyer broker;

iv. permitted buyer brokers to misrepresent that their services are free;

v. permitted buyer brokers to filter listings based on the offered commissions and to steer homebuyers toward higher-commission listings;

vi. severely restricted the ability to modify the buyer broker commission after the buyer broker conveys a purchase offer; and

vii. limited access to the lockboxes that provide physical access to homes to NAR members.

(*Id.*). Plaintiffs claim that these rules and the alleged conspiracy reduced or eliminated competition among buyer-brokers, effectively raising, fixing, and maintaining commissions at artificially high levels that would not have existed in a competitive marketplace. (*Id.* ¶¶ 85-99). Plaintiffs further allege that buyer-broker commissions are incorporated into a home's purchase price, such that the conspiracy resulted in harm to homebuyers who paid elevated home prices incorporating the commissions. (*Id.*). The effects of the conspiracy allegedly extended nationwide and affected all residential real estate multiple listing services in the U.S., whether NAR-affiliated or not. (*Id.* ¶¶ 1, 91).

Plaintiffs assert claims for violations of (I) the Sherman Antitrust Act, 15 U.S.C. § 1; (II) violations of the Illinois Antitrust Act ("IAA"), 740 ILCS 10/1 *et seq.* and substantially similar antitrust statutes in other states; (III) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*. and substantially similar consumer fraud statutes in other states; and (IV) unjust enrichment. (*See generally id.* ¶¶ 115-152). Each Plaintiff, both individually and on behalf of a putative nationwide class, seeks damages stemming from the elevated commissions as well as injunctive and declaratory relief.

**B. Procedural History And Settlement Negotiations.**

Plaintiff Tuccori initiated the earliest-filed *Tuccori* action against Defendant At World Properties, LLC ("@properties") on December 8, 2023 in the Circuit Court of Cook County, Illinois. @properties removed the *Tuccori* action to federal court on January 5, 2024, where it was assigned to the Hon. Lindsay C. Jenkins. (Dkt. 1). Each of the other cases related with *Tuccori* was either removed to or filed directly in this District. The related cases include *Maslanka et al. v. Baird & Warner, Inc.*, No. 1:24-cv-02399, filed on February 22, 2024; *Hartz v. Real Estate One, Inc.*, No. 1:24-cv-03160, filed on March 20, 2024; *Wallach et al. v. Silvercreek Realty Group LLC*, No. 1:24-cv-3356, filed on April 25, 2024; *Zawislak et al. v. Equity Realtors L.L.C. d/b/a Equity Real Estate et al.*, No. 24-cv-9039, filed on September 26, 2024; *Lopez v. NextHome, Inc. et al.*, No. 24-cv-11735 (*Lopez I*), filed on November 14, 2024; and *Lopez v. Jennifer Ames Chicago, Inc.*, No. 1:25-cv-04207 (*Lopez II*), filed on April 17, 2025.

On May 28, 2025, the Court granted Plaintiffs' Motion to Relate and Reassign Cases Pursuant to Local Rule 40.4. (Dkt. 43). The Court's May 28, 2025 Order deemed *Tuccori*, *Maslanka*, *Hartz*, *Wallach*, *Zawislak*, and *Lopez I* related pursuant to L.R. 40.4. Additionally, the other related cases were reassigned to this Court pursuant to L.R. 40.4(b) (if they were not already

assigned). On October 1, 2025, the Court entered an Order holding that *Lopez II* was also related and reassigning that case to this Court's calendar as well. (Dkt. 51). On October 6, 2025, Plaintiffs moved for an order consolidating the seven related cases in the Litigation for settlement purposes. (Dkt. 55).[3]

On April 15, 2024, this Court maintained a stay of proceedings in *Tuccori* at an early stage of the litigation to enable the Parties to engage in mediation. (Dkt. 18). The Parties in the *Tuccori* matter attended a mediation on May 21, 2025 before the Honorable James F. Holderman of JAMS Chicago. (Declaration of Judge James F. Holderman (Ret.) ¶ 7, hereinafter "Holderman Decl."); (Declaration of Paul T. Geske in Support of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Action Settlement ¶ 17, hereinafter "Geske Decl."). That mediation was productive and led to a potential framework for a class settlement. (*Id.*); (Dkt. 21). All the other cases in the Litigation followed a similar path with respect to the Settling Defendants. (Holderman Decl. ¶¶ 8-12); (Geske Decl. ¶¶ 18-19). The settlement negotiations in the Litigation spanned many months and included nine other, separate mediation sessions, including mediations with:

- Defendant Baird & Warner, Inc. before Judge Holderman on August 1, 2024;
- Defendant Real Estate One, Inc. before Tom McNeill of Tom McNeill ADR on June 13, 2024;
- Defendant NextHome, Inc. before Judge Holderman on February 11, 2025;
- Defendant Shorewest, Inc. before Judge Holderman on March 6, 2025;
- Defendant Realty Executives Intl. Svcs. LLC before the Hon. Morton Denlow (Ret.) of JAMS Chicago on July 8, 2025;

---

[3] Following consolidation, Plaintiffs intend to file an amended consolidated complaint to unify Plaintiffs' claims and allegations and further streamline the procedure for approval of the settlements with the settling Defendants.

- Defendant Side, Inc. before Judge Holderman on August 21, 2025;
- Defendants The Keyes Company and Illustrated Properties, LLC before Judge Holderman on August 27, 2025;
- Defendant Vanguard Properties, Inc. before Judge Holderman on September 25, 2025; and
- Defendants Engel & Völkers Americas, Inc. and Engel & Völkers GmbH before Judge Holderman on September 29, 2025.

(Holderman Decl. ¶¶ 8-12); (Geske Decl. ¶¶ 18-19). Each of these mediations was conducted at arms-length and in an adversarial manner, as were the discussions with Settling Defendants who chose to engage in direct negotiations. (Holderman Decl. ¶¶ 10-15); (Geske Decl. ¶¶ 19-20). Even after each mediation session, negotiations continued through numerous calls and email exchanges that spanned many months. (Holderman Decl. ¶ 12); (Geske Decl. ¶ 20). Throughout this time, the Settling Parties discussed the framework and contours of the Settlement Agreement, including the appropriate class definition, the scope of the release, and the various provisions governing implementation of the Settlement. (Geske Decl. ¶ 20-22). Once negotiations concluded, the Settling Parties executed the final Settlement Agreement that is now being submitted to the Court for approval. (*Id.* ¶ 21).

## III. THE PROPOSED SETTLEMENT

### A. Settlement Class Definition.

The proposed Settlement entails certification of the Settlement Class defined as follows:

> All persons who purchased a home that was listed on an MLS anywhere in the United States where a commission was paid to any brokerage in connection with the transaction during the Class Period.

(Ex. A ¶¶ 2, 9, 15, 20). In accordance with the Parties' Settlement Agreement, expressly excluded from the Settlement Class are persons who submit a valid request to be excluded, the Parties' counsel, the Special Master for Mediation, the Court and staff to whom this case is assigned, and any immediate family members of the Court or its staff. (*Id.* ¶ 15). These exclusions are standard in class action settlements and do not materially affect the size or makeup of the Settlement Class. The Settlement Class definition also excludes persons who have separately released their claims against a Settling Defendant as part of certain other court approved class settlements, but only as to that Settling Defendant (as those individuals would have already released the Released Claims against such Settling Defendant). (*Id.*).

**B. Monetary Relief And The Global Settlement Fund.**

The Settlement provides, among other things, for the establishment of a Global Settlement Fund comprised of the contribution payments from all Settling Defendants and any Opt-In Settlors. (*Id.* ¶¶ 6, 42, 69-73) Upon final approval, the Global Settlement Fund will be distributed to Settlement Class Members after deductions for any court-approved award of reasonable attorneys' fees and litigation expenses; court-approved notice and administration costs; court-approved service award(s); and any other court-approved settlement-related costs. (*Id.*). The Global Settlement Fund is non-reversionary in that the net funds after any Court-approved deductions, awards, and expenses will be distributed to Settlement Class Members according to a plan of allocation with no amount reverting to the Settling Defendants or Opt-In Settlors, regardless of the number of claims made. (*Id.* ¶¶ 69-70, 73).

As stated above, the Settling Defendants have agreed to contribute a total of $3,202,000.00 according to the terms of each Settling Defendant's respective addendum.[4] Plaintiffs and Class

[4] True and accurate copies of all Settling Defendants' addenda are attached hereto as Exhibit B.

Counsel have also secured agreements from several additional entities to participate as Opt-In Settlors and make contributions that will further increase the Global Settlement Fund. (Geske Decl. ¶ 24). Plaintiffs and Class Counsel anticipate that the Global Settlement Fund will continue to grow following preliminary approval once other real estate industry participants are given the opportunity to opt in. (*Id.*).

**C. Opt-In Procedure.**

As noted above, the proposed Settlement would establish an opt-in procedure where non-parties, such as other real estate brokerages, could elect to participate in the Settlement and obtain a release for the Released Claims in exchange for contributing a payment to the Global Settlement Fund and adopting the Settlement's practice changes. (Ex. A ¶¶ 35-36). There are three pathways to opt-in: 1) option 1 involves attending a mediation before the Special Master for Mediation or another agreed upon mediator; 2) option 2 provides a formula for a contribution payment and is available only to entities that have entered into a court-approved class settlement with home sellers in the *Burnett*, *Gibson*, or *Keel* cases; 3) and option 3 allows real estate brokerages to opt in by making a payment based a formula applied to their Total Transaction Volume (as defined in the Opt-In Agreement) over the most recent four calendar years. (*Id.*).

Opt-In Settlors must also agree to an Opt-In Agreement substantially similar to Appendix A attached to the Settlement Agreement. (*Id.*). All Opt-In Agreements will be subject to Court approval. (*Id.* ¶ 40). Plaintiffs will move for preliminary approval of any settlements they reach with Opt-In Settlors no later than 35 days after the end of the 180-day Opt-In Period, which beings following entry of an order granting preliminary approval to the Settlement Agreement. (*Id.* ¶¶ 8, 40).

**D. Appointment of the Special Master For Mediation.**

As part of this Motion, Plaintiffs are seeking the appointment of Judge James F. Holderman (Ret.) of JAMS Chicago as Special Master for Mediation. (Ex. A ¶¶ 32-33); (Holderman Decl. ¶ 16). In this role, Judge Holderman will be available to conduct, supervise, and oversee mediations with non-parties who elect to pursue Option 1 of the Settlement's opt-in procedures to become an Opt-In Settlor. (*Id.*). Judge Holderman is exceptionally qualified and particularly well-suited for this appointment because he is already familiar with the claims and history of this Litigation, having successfully mediated the claims against Defendants @properties, Baird & Warner, NextHome, Shorewest, Side, and others. (Holderman Decl. ¶¶ 8, 16).

**E. Notice And Settlement Administration.**

Under this Settlement, notice and claims administration will be held in abeyance until the Global Settlement Fund reaches a certain "Threshold Amount." (Ex. A ¶¶ 25, 51).[5] The Parties have agreed to engage Epiq Class Action & Claims Solutions, Inc. – a nationally recognized class action settlement administrator with substantial experience in antitrust matters – to assist with administering the Settlement. (*Id.* ¶ 14); (*see generally* Declaration of Cameron R. Azari, Esq. Regarding Notice Plan ¶¶ 1-7, 9, hereinafter "Azari Decl."). The Settlement Administrator will be responsible for carrying out the Settlement's Notice Plan and administering the claims process subject to Class Counsel's supervision. (Ex. A ¶¶ 51-52); (Azari Decl. ¶¶ 9, 17-49). The Settlement contemplates a two-pronged notice plan with direct notice by email to Class Members for whom

[5] The Settlement is contingent on the Global Settlement Fund reaching the "Threshold Amount," unless some or all of the Settling Parties agree to proceed at a lower amount in connection with the rescission rights described in Section P of the Settlement Agreement. (Ex. A ¶¶ 82-84). By confidential filing submitted herewith as <u>Exhibit C</u>, Plaintiffs are disclosing the "Threshold Amount" to the Court for in camera review. Plaintiffs are confident that, by the end of the Opt-In Period, the Global Settlement Fund will exceed the Threshold Amount, which is designed to ensure that the Settlement provides substantial relief to class members after accounting for the anticipated costs of notice and administration.

contact information is reasonably available, and notice by publication to all other Class Members, including via a settlement website. (Ex. A ¶¶ 51-52); (Azari Decl. ¶¶ 17-42).

Notice will not begin immediately upon preliminary approval. Rather, following the conclusion of the Opt-In Period, and after the Court has ruled on the approval of any agreements with any Opt-In Settlors, Class Counsel will submit a Notice Motion that includes the proposed form of, method for, and dates of dissemination of notice as well as the procedure for submission of claims. (Ex. A ¶¶ 51, 59).

**F. Release.**

In exchange for the relief described above, the Settlement Class Members will provide the Settling Defendants and Opt-In Settlors, as well as affiliated persons, with a release of any and all state and federal claims regardless of the cause of action arising from or related to conduct that was or could have been alleged in the Litigation based on any or all of the same factual predicates as those claims, including but not limited to claims based on antitrust laws, consumer protection or other state laws, and/or anticompetitive conduct relating to the commissions negotiated, offered, obtained, or paid to brokerages, or the impact of the foregoing on the purchase price, in connection with the purchase of residential real estate. (*Id.* ¶¶ 11-12, 29-30). The Released Parties include the Settling Defendants, Opt-In Settlors, and their franchisees, sub-franchisors, and licensees and their respective employees, agents, and independent contractors. (*Id.* ¶ 11). The release is more fully described in Section E of the Settlement Agreement. (*Id.* ¶¶ 29-31).

**G. Attorneys' Fees And Service Awards.**

Subject to Court approval, any award of attorneys' fees, costs, and expenses to Class Counsel, and any service awards to the Class Representatives, are to be paid from the Gross Settlement Fund. (*Id.* ¶¶ 6, 74). When class notice is issued following the conclusion of the Opt-

In Period, the notices will disclose Class Counsel's requested award for fees and costs and for service awards. Following an opportunity for the Settlement Class to review and consider the requested awards, Class Counsel will move for approval of the requested awards in advance of final approval.

## IV. DISCUSSION

There are three stages for the approval of a class action settlement. First, the parties present a proposed settlement to the court for preliminary approval. Second, if the court preliminarily approves the settlement, notice of the proposed settlement is sent to the class, and class members are given an opportunity to object or opt out of the settlement. Third, after holding a final fairness hearing, the court decides whether to give final approval to the settlement. Fed. R. Civ. P. 23(e); Newberg & Rubenstein on Class Actions § 13:1 (6th ed.); *see generally Manual for Complex Litigation (Fourth)* § 21.63 (2004).

At this first stage, preliminary approval, the parties must show "that the court will likely be able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B). Here, both elements are satisfied.

### A. The Proposed Settlement Class Should Be Certified For Settlement Purposes.

Taking the second prong first, the Court can readily certify the Settlement Class for settlement purposes. District courts have broad discretion to determine whether class certification is appropriate. *Arreola v. Godinez*, 546 F.3d 788, 794 (7th Cir. 2008). To merit certification, the Settlement Class must satisfy the requirements of Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. *Amgen Inc. v. Conn. Ret. Plans and Tr. Funds*, 568 U.S. 455, 460 (2013). Additionally, where, as here, certification is sought pursuant to Rule 23(b)(3), it must be

# Exhibit A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, individually and on behalf of similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiffs*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Related with: |
| AT WORLD PROPERTIES, LLC, an Illinois Limited Liability Company, | ) | No. 24-cv-02399<br>No. 24-cv-03160<br>No. 24-cv-3356 |
| *Defendant*. | ) | No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |

**CLASS SETTLEMENT AGREEMENT**

This Class Settlement Agreement ("Agreement") is made and entered into this 10th day of October, 2025 ("Execution Date"), by and between Plaintiffs James Tuccori, Courtney Foregger, Kevin Cwynar, Dawid Zawislak, Michael D'Acquisto, and Alejandro Lopez a/k/a Aleandro Lopez (collectively, "Plaintiffs"), both individually and on behalf of a Settlement Class (defined below) of similarly situated individuals, and the Settling Defendants (defined below) (the Plaintiffs and the Settling Defendants are collectively referred to herein as the "Parties" or "Settling Parties").

**A. Recitals**

WHEREAS, the cases covered by this Agreement include: *Tuccori v. At World Properties, LLC*, 1:24-cv-00150 (N.D. Ill.); *Maslanka et al. v. Baird & Warner, Inc.*, No. 1:24-cv-02399 (N.D. Ill.); *Hartz v. Real Estate One, Inc.*, No. 1:24-cv-03160 (N.D. Ill.); *Wallach et al. v. Silvercreek Realty Group LLC*, No. 1:24-cv-3356 (N.D. Ill.); *Zawislak et al. v. Equity Realtors L.L.C. d/b/a Equity Real Estate et al.*, No. 24-cv-9039 (N.D. Ill.); *Lopez v. NextHome, Inc. et al.*, No. 24-cv-

WHEREAS, together with this Agreement, the Settling Defendants are executing individual addenda to this Agreement, attached hereto, that include terms unique or specific to each Settling Defendant (collectively, the "Addenda");

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between Plaintiffs, individually and on behalf of the Settlement Class, and the Settling Defendants that the Litigation be settled, compromised, and dismissed with prejudice as to the Settling Defendants and, except as hereinafter provided, without costs as to Plaintiffs, the Settlement Class, or the Settling Defendants, subject to the approval of the Court, on the following terms and conditions:

## B. Definitions

The following terms, as used in this Agreement, have the following meanings:

1. "Burnett" means the case captioned *Burnett v. The Nat'l Assoc. of REALTORS®*, No. 19-cv-00332 (W.D. Mo.), pending in the U.S. District Court for the Western District of Missouri, in which certain Settling Defendants have reached class settlements.

2. "Class Period" means:

   i. from December 8, 2017, to date of Class Notice for homes in Alabama, Georgia, Indiana, Maine, Michigan, Minnesota, New Jersey, Pennsylvania, Tennessee, Vermont, Wisconsin, and Wyoming;

   ii. from December 8, 2018, to the date of Class Notice for homes in Arkansas, Illinois, Kentucky, and Missouri;

   iii. from December 8, 2019, to the date of Class Notice for all other homes across the United States.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, individually and on behalf of all similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiff*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Related with: |
| AT WORLD PROPERTIES, LLC, an Illinois Limited Liability Company | ) | No. 24-cv-02399<br>No. 24-cv-03160<br>No. 24-cv-3356<br>No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |
| *Defendant*. | ) | |

**DECLARATION OF PAUL T. GESKE IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**

1. I, Paul T. Geske, hereby aver pursuant to 28 U.S.C. § 1746 that I am fully competent to make this Declaration, I have personal knowledge of all matters set forth herein unless stated otherwise, and I would testify to all such matters if called as a witness.

2. I am a licensed attorney and a partner at McGuire Law, P.C. I am admitted to practice in Illinois and before numerous federal courts throughout the country, including the U.S. District Court for the Northern District of Illinois and the U.S. Supreme Court.

3. Along with my colleagues Myles McGuire and Evan Meyers at McGuire Law, P.C. and my co-counsel at Freed Kanner London & Millen LLC, I am counsel of record for Plaintiff James Tuccori in the above-captioned matter as well as the named Plaintiffs in the following related cases also before this Court: *Maslanka et al. v. Baird & Warner, Inc.*, No. 1:24-cv-02399; *Hartz v. Real Estate One, Inc.*, No. 1:24-cv-03160; *Wallach et al. v. Silvercreek Realty Group LLC*, No. 1:24-cv-3356; *Zawislak et al. v. Equity Realtors L.L.C. d/b/a Equity Real Estate*

has successfully prosecuted claims on behalf of his clients in trial and appellate courts at both the state and federal levels throughout the country in cases involving consumer fraud, unfair competition, invasion of privacy, false advertising, and breach of contract, among many others. Mr. McGuire is a graduate of Marquette University and Marquette University Law School and is admitted to practice in the Illinois Supreme Court, Wisconsin Supreme Court, and the U.S. Supreme Court, where he was co-lead counsel in the *Campbell-Ewald Co. v. Gomez* matter. Prior to founding McGuire Law, P.C. in 2013, Mr. McGuire was a managing member of Edelson McGuire, LLC.

12. A copy of the McGuire Law, P.C. firm resume is attached hereto.

***<u>Class Counsel's Efforts Leading to the Settlement</u>***

13. My firm filed the above-captioned lawsuit on behalf of Plaintiff Tuccori on December 8, 2023. (Dkt. No. 1).

14. My firm and our co-counsel also brought the other cases that this Court has deemed related to the *Tuccori* action, including *Maslanka et al. v. Baird & Warner, Inc.*, No. 1:24-cv-02399, filed on February 22, 2024; *Hartz v. Real Estate One, Inc.*, No. 1:24-cv-03160, filed on March 20, 2024; *Wallach et al. v. Silvercreek Realty Group LLC*, No. 1:24-cv-3356, filed on April 25, 2024; *Zawislak et al. v. Equity Realtors L.L.C. d/b/a Equity Real Estate et al.*, No. 24-cv-9039, filed on September 26, 2024; *Lopez v. NextHome, Inc. et al.*, No. 24-cv-11735 (*Lopez I*), filed on November 14, 2024; and *Lopez v. Jennifer Ames Chicago, Inc.*, No. 1:25-cv-04207 (*Lopez II*), filed on April 17, 2025. (*See* Dkt. Nos. 43, 51).

15. Each of the Related Cases involves claims that real estate brokerages, brokerage franchisors, and other real estate companies joined a conspiracy with the National Association of REALTORS® and its members to implement and follow anticompetitive practices in the market

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES TUCCORI, individually and on behalf of similarly situated individuals,<br><br>*Plaintiff*,<br><br>v.<br><br>AT WORLD PROPERTIES, LLC, an Illinois Limited Liability Company,<br><br>*Defendant*. | No. 1:24-cv-00150<br><br>Hon. Lindsay C. Jenkins<br><br>Related with:<br><br>No. 24-cv-02399<br>No. 24-cv-03160<br>No. 24-cv-3356<br>No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |

**PRELIMINARY APPROVAL ORDER**

This matter having come before the Court for consideration of Plaintiffs' Unopposed Motion for Preliminary Approval of Class Settlement, Certification of Settlement Class, Appointment of Class Representatives and Settlement Class Counsel, and Appointment of Special Master for Mediation, the Court having reviewed in detail and considered the Motion, the Parties' Class Action Settlement Agreement, and all other papers that have been filed with the Court related to the Settlement Agreement, including all exhibits and attachments to the Motion and the Settlement Agreement,

IT IS HEREBY ORDERED:

1. Unless stated otherwise, all capitalized terms used in this Order shall be defined and interpreted in accordance with the definitions in the Parties' Settlement Agreement.

2. The Parties have applied to the Court for preliminary approval of the proposed Settlement, the terms of which are set forth in the Settlement Agreement, and have provided the

Court with sufficient information to enable it to determine whether to certify the Settlement Class and preliminarily approve the Settlement.

3. Subject to further consideration by the Court at the time of final approval, the Court preliminarily approves the Parties' Settlement as falling within the range of possible final approval. The Court finds that the proposed Settlement, as set forth in the Settlement Agreement, is fair, reasonable and adequate, the Settlement Agreement was negotiated at arm's length by experienced counsel acting in good faith, including through multiple mediation sessions with highly experienced mediators, and the Settlement Agreement was reached as a result of those negotiations; there has been adequate opportunity for experienced counsel to evaluate the claims and risks at this stage of the litigation; and the Court will likely be able to approve the Settlement pursuant to Rule 23(e)(2).

4. For settlement purposes only, the Court finds that the prerequisites to class action treatment under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure – including numerosity, commonality, typicality, adequacy, superiority, and predominance – have been preliminarily satisfied.

5. The Court hereby conditionally certifies, pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3), and for the purposes of settlement only, the following Settlement Class consisting of:

> All persons who purchased a home that was listed on an MLS anywhere in the United States where a commission was paid to any brokerage in connection with the transaction during the Class Period.

6. The Settlement Class includes persons who purchased a home listed on any MLS, regardless of affiliation with NAR, including the Real Estate Board of New York ("REBNY"), the REBNY Residential Listing Service ("RLS"), the Northwest Multiple Listing Service

("NWMLS"), West-Penn Multi-List, Inc. ("WPMLS"), and MLS Property Information Network ("MLS PIN").

7. Excluded from the Settlement Class are persons who submit a valid request to be excluded from the Settlement Class; persons who have separately released the Released Claims against a Settling Defendant in a court approved class settlement in Burnett, Gibson or Keel, but only as to that Settling Defendant; the Parties' counsel; the Special Master for Mediation; the Court and staff to whom this case is assigned, and any immediate family members of the Court or its staff.

8. For settlement purposes only, the Court preliminarily finds that the Parties' Settlement Agreement and the proposed Settlement Class satisfy all of the prerequisites to maintenance of a class action listed in Federal Rule 23(a) and (b)(3), namely:

a. the members of the Settlement Class are so numerous that joinder is impracticable;

b. there are issues of law and fact common to the Settlement Class Members' claims;

c. Plaintiffs' claims are typical of the claims of the Settlement Class Members;

d. Plaintiffs and Class Counsel have and will continue to fairly and adequately represent the interests of the Settlement Class Members;

e. Common issues, including whether the Settling Defendants entered into any conspiracy and whether the challenged practices constitute a conspiracy to restrain trade in the market for residential real estate broker services in violation of Section 1 of the Sherman Antitrust Act and analogous state laws, predominate over any questions affecting only individual members of the Settlement Class; and

f. settlement of this action on a class basis is superior to other means of resolving the Litigation.

9. In making these preliminary findings, the Court has considered, *inter alia*, (1) the interests of the Settlement Class Members in individually controlling the prosecution or defense of separate actions; (2) the impracticality or inefficiency of prosecuting or defending separate actions; (3) the extent and nature of any litigation concerning these claims already commenced; and (4) the desirability of concentrating the litigation of the claims in a particular forum.

10. For settlement purposes only, Plaintiffs James Tuccori, Courtney Foregger, Kevin Cwynar, Dawid Zawislak, Michael D'Acquisto, and Alejandro Lopez a/k/a Aleandro Lopez are appointed as Class Representatives, and the following counsel are appointed as Class Counsel pursuant to Federal Rule 23(g):

Jonathan M. Jagher
FREED KANNER LONDON & MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428

Matthew W. Ruan
FREED KANNER LONDON & MILLEN LLC
100 Tri-State International, Ste. 128
Lincolnshire, IL 60069

Myles McGuire
Evan Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601

11. The Court finds that Plaintiffs and Class Counsel will fairly and adequately protect the interests of the Settlement Class because: Plaintiffs' interests are consistent with those of Settlement Class Members; there appear to be no conflicts between or among Plaintiffs and the Settlement Class Members; Plaintiffs have been and appear to be capable of continuing to be active participants in both the prosecution and the settlement of this Litigation; and Plaintiffs and the

Settlement Class Members are represented by qualified, reputable counsel who are experienced in prosecuting class action cases, including those concerning antitrust violations.

12. The Court recognizes that, pursuant to the Settlement Agreement, the Settling Defendants retain all rights to object to the propriety of class certification in the Litigation in all other contexts and for all other purposes if the Settlement is not finally approved. Therefore, if the Settlement is not finally approved, and the Litigation resumes, this Court's preliminary findings regarding the propriety of class certification shall be of no further force or effect whatsoever, and this Order will be vacated in its entirety.

13. In the event that a Settlement does not become final and effective for any reason or is validly rescinded or otherwise terminated as provided for in the Settlement Agreement, all proceedings had in connection with that Settlement and any orders regarding that Settlement shall be null and void, except insofar as expressly provided to the contrary in the Settlement Agreement, and without prejudice to the status quo ante rights of the Plaintiffs, the Settling Defendants, the Opt-In Settlors, and the Settlement Class Members.

14. Epiq Class Action & Claims Solutions, Inc. is hereby appointed Settlement Administrator to supervise and administer the notice and claims process, as well as to oversee the administration of the Settlement, as more fully set forth in the Settlement Agreement. At the appropriate time following the conclusion of the Opt-In Period, the Settlement Administrator is authorized to implement the parties' Class Notice Plan as outlined in the Declaration of Cameron R. Azari, Esq. Subject to further consideration following the filing of Plaintiffs' Notice Motion, the Court finds that the notice plan outlined in the Azari Declaration is the best notice practicable and satisfies the requirements of Rule 23 and due process.

15. The Court appoints the Hon. James F. Holderman (Ret.) of JAMS Chicago as Special Master for Mediation. The Special Master for Mediation:

a. will perform duties of conducting, supervising, and overseeing mediations with non-parties who elect to use the Special Master for Mediation pursuant to Option 1 in an effort to become an Opt-In Settlor;

b. will carry out all duties personally or through others working under the supervision of or in conjunction with the Special Master for Mediation with reasonable diligence;

c. has the authority to carry out the duties to facilitate mediations and settlements with non-parties, including the authority to require a non-party and/or its counsel to appear in person or remotely by videoconference for settlement conferences and mediations, but not have the authority to compel any entity to make or accept any specific offer of compromise;

d. may communicate with negotiating parties or the Court *ex parte* to the extent required, in the exercise of the Special Master for Mediation's individual judgment, to carry out his duties;

e. is not required to preserve or file records related to the Special Master for Mediation's activities;

f. shall provide the Court reports upon the Court's request and subject to the Court's discretion; and

g. will split charges for reasonable compensation and reimbursement for expenses reasonably incurred in connection with the Special Master for Mediation's duties

evenly between Settlement Class Counsel and the non-party participating in a particular mediation.

16. The Court approves the establishment of the Settlement's Global Settlement Fund and the Escrow Account, which shall be funded and administered as a Qualified Settlement Fund in accordance with Treasury Regulation § 1.468B-1, 26 C.F.R. § 1.468B-1 and the terms of the Settlement Agreement.

17. Settlement Class Members shall be bound by all determinations and orders pertaining to the Settlement, including with respect to Released Claims as set forth in the Settlement Agreement, whether favorable or unfavorable, unless such persons request exclusion from the Settlement Class in a timely and proper manner, as hereinafter provided. Settlement Class Members who do not timely and validly request exclusion shall be so bound even if they have previously initiated other litigation or proceedings against Defendant or the Released Parties relating to the claims released under the terms of the Settlement Agreement.

18. In order to exercise the right to be excluded, a person within the Settlement Class must timely send a written request for exclusion to the Settlement Administrator, providing his or her name and address, telephone number, signature, the name and case number of this Litigation, and a statement that he or she wishes to be excluded from the Settlement Class. Any request for exclusion submitted via U.S. mail must be personally signed by the person requesting exclusion. Such exclusion requests must be sent to the Settlement Administrator at the address to be specified in the Notice, by first class mail, postage prepaid, and postmarked no later than the deadline for exclusion requests under the Settlement Agreement.

19. No person within the Settlement Class, or any person acting on behalf of, in concert with, or in participation with that person within the Settlement Class, may request exclusion from the Settlement Class of any other person within the Settlement Class.

20. Any person in the Settlement Class who elects to be excluded shall not: (i) be bound by any orders or the Final Approval Order; (ii) be entitled to relief under the Settlement Agreement; (iii) gain any rights by virtue of this Settlement Agreement; or (iv) be entitled to object to any aspect of the Settlement Agreement.

21. Class Counsel may file a motion seeking an award of attorneys' fees plus reimbursable costs and litigations expenses, as well as service awards for the Class Representatives, within 30 days after the commencement of notice and shall post such motion on the Settlement Website.

22. Any Settlement Class Member who has not requested exclusion from the Settlement Class and who wishes to object to any aspect of the Settlement Agreement, including the amount of the attorneys' fees, costs, and expenses that Class Counsel intends to seek and the payment of the Service Award to the Class Representatives, may do so, either personally or through an attorney, by filing a written objection, together with the supporting documentation set forth in the Court's subsequent order on Plaintiffs' Notice Motion.

23. In addition, any objection made by a Settlement Class Member who is represented by counsel must be filed through the Court's CM/ECF system.

24. Any Settlement Class Member who has not requested exclusion and who intends to object to the Settlement must state, in writing, all objections and the basis for any such objection(s); the objector's full name and the case name and case number(s) of the Litigation; the objector's current address, email, and phone number; the reasons why the objector objects to the

Settlement along with any supporting legal authority; a list of any objections they or their counsel have filed in any state or federal court class action in the last five (5) years, identified by the name of the case, the case number, the court in which the objection was filed, and the outcome of the objection; whether or not the objector intends to appear at the final fairness hearing on the motion for final approval of the Settlement, and if so, the reasons for seeking to appear; and the objector's signature. Objections not filed and served in accordance with this Order and the Court's subsequent order regarding Plaintiffs' Notice Motion shall not be received or considered by the Court. Any Settlement Class Member who fails to timely file and serve a written objection shall be deemed to have waived, and shall be forever foreclosed from raising, any objection to the Settlement, to the fairness, reasonableness, or adequacy of the Settlement, to the payment of attorneys' fees, costs, and expenses, to the payment of a service award, and to any order finally approving the Settlement and the right to appeal same.

25. A Settlement Class Member who has not requested exclusion from the Settlement Class and who has properly submitted a written objection in compliance with the Settlement Agreement may appear at the final approval hearing in person or through counsel to show cause why the proposed Settlement should not be approved as fair, reasonable, and adequate. Attendance at the hearing is not necessary; however, persons wishing to be heard orally in opposition to the approval of the Settlement and/or Class Counsel's fee award and/or the request for service awards to the Class Representatives are required to indicate in their written objection their intention to appear at the final approval hearing on their own behalf or through counsel. For any Settlement Class Member who files a timely written objection and who indicates their intention to appear at the final approval hearing on their own behalf or through counsel, such Settlement Class Member must also include in their written objection the identity of any witnesses they may call to testify,

and all exhibits they intend to introduce into evidence at the final approval hearing, which shall be attached

26. No Settlement Class Member shall be entitled to be heard, and no objection shall be considered, unless the requirements set forth in this Order, the order on Plaintiffs' Notice Motion, and in the Settlement Agreement are fully satisfied. Any Settlement Class Member who does not make their objection to the Settlement in the manner provided herein, or who does not also timely provide copies to Counsel for the Settling Parties, shall be deemed to have waived any such objection by appeal, collateral attack, or otherwise, and shall be bound by the Settlement Agreement, the releases contained therein, and all aspects of the final approval order.

27. Pending completion of the notice and claims process (including the opportunity for members of the Settlement Classes to opt out of the Settlements) and this Court's ruling on a motion for final approval of the Settlements, members of the Settlement Class, unless they exclude themselves from the Settlement Class, are hereby temporarily enjoined from filing, commencing, prosecuting, intervening in, or pursuing as a plaintiff or class member, against any Settling Defendant or Released Party, any Released Claim, including, without limitation, any and all state and federal claims regardless of the cause of action arising from or related to conduct that was or could have been alleged in the Litigation based on any or all of the same factual predicates as those claims, including but not limited to claims based on antitrust laws, consumer protection or other state laws, and/or anticompetitive conduct relating to the commissions negotiated, offered, obtained, or paid to brokerages, or the impact of the foregoing on the purchase price, in connection with the purchase of residential real estate.

28. In the Court's order on Plaintiffs' Notice Motion, the Court will schedule a final approval hearing for the following purposes:

(a) to finally determine whether the applicable prerequisites for settlement class action treatment under Rule 23 of the Federal Rules of Civil Procedure have been met;

(b) to determine whether the Settlement is fair, reasonable and adequate, and should be approved by the Court;

(c) to determine whether the judgment as provided under the Settlement Agreement should be entered, including an order prohibiting Settlement Class Members from further pursuing Released Claims as set forth in the Settlement Agreement;

(d) to consider the application for an award of attorneys' fees, costs and expenses of Class Counsel;

(e) to consider the application for service awards to the Class Representatives;

(f) to consider the distribution of the Gross Settlement Fund pursuant to the Settlement Agreement; and

(g) to rule upon such other matters as the Court may deem appropriate.

29. The final approval hearing may be postponed, adjourned, transferred or continued by order of the Court without further notice to the Settlement Class other than through a posting on the Settlement Website. At or following the final approval hearing, the Court may enter a judgment approving the Settlement Agreement and a final approval order in accordance with the Settlement Agreement that adjudicates the rights of all Settlement Class Members.

30. Settlement Class Members do not need to appear at the Final Approval Hearing or take any other action to indicate their approval.

31. All discovery and other proceedings in the Litigation as between Plaintiffs and the Settling Defendants are stayed and suspended until further order of the Court except such actions as may be necessary to implement the Settlement Agreement and this Order.

***So Ordered*. 24-cv-150.**

ENTERED: 10/16/2025

Hon. Lindsay C. Jenkins
United States District Court Judge

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| James Tuccori, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>At World Properties,<br><br>*Defendant*. | No. 24 CV 150<br><br>Judge Lindsay C. Jenkins |

## Memorandum Opinion and Order

This order resolves Plaintiffs' motion to consolidate, *see* dkt. 52, which is granted for the reasons discussed below.

Seven Plaintiffs[1] in seven separate cases seek consolidation under Federal Rule of Civil Procedure 42(a). After granting Plaintiffs' motion to reassign on relatedness grounds under Local Rule 40.4, all seven cases were assigned to this court. [Dkts. 43, 51.] The seven pending cases are: *Tuccori v. At World Properties*, No. 1:24-cv-00150; *Maslanka v. Baird & Warner, Inc.*, No. 1:24-cv-02399; *Hartz v. Real Estate One, Inc.*, No. 1:24-cv-03160; *Wallach v. Silvercreek Realty Group LLC*, No. 1:24-cv-3356; *Lopez v. NextHome*, Inc., 24-cv-11735 ("*Lopez I*"); and *Zawislak v. Equity Realtors, L.L.C. d/b/a Equity Real Estate*, No. 24-cv-9039; *Lopez v. Jennifer Ames Chicago, Inc.*, 1:25-cv-04207 (N.D. Ill.) ("*Lopez II*").

In each case, Plaintiffs generally raise allegations of anti-competitive practices by real estate brokers, brokerage franchisors, and other real estate companies arising from residential real estate transactions. According to Plaintiffs, each of the sixteen Defendants conspired with the National Association of Realtors, a national trade association, by adopting and enforcing rules, policies, and practices that apply to homes listed for sale on NAR's Multiple Listing Service, a database that provides agents and brokers with access to listings. The alleged practices include, for example, concealing the commission split between the agents; permitting buyer agents to falsely represent that their services were free; restricting or eliminating the ability to change the buyer agent commission after a purchase offer was made; and limiting access to lockboxes. In the end, Plaintiffs say, these practices resulted in sellers paying concealed and/or artificially inflated commissions.

[1] Plaintiffs are James Tuccori, Mary Maslanka, David Freifeld, Matthew Hartz, Janet Wallach, Courtney Foregger, Kevin Cwynar, Dawid Zawislak, Michael D'Acquisto and Alejandro Lopez.

Tuccori's class action complaint brings claims for unjust enrichment and violations of the Sherman Antitrust Act, 15 U.S.C. § 1, the Illinois Antitrust Act, 740 ILCS 10/1 *et seq*., and the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*. [Dkt. 1-2, ¶ 1-2, 10-22, 34-46.] The remaining cases raise (or raised) the same or similar allegations under the Sherman Antitrust Act and under state law.

As noted, the court granted Plaintiffs' unopposed motion to reassign the cases as related. [Dkts. 43, 51.] Plaintiffs now seek to consolidate the cases. Two Defendants object: HomeSmart International, LLC and Fathom Realty, who are each named as Defendants in *Zawislak*.[2]

*Legal Standard*

Federal Rule of Civil Procedure 42(a) allows the court to consolidate cases if they "involve a common question of law or fact." Fed. R. Civ. P. 42(a). Consolidation is meant to promote judicial efficiency, but cases should not be consolidated if prejudice to any of the parties outweighs the value of increased efficiency. *Westfield Ins. Co. v. Indem. Ins. Co. of N. Am*., 2017 WL 7803767 at *2 (C.D. Ill. Mar. 7, 2017). Consolidation can be ordered where there is a risk of inconsistent rulings. *Id*. at *2. A district court's decision granting or denying a motion to consolidate is reviewed for an abuse of discretion. *Star Ins. Co. v. Risk Mktg. Group, Inc*., 561 F.3d 656, 660 (7th Cir. 2009).

*Analysis*

Consolidation of all seven cases is warranted here because the factual and legal issues of the cases significantly overlap. All seven cases generally concern anti-competitive practices that Plaintiffs allege resulted in inflated commissions, including policies requiring seller agents to make blanket offers of compensation to buyer agents regardless of experience, limitations on buyer-agent commissions, and mechanisms that permit buyer agents to falsely represent that their services are free. [Dkt. 53 at 5-6.] All seven cases involve common legal and factual questions concerning, among other things, the existence of an antitrust conspiracy under the Sherman Act, whether the challenged policies amount to unlawful restraints on trade, whether commissions were in fact impacted by the practices described, and whether the Defendants' conduct violated applicable state antitrust or deceptive practices laws.

Defendants HomeSmart and Fathom do not seriously argue otherwise, but they do oppose consolidation for a few other reasons. First, they say that consolidating is inappropriate because there is no new operative pleading in *Zawislak* following

[2] Defendant Live & Play LLC d/b/a Engel & Voelkers Chicago, a party to *Lopez I*, has not taken a position on the motion.

dismissal of the first amended complaint without prejudice in July. [Dkt. 61 at 4-5.] Second, they maintain that Zawislak's claims as originally pled differ in some respects from the claims raised in other cases. For example, the *Malsanka* plaintiffs pursue class action claims on behalf of both buy-side and sell-side clients, whereas *Zawislak* involves only buy-side claims. And *Wallach* and *Hartz* raise claims under Idaho and Michigan statutes, whereas *Tuccori*, and *Lopez I* and *II* raise Illinois state law claims. [Dkt. 61 at 2-3, 5.]

These differences do not make consolidation inappropriate. Claims need not "neatly overlap" to warrant consolidation. *Brunner v. Jimmy John's*, LLC, 2016 WL 7232560, at *2 (N.D. Ill. Jan. 14, 2016). Rather, Rule 42 requires only "*a* common issue of law or fact." Rule 42(a) (emphasis added). Here, all seven cases concern brokerages, brokerage franchisors, and other real estate companies alleged efforts to inflate real estate commissions paid to brokers. *Zawislak*'s first amended complaint raised claims in this vein under the Sherman Act and the Illinois antitrust and deceptive practices acts. And while it is true that the *Malanska*, *Wallach* and *Hartz* cases vary slightly in their focus, the court has no trouble concluding that all the cases involve at least one common question of law and of fact.

As to the argument that consolidation is premature because *Zawislak* has not yet filed a second amended complaint, it is true that the court granted *Zawislak* additional time to file his amended pleading. But the court did so with the intent of resolving the consolidation and reassignment questions first. [*Zawislak*, No. 24-cv-9039, Dkt. 79.] Indeed, to have required *Zawislak* to amend his pleading before deciding whether consolidation was appropriate would only inject more inefficiency into the case. Had *Zawislak* filed a second amended complaint, Fathom and HomeSmart would have filed another motion to dismiss, which would have been rendered moot by an amended consolidated complaint. In this way, *Hobbs v. Haaland* on which Defendants rely is distinguishable. 2025 WL 506660, at *6 (E.D. Wis. Feb. 14, 2025) (denying without prejudice plaintiff's motion to consolidate, noting that defendants were "entitled to resolution of their motion to dismiss before the court considers a motion to consolidate filed eighteen months after the defendants filed their motion to dismiss.")

The court agrees with Plaintiffs that consolidation will result in a substantial savings of judicial time and effort. Thirteen of the sixteen Defendants have reached a global settlement with all the Plaintiffs, so consolidation will avoid the need to file separate preliminary approval motions in each case; to proceed otherwise would waste everyone's time and resources. And though HomeSmart and Fathom have made their intent to litigate clear, they can do so in the consolidated case with as much efficiency as they could in the *Zawislak* case. The remaining parties can proceed with a global settlement. In this way, the court fails to see how consolidation would unfairly prejudice HomeSmart or Fathom.

Finally, consolidation will help streamline the cases and allow the court to conserve substantial resources by avoiding the potential for inconsistent rulings on important issues and, if necessary, allow the court to try any claims that remain together. *Tipsword v. IFDA Servs., Inc.*, 2010 WL 1521612, at *1 (S.D. Ill. Apr. 14, 2010).

**Conclusion**

The motion to consolidate is granted under Rule 42(a). The *Tuccori* case will be the lead case and all future filings will occur in this case. The court will separately set a date for filing an amended consolidated complaint and a responsive pleading deadline.

Enter: 24-cv-150
Date: October 22, 2025

Lindsay C. Jenkins
United States District Court Judge

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, *et al.*, individually and on behalf of similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiffs*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Consolidated with: |
| AT WORLD PROPERTIES, LLC, *et al.*, | ) | No. 24-cv-02399<br>No. 24-cv-03160 |
| *Defendants.* | ) | No. 24-cv-3356<br>No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |

**PLAINTIFFS' PARTIALLY OPPOSED MOTION AND MEMORANDUM FOR LEAVE TO FILE *INSTANTER* FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

Plaintiffs, James Tuccori, Courtney Foregger, Kevin Cwynar, Dawid Zawislak, Michael D'Acquisto, and Alejandro Lopez a/k/a Aleandro Lopez, pursuant to Federal Rule 15(a)(2), respectfully request leave to file *instanter* the proposed First Amended Consolidated Class Action Complaint being submitted herewith as Exhibit 1 (the "Amended Consolidated Complaint" or "ACC"). A redlined version of the ACC is being filed as Exhibit 2. In support of this Motion, Plaintiffs state as follows:

## I. INTRODUCTION

Plaintiffs seek leave to amend their Consolidated Class Action Complaint (Dkt. 70, the "Consolidated Complaint" or "CC") to name several additional real estate companies that have elected to opt into the Court-approved class settlement in this matter. (*See generally* Preliminary Approval Order, Dkt. 65); (*see also* Dkt. 58 at 8) (summarizing the Settlement's opt-in procedure).

These "Opt-In Settlors"[1] are already referenced in the CC as co-conspirators with the existing Defendants, but the ACC formally names them to procedurally facilitate their participation in the settlement. In all other respects, the proposed ACC is virtually identical to the CC. It does not add new claims against the Defendants, change the underlying theories of liability, nor alter the proposed class definitions.

Importantly, as explained more fully below, *none* of the existing Defendants or Opt-In Settlors have expressed opposition the amendment, apart from Defendant Fathom Realty, LLC ("Fathom"). Prior to filing this Motion, Plaintiffs' counsel conferred with Fathom's counsel who indicated that Fathom opposes the ACC primarily due to the pending Joint Motion to Dismiss (Dkt. 78)[2] and Motion to Strike Class Allegations (Dkt. 79). Plaintiffs do not intend for their amendment to disrupt or reset the briefing on these motions. Accordingly, Plaintiffs have offered—and remain willing—to enter into a stipulation that Fathom's Motion to Dismiss and Motion to Strike Class Allegations, as well as the briefing on those Motions, shall be deemed filed as to the ACC and need not be refiled. As such, the ACC will neither prejudice Fathom nor delay resolution of its pending motions. Despite Plaintiffs' proposed stipulation, Fathom has refused to consent to the amendment.

In any event, because this Motion is being brought early on and well before any applicable deadlines, Plaintiffs' request to amend is subject to the low bar of Federal Rule 15(a)(2), which presumes that "[a]s a general rule, district courts should liberally grant leave to amend pleadings." *Mulvania v. Sheriff of Rock Island Cnty.*, 850 F.3d 849, 854 (7th Cir. 2017). Plaintiffs' request to

---

[1] The Opt-In Settlors being added are Anywhere Real Estate Inc., The Real Brokerage Inc., Real Broker, LLC, and Vanguard Properties, Inc.

[2] Defendant HomeSmart International, LLC ("HomeSmart") joined Fathom's Rule 12(b)(6) motion to dismiss but has since jointly moved with Plaintiffs to stay this case as to HomeSmart pending an upcoming mediation to negotiate HomeSmart's potential participation in the Court-approved settlement. (Dkt. 94).

file the ACC readily meets this permissive standard. This Motion is timely and there is no risk of delay or prejudice to Fathom given the limited nature of the amendments and Plaintiffs' proposed stipulation concerning Fathom's pending Motions. Further, there is no evidence of bad faith or dilatory motive on the part of Plaintiffs. They are bringing this amendment solely to facilitate the Opt-In Settlors' participation in the Court-approved class settlement for the benefit of the settlement class members.

Accordingly, Plaintiffs respectfully request that the Court grant this Motion and grant Plaintiffs leave to file *instanter* the attached ACC.

## II. RELEVANT BACKGROUND

The claims in this consolidated litigation[3] arise out of an alleged commission-fixing conspiracy in the market for residential real estate broker services. Plaintiffs claim that the Defendants conspired with the NAR and other NAR members such as real estate brokerages, real estate franchisors, and other real estate companies, to artificially stabilize real estate broker commissions at elevated rates in violation of Section 1 of the Sherman Antitrust Act and certain state antitrust and consumer protection laws. Both the CC and ACC assert claims under four counts for: (I) violations of the Sherman Antitrust Act, 15 U.S.C. § 1; (II) violations of the Illinois Antitrust Act ("IAA"), 740 ILCS 10/1 *et seq.* and substantially similar antitrust statutes in other states; (III) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/1 *et seq*. and substantially similar consumer fraud statutes in other states; and (IV) unjust enrichment.

[3] The consolidated cases before the Court include: *Tuccori v. At World Properties, LLC*, 1:24-cv-00150; *Maslanka et al. v. Baird & Warner, Inc.*, No. 1:24-cv-02399; *Hartz v. Real Estate One, Inc.*, No. 1:24-cv-03160; *Wallach et al. v. Silvercreek Realty Group LLC*, No. 1:24-cv-3356; *Zawislak et al. v. Equity Realtors L.L.C. d/b/a Equity Real Estate et al.*, No. 24-cv-9039; *Lopez v. NextHome, Inc. et al.*, No. 24-cv-11735; and *Lopez v. Jennifer Ames Chicago, Inc.*, No. 1:25-cv-04207.

On October 13, 2025, Plaintiffs moved for preliminary approval of a class settlement that encompasses the claims against most of the Defendants named in the CC. (Dkt. 58). On October 16, 2025, the Court granted preliminary approval to the settlement. (Dkt. 65). The Court-approved settlement includes an opt-in procedure by which other real estate brokerages and real estate companies can elect to participate in the settlement in exchange for contributing a payment to the settlement's global settlement fund, among other things (Dkt. 58 at 8) (explaining the settlement's opt-in procedure). The opt-in period remains open until April 13, 2026 (Dkt. 62), but Plaintiffs have already secured agreements from a number of entities to opt in to the settlement and make monetary contributions that will collectively exceed the settlement's "Threshold Amount" and ensure that the settlement proceeds to the next phase. (Dkt. 58 at 9).

As a procedural step to bringing certain non-party Opt-In Settlors into this case and the preliminarily approved settlement, the proposed ACC formally names those Opt-In Settlors as defendants. Otherwise, the ACC includes only minimal, non-material changes. Plaintiffs' operative CC already references the Opt-In Settlors as co-conspirators of the existing Defendants (*see, e.g.,* Dkt. 70 ¶¶ 47-50), so the ACC does not substantively change the operative claims and allegations. Further, the claims against the Opt-In Settlors share numerous common questions of law and fact with the claims against the existing Defendants, including because they involve the same or similar allegedly unlawful conduct and the same alleged commission-fixing conspiracy.

Concurrently with this Motion, Plaintiffs are filing a motion to preliminarily approve the agreements reached with a number of Opt-In Settlors.

## III. <u>LEGAL STANDARD</u>

Under Federal Rule 15, leave to amend pleadings "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a)(2); *Runnion ex rel. Runnion* v. *Girl Scouts of Greater Chi. & Nw.*

*Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) (citing *Foman* v. *Davis*, 371 U.S. 178, 182 (1962)). Rule 15 is construed with a liberal presumption in favor of granting motions for leave to amend. *Bressner* v. *Ambroziak*, 379 F.3d 478, 484 (7th Cir. 2004); *U.S. ex rel. Ceas* v. *Chrysler Group, LLC*, 2015 WL 394100, at *11 (N.D. Ill. 2015).

Accordingly, leave to amend should be "liberally grant[ed]" absent "undue prejudice to the opposing party or undue delay, bad faith or dilatory motive on the part of the movant." *Sides* v. *City of Champaign*, 496 F.3d 820, 825 (7th Cir. 2007); *Eastern Natural Gas Corp*. v. *Aluminum Co. of Am*., 126 F.3d 996, 999 (7th Cir. 1997). Consideration of undue prejudice carries the greatest weight in the Rule 15 analysis, *see United States of Am. ex rel. James Cape & Sons Co*. v. *Am. Home Assurance Co*., No. 02 C 1903, 2004 WL 1146318, at *2 (N.D. Ill. May 18, 2004), and "the non-moving party bears the burden of showing undue prejudice as a result of the proposed amendment." *Dugan* v. *Selco Indus., Inc.*, 1997 WL 701336, at *3 n.2 (N.D. Ill. 1997); *Brown* v. *Yellow Transp., Inc*., No. 08 C 5908, 2010 WL 2911786, at *2 (N.D. Ill. July 26, 2010). Absent undue prejudice to the party opposing the motion or a showing of any of the other factors, leave should be freely given. *Eastern Natural Gas Corp*., 126 F.3d at 999; *In re Abbot Depakote Shareholder Derivative Litig*., 909 F. Supp. 2d 984, 1000 (N.D. Ill. 2012).

## IV. ARGUMENT

### A. Apart From Defendant Fathom, No Other Parties Oppose Plaintiffs' Request For Leave To Amend.

In compliance with the Court's Standing Order, Plaintiffs' counsel contacted counsel for all Defendants and Opt-In Settlors prior to filing this Motion to ask whether there were any objections to this Motion. None of the settling Defendants indicated that they oppose the filing of the ACC for purposes of facilitating the settlement, provided they are not required to file an answer or responsive pleading to the ACC unless the settlement is not finally approved, in which case the

settling Defendants preserve all their potential defenses. Likewise, none of the non-party Opt-In Settlors oppose being named in the ACC and added to this case subject to the same conditions.

Defendant HomeSmart did not provide its position on the amendment by the time of filing, but it too is exploring opting into the settlement and has agreed to attend a mediation with the Court-appointed Special Master for Mediation, Judge James F. Holderman (ret.). (Dkt. 94).

Defendant Fathom did not agree to the amendment. As explained below, however, Fathom has no basis to oppose the amendment, and Plaintiffs should be granted leave to amend over Fathom's lone objection.

### B. Plaintiffs Should Be Granted Leave To Amend To Facilitate The Opt-In Settlors' Participation In The Court-Approved Settlement.

Because there is a liberal presumption in favor of allowing Plaintiffs to amend, it is Fathom's burden to establish that granting leave to amend would be improper. Fathom will be unable to meet its burden.

First, because the proposed ACC makes no substantive changes to the claims against Fathom, there is no risk of prejudice to Fathom. The issue of undue prejudice to the nonmovant is the primary consideration when assessing whether to grant leave to file an amended pleading. *Am. Home Assurance Co.*, 2004 WL 1146318, at *2 ("Undue prejudice 'is the most important factor in determining whether to allow an amendment to a complaint.'" (quoting *Ameritech Mobile Commc'ns, Inc*. v. *Computer Sys. Solutions, Inc*., 188 F.R.D. 280, 283 (N.D. Ill. 1999))). Because virtually every amendment will result in some prejudice to the nonmovant, courts should only deny a motion for leave to amend if the burden on the nonmovant rises to the level of undue prejudice. *Orlowski* v. *Dominicks Finer Foods, Inc*., 937 F. Supp. 723, 732 (N.D. Ill. 1996) (citing *Alberto-Culver Co*. v. *Gillette Co*., 408 F. Supp. 1160, 1162 (N.D. Ill. 1976).

Here, Plaintiffs' proposed ACC will not lead to any prejudice whatsoever, let alone undue prejudice. As shown in the redlined version of the ACC, the ACC is virtually identical to the CC. It only adds several new parties, all of which have agreed to participate in the Court-approved class settlement. The addition of these settling parties will not have any adverse effect on Fathom's ability to defend this case.

Although Fathom's Motion to Dismiss and Motion to Strike Class Allegations are still pending, the changes in the ACC have no impact on the issues raised in the briefing on those Motions. Moreover, as stated above, Plaintiffs have agreed to stipulate that Fathom's pending Motions apply to the ACC. So there will be no need for Fathom to refile or rebrief its Motions. Nor will the ACC delay in the Court's consideration of those Motions.

Further, the ACC does not pose any risk of surprise to Fathom because it does not change Plaintiffs' claims or allegations against Fathom. Because the ACC asserts the same claims based on the same facts as the CC, Fathom will not be required to answer or respond to any new or unexpected claims or factual allegations. For these same reasons, the ACC will not expand the scope of discovery. Accordingly, granting leave to amend will neither burden Fathom nor lead to undue prejudice.

Second, Plaintiff's proposed amendment is timely. The current deadline for Plaintiffs to amend pleadings or add Parties is June 25, 2026. (Dkt. 74). Fathom expressly agreed to this deadline as part of the Parties' joint proposed fact discovery schedule. (Dkt. 73 at 2). *Acosta v. Target Corp.*, No. 05 C 7068, 2011 WL 2550754, *1 (N.D. Ill. June 24, 2011) (granting leave to amend, in part, because the movant filed its motion within the schedule set by the parties and the court); *Hoenig* v. *Karl Knauz Motors, Inc.*, 983 F. Supp. 2d 952, 960 (N.D. Ill. 2013) (finding no undue delay, in part, because the movant filed its motion for leave to amend one month prior to

the parties' mutually agreed upon deadline to amend pleadings). Therefore, there can be no argument that Plaintiffs' amendment is untimely. Nor will Plaintiffs' proposed amendment result in any undue delay in this litigation prospectively.

Third, Plaintiffs are not bringing this Motion in bad faith or for any improper motive. As stated above, Plaintiffs are seeking leave to amend solely for the purpose of facilitating the non-party Opt-In Settlors' participation in the settlement. This will allow them to contribute to the settlement's global settlement fund and provide additional monetary relief for the well-deserved benefit of the settlement class members.

Finally, the futility factor is inapplicable here because Plaintiffs are not seeking to cure any defects in the operative CC. Nor are they attempting to reintroduce or replead previously dismissed claims. Accordingly, there is no basis to deny Plaintiffs' request for leave to amend on futility grounds.

In sum, none of the Rule 15 factors weigh against granting leave to amend here. Fathom thus cannot overcome the presumption that leave to amend should be freely and liberally granted. Plaintiffs' request for leave to amend should therefore be granted.

## V. <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order 1) granting this Motion; 2) granting Plaintiffs leave to file *instanter* their proposed First Amended Consolidated Complaint attached hereto; and 4) granting such further and additional relief as the Court deems reasonable and just.

Dated: February 23, 2026

Respectfully Submitted,

JAMES TUCCORI, COURTNEY FOREGGER, KEVIN CWYNAR, DAWID ZAWISLAK, MICHAEL D'ACQUISTO, and ALEJANDRO LOPEZ A/K/A

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, *et al.*, individually and on behalf of similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiffs*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Consolidated with: |
| AT WORLD PROPERTIES, LLC, *et al.*, | ) | No. 24-cv-02399<br>No. 24-cv-03160<br>No. 24-cv-3356<br>No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |
| *Defendants.* | ) | |

**PLAINTIFFS' UNOPPOSED MOTION AND MEMORANDUM FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH BROKERAGES OPTING INTO THE COURT APPROVED CLASS SETTLEMENT AGREEMENT**

Plaintiffs, James Tuccori, Courtney Foregger, Kevin Cwynar, Dawid Zawislak, Michael D'Acquisto, and Alejandro Lopez a/k/a Aleandro Lopez, by and through their undersigned counsel, and pursuant to Section G of the Court-approved Class Settlement Agreement in this matter, respectfully move for preliminary approval of the Opt-In Agreements being filed herewith. In support of this Motion, Plaintiffs state as follows:

## I. INTRODUCTION

On October 16, 2025, the Court granted preliminary approval to the Class Settlement Agreement[1] with the Settling Defendants. (Preliminary Approval Order, Dkt. 65). As described in the Agreement and Plaintiffs' Preliminary Approval Motion (Dkt. 58), the Settlement includes an opt-in procedure by which other real estate brokerages and real estate companies can elect to

[1] Unless stated otherwise, capitalized terms used in this Motion are intended to be interpreted in accordance with the definitions in the Court-approved Class Settlement Agreement. (Dkt. 58-1).

participate in the Settlement in exchange for, among other things: (1) contributing a payment to the Settlement's Global Settlement Fund; (2) committing to certain practice changes; and (3) agreeing to terms substantially similar to those of the Opt-In Agreement attached as Appendix A to the Agreement. (*Id.* at 8) (summarizing the Settlement's opt-in procedure); (Settlement Agreement ¶¶ 35-41). This opt-in mechanism "deliver[s] significant value to the Settlement Class by . . . grow[ing] the Global Settlement Fund" over time and providing additional monetary compensation to the Settlement Class Members. (Dkt. 58 at 2).

The Settlement's Opt-In Period is open until April 13, 2026. (Dkt. 62). Plaintiffs are pleased to report that they have already secured Opt-In Agreements from a number of entities to join the Settlement and make significant monetary contributions that will collectively exceed the settlement's "Threshold Amount." (Dkt. 58 at 9). Each of these agreements is the result of extensive, arms-length negotiations, including separate mediations overseen by the Court-appointed Special Master for Mediation, Judge James F. Holderman (ret.) of JAMS Chicago.

Although the Court has already preliminarily approved the Settlement and its opt-in procedures, out of an abundance of caution, Plaintiffs respectfully request that the Court enter an order preliminarily approving the Opt-In Agreements with the Opt-In Settlors submitted with this Motion. To avoid repetition, Plaintiffs incorporate by reference their Preliminary Approval Motion (Dkt. 58), the Parties' Class Settlement Agreement (Dkt. 58-1), and the Court's Preliminary Approval Order (Dkt. 65), which fully describe the Settlement's terms and support the fairness and adequacy of the Settlement and Opt-In Agreements.

## II. DISCUSSION

### A. The Opt-In Agreements Are Fair, Reasonable, And Adequate And Consistent With The Court-Approved Class Settlement Agreement.

By this Motion, Plaintiffs seek preliminary approval of Opt-In Agreements reached with

the following Opt-In Settlors: The Keyes Company and Illustrated Properties, LLC; Anywhere Real Estate Inc.[2]; The Real Brokerage Inc. and Real Broker, LLC; and Vanguard Properties, Inc. As stated above, each of these Opt-In Settlors participated in a separate mediation with the Special Master for Mediation. *T.K. ex. rel. Leshore v. Bytedance Technology Co., Ltd.*, No. 19-CV-7915, 2022 WL 888943, at *11 (N.D. Ill. Mar. 25, 2022) ("The best evidence of a truly adversarial bargaining process is the presence of a neutral third-party mediator." (quoting 4 William Rubenstein, *Newberg on Class Actions* § 13:50 (5th ed. 2021))).

These mediations were attended by lead counsel for Plaintiffs, lead counsel for each Opt-In Settlor, and key executives from each entity. (Declaration of Paul T. Geske ¶ 8, hereinafter "Geske Decl."). Further, each agreement was reached only after intensive negotiations, the exchange of mediation briefs and other relevant information, and weeks of direct negotiations over limited modifications to the terms of each Opt-In Settlor's Opt-In Agreement, where appropriate. (*Id.* ¶¶ 8-10); (*see also* Settlement Agreement ¶ 36) (directing Class Counsel to "use their best efforts to resolve Released Claims with the National Association of REALTORS®, and any real estate brokerage, franchisor, or real estate company that is not a Party to this Settlement Agreement during the Opt-In Period.").

The proposed Opt-In Agreements incorporate the same Settlement Class definition as in the original Class Settlement Agreement and provide prospective relief to the Settlement Class Members by requiring that the Opt-In Settlors agree to implement or maintain practice changes identical to those set forth in the Settlement Agreement. (*See generally* Exs. 1-4 to Geske Decl.). These practice changes are aimed at addressing the conduct that led to the Litigation. (Settlement

[2] On January 9, 2026, Anywhere Real Estate Inc. ("Anywhere") was acquired by Compass, Inc. and became a corporate affiliate of At World Properties ("@properties"), one of the original Settling Defendants in this case. After Anywhere became a corporate affiliate of @properties, it engaged in a mediation with Plaintiffs.

Agreement ¶ 78); (Dkt. 58 at 8, 24).

In addition to practice changes, the Opt-In Settlors have agreed to collectively contribute $10,787,500.00 to the Global Settlement Fund, bringing the total of all monetary contributions thus far to $13,989,500.00. (Geske Decl. ¶¶ 16-17).[3] Following final approval, the Global Settlement Fund—including contributions from both the initial Settling Defendants and all Opt-In Settlors—will be distributed in accordance with the Settlement Agreement and the Court-approved plan of allocation. (Settlement Agreement ¶¶ 69-71). When Plaintiffs submit their plan of allocation, they will propose a formula under which each payment to a Settlement Class Member will be determined equitably according to a pro rata formula for allocation. Thus, no group or individual will be unfairly advantaged or disadvantaged, and the Settlement will fully comply with the Rule 23(e)(2) requirement that the Settlement "treats class members equitably relative to each other."

The Opt-In Settlors' monetary contributions are fair, reasonable, and adequate when considering the substantial benefits to the Settlement Class Members balanced against the risks, cost, and delay of litigation, as well as limitations on certain Opt-In Settlors' ability to pay the full amount of any trial judgment entered against them. (Geske Decl. ¶ 19). Further, as noted above, the Opt-In Settlors' contributions will take the Global Settlement Fund past the Threshold Amount and thus secure the Settlement's benefits for Class Members. (*Id.* ¶ 17); (*see also* Dkt. 58 at 9 n.5).

Indeed, the monetary relief contributed by the Opt-In Settlors delivers an excellent result for the Settlement Class given the risks of this indirect-purchaser litigation. (Dkt. 58 at 24-26); (Geske Decl. ¶ 19). Another court in this District has already held that homebuyers are indirect

---

[3] As with the Settling Defendants, the amount of each individual Opt-In Settlor's payment is being submitted to the Court for *in camera* review and will remain confidential until the dissemination of Class Notice. (*See* Agreement ¶ 43).

purchasers who cannot seek damages under the Sherman Act. *See generally Leeder v. Nat'l Assoc. of Realtors*, 601 F. Supp. 3d 301, 309 (N.D. Ill. 2022) (citing *Ill. Brick Co. v. Ill.*, 431 U.S. 720, 729 (1977)). This finding creates a risk that recovering damages for homebuyers' state law claims would be limited to only those states with *Illinois Brick* repealer statutes.

Further, proving the amount of damages poses challenges here, since homebuyers must establish that the allegedly higher buyer-broker commissions were passed on to them through the increased prices of the homes they bought. Proving up a passthrough theory will require significant expert work and attorney investment, driving up the costs and risk to the Settlement Class.

It's also worth emphasizing that a litigation class has not yet been certified and would be highly contested. The prospect of adversarial class certification presents serious risks on its own. *See* Fed. R. Civ. P. 23(e)(2), Advisory Committee's Note to 2018 Amendment; *see also Hudson v. Libre Tech., Inc.*, No. 3:18-cv-1371-GPC-KSC, 2020 WL 2467060, at *6 (S.D. Cal. May 13, 2020) ("Proceeding in this litigation in the absence of settlement poses various risks such as failing to certify a class."). Additionally, Plaintiffs' claims have not yet reached the summary judgment stage. Although Plaintiffs are confident they would prevail on the merits and at class certification, they recognize the risks posed by further litigation.

In sum, "any relief to class members would still be far down the road and may ultimately be entirely denied." *Charvat v. Valente*, No. 12-cv-05746, 2019 WL 5576932, at *7 (N.D. Ill. Oct. 29, 2019). In contrast, "[a]pproving the proposed settlement agreement will end the case and cause benefits to flow in short order." *Id.*; *see also Young v. Rolling in the Dough, Inc.*, No. 1:17-cv-07825, 2020 WL 969616, at *5 (N.D. Ill. Feb. 27, 2020) ("If this case had been litigated to conclusion, all that is certain is that plaintiffs would have spent a large amount of money, time, and effort."). The Opt-In Settlement provides meaningful relief to the Settlement Class, avoiding

potentially years of complex litigation and appeals with a risk of no recovery whatsoever.

Prior to reaching agreement with each Opt-In Settlor, Class Counsel undertook significant research into each Opt-In Settlor's involvement in the alleged conspiracy to raise, fix, maintain, or stabilize real estate broker commissions in violation of Section 1 of the Sherman Act, state antitrust laws, and state consumer protection laws, including their participation in the National Association of Realtors® ("NAR"), their role and relative size in the real estate broker services market, and their adoption, implementation, and enforcement of the challenged NAR rules at issue. As one example, Class Counsel issued a document subpoena to Anywhere and received an extensive document production comprising 7,076 documents, totaling 155,874 pages and 2,496 native documents, for a total production size of 57.27 gigabytes.[4] This gave Class Counsel more than "an adequate information base" on which to negotiate. *T.K.*, 2022 WL 888943, at *11.

Lastly, the Opt-In Agreements also include other edits or additions where appropriate to address each Opt-In Settlor's potential exposure and other company-specific matters. For example, in Anywhere's Opt-In Agreement, the Class Period was extended to include all time periods covered by this case and other, concurrent homebuyer antitrust litigation such as *Batton v. The Nat'l Assoc. of REALTORS®*, No. 21-cv-00430 (N.D. Ill.).[5] (Ex. 4 to Geske Decl. at 2-3). This modified Class Period was necessary to provide finality against all litigation for Opt-In Settlors who are defendants in separate litigation, such as Anywhere.

---

[4] This production included documents Anywhere originally produced in connection with home seller antitrust litigation, including *Sitzer, et al. v. The National Association of Realtors, et al.*, No. 4:19-cv-00332 (W.D. Mo.), *Moehrl, et al. v. The National Association of Realtors, et al.*, No. 1:19-cv-01610 (N.D. Ill.), and *Nosalek, et al. v. MLS Property Information Network, Inc., et al.*, No 1:20-cv-12244 (D. Mass.)).

[5] On February 2, 2026, Plaintiffs in *Batton, et al. v. The National Association of Realtors, et al.*, No. 1:21-cv-00430 (N.D. Ill.) filed a Motion for Preliminary Approval of a settlement with Keller Williams Realty. (Dkt. 262). That settlement was preliminarily approved on February 12, 2026. (*Id.* Dkt. 269.) Unlike the Opt-In Settlements here, the Keller Williams settlement encompasses homebuyer claims that have already been released (76-79% of all such claims) in home seller settlements, not just the buyer-only claims that were not released (21-24% of buyer claims).

Plaintiffs may reach additional settlements with other Opt-In Settlors or Defendants in this case. To promote efficient use of Settlement funds and class notice resources, and to avoid confusion to the Class Members, Plaintiffs intend to combine the dissemination of Class Notice of the Settlement. Plaintiffs will file, at a later date, a separate Notice Motion for approval of the form and manner of class notice. (Settlement Agreement ¶ 19).

### B. The Opt-In Settlors Should Be Added To Plaintiffs' Consolidated Class Action Complaint To Facilitate Their Participation In The Settlement.

Together with this Motion, Plaintiffs have moved for leave to file an amended consolidated class action complaint that includes the Opt-In Settlors that have not already been named as Defendants in this action. Plaintiffs' operative Consolidated Class Action Complaint (Dkt. 70, the "Consolidated Complaint") already references the Opt-In Settlors as co-conspirators (*see, e.g., id.* ¶¶ 47-50), so the claims against the Opt-In Settlors share numerous common questions of law and fact with the existing action, including because they involve the same or similar allegedly unlawful conduct and the same alleged commission-fixing conspiracy.

In addition, permitting the Opt-In Settlors to join will not delay the proceedings or otherwise prejudice the adjudication of the underlying case. To the contrary, adding the Opt-In Settlors as defendants provides an efficient procedural mechanism to allow them to participate in the existing Settlement. Accordingly, Plaintiffs seek to amend their Consolidated Complaint to formally bring these entities into the case and the Settlement.

## III. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an order: 1) granting this Motion; 2) granting preliminary approval to the Opt-In Agreements with each Opt-In Settlor; and 3) granting such further and additional relief as the Court deems reasonable and just.

Dated: February 23, 2026

Respectfully Submitted,

JAMES TUCCORI, COURTNEY FOREGGER, KEVIN CWYNAR, DAWID ZAWISLAK, MICHAEL D'ACQUISTO, and ALEJANDRO LOPEZ A/K/A ALEANDRO LOPEZ, individually and on behalf of similarly situated individuals

By: /s/ Paul T. Geske
One of Plaintiffs' attorneys

Myles McGuire
Evan Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

Jonathan M. Jagher
FREED KANNER LONDON
& MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

Matthew W. Ruan
FREED KANNER LONDON
& MILLEN LLC
100 Tri-State International, Ste. 128
Lincolnshire, IL 60069
Tel: (224) 632-4500
mruan@fklmlaw.com

*Counsel for Plaintiffs and the Settlement Class*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on February 23, 2026 I caused the foregoing *Plaintiffs' Unopposed Motion and Memorandum for Preliminary Approval of Settlements With Brokerages Opting Into the Court Approved Class Settlement Agreement* to be electronically filed with the Clerk of the Court using the CM/ECF system. A copy of said document will be electronically transmitted to all counsel of record.

/s/ *Paul T. Geske*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, *et al.*, individually and on behalf of similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiffs*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Consolidated with: |
| AT WORLD PROPERTIES, LLC, *et al.*, | ) | No. 24-cv-02399<br>No. 24-cv-03160 |
| *Defendants.* | ) | No. 24-cv-3356<br>No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |

**DECLARATION OF PAUL T. GESKE IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENTS WITH BROKERAGES OPTING INTO THE COURT APPROVED CLASS SETTLEMENT AGREEMENT**

I, Paul T. Geske, hereby aver pursuant to 28 U.S.C. § 1746 that I am fully competent to make this Declaration, I have personal knowledge of all matters set forth herein unless stated otherwise, and I would testify to all such matters if called as a witness.

1. I am a licensed attorney and a partner at McGuire Law, P.C. I am admitted to practice in Illinois and before numerous federal courts throughout the country, including the U.S. District Court for the Northern District of Illinois and the U.S. Supreme Court.

2. Along with my colleagues Myles McGuire and Evan Meyers at McGuire Law, P.C. and my co-counsel at Freed Kanner London & Millen LLC, I am counsel of record for Plaintiffs and the certified Settlement Class in this matter.

3. This Declaration is being submitted in support of Plaintiffs' Unopposed Motion and Memorandum for Preliminary Approval of Settlements With Brokerages Opting Into the

Court Approved Class Settlement Agreement being filed herewith.

4. On October 16, 2025, the Court entered its Preliminary Approval Order granting preliminary approval to the Class Settlement Agreement[1] with the Settling Defendants. (Dkt. 65).

5. The Court-approved Settlement includes a mechanism by which "The National Association of REALTORS®, and any real estate brokerage, franchisor, or real estate company that is not a Party to th[e] Settlement Agreement" can elect to opt into the Settlement in exchange for fulfilling certain conditions and making a monetary contribution to the Settlement's Global Settlement Fund, among other things. (Settlement Agreement ¶¶ 35-36); (Dkt. 58 at 8) (summarizing the Settlement's opt-in procedure).

6. As part of the Court-approved opt-in procedure, the Court has appointed Judge James F. Holderman (ret.) of JAMS Chicago to serve as the Special Master for Mediation and conduct, supervise, and oversee mediations with non-parties who elect to attend a mediation in an effort to become an Opt-In Settlor. (Settlement Agreement ¶¶ 32-34).

7. Further, the Court-approved Settlement directs Class Counsel to "use their best efforts to resolve Released Claims with the National Association of REALTORS®, and any real estate brokerage, franchisor, or real estate company that is not a Party to this Settlement Agreement during the Opt-In Period." (*Id.* ¶ 36).

8. In accordance with the Settlement Agreement and the Court's Preliminary Approval Order, Class Counsel have organized and attended a number of mediations before Judge Holderman with potential Opt-In Settlors, including:

- A mediation with Vanguard Properties, Inc. on August 12, 2025;
- A mediation with The Keyes Company and Illustrated Properties, LLC on

[1] Unless stated otherwise, capitalized terms used in this Declaration are intended to be interpreted in accordance with the definitions in the Court-approved Class Settlement Agreement. (Dkt. 58-1).

August 27, 2025;

- A mediation with The Real Brokerage Inc. and Real Broker, LLC on December 16, 2025; and
- A mediation with Anywhere Real Estate Inc.[2] on February 4, 2026.

9. Each of these mediations was conducted separately and at arms' length, and involved the exchange of mediation submissions including briefs, position statements, and other information unique to each party.

10. These negotiations culminated in the execution of an Opt-In Agreement with each potential Opt-In Settlor, which are being submitted to the Court for approval.

11. Attached hereto as Exhibit 1 is the executed Opt-In Agreement with Vanguard Properties, Inc.

12. Attached hereto as Exhibit 2 is the executed Opt-In Agreement with The Keyes Company and Illustrated Properties, LLC.

13. Attached hereto as Exhibit 3 is the executed Opt-In Agreement with The Real Brokerage Inc. and Real Broker, LLC.

14. Attached hereto as Exhibit 4 is the executed Opt-In Agreement with Anywhere Real Estate Inc.

15. Based on Class Counsel's investigation of the potential claims against each Opt-In Settlor, together with years of experience prosecuting other class action litigation in courts nationwide, I believe that the above Opt-In Agreements are in the best interests of the Plaintiffs and the other Settlement Class Members. In particular, I, along with the other attorneys serving

[2] On January 9, 2026, Anywhere was acquired by Compass, Inc. and became a corporate affiliate of At World Properties (@properties"), one of the original Settling Defendants in this case. After Anywhere became a corporate affiliate of @properties, it engaged in a mediation with Plaintiffs.

as Class Counsel, have concluded that the relief provided under each Opt-In Settlor's Opt-In Agreement is fair, reasonable, and adequate in light of the risks of further litigation.

16. Pursuant to the above Opt-In Agreements, this initial group of potential Opt-In Settlors have committed to pay a total of $10,787,500.00 into the Settlement's Global Settlement Fund if the Settlement is finally approved.

17. If approved, the Opt-In Settlors' contributions, together with the $3,202,000.00 in contributions from the initial Settling Defendants, will bring the total of all monetary relief provided under the Settlement to $13,989,500.00. This amount exceeds the Settlement's "Threshold Amount" and will enable the Settlement to proceed to the next phase. (Settlement Agreement ¶¶ 82-83); (Dkt. 58 at 9 n.5).

18. Because the Opt-In Period is open until April 13, 2026 (Dkt. 62), the Settlement's Global Settlement Fund has the potential to continue to grow, which will translate into higher payments to the Settlement Class Members and deliver significant value.

19. While I believe that the Plaintiffs' and the Settlement Class Members' claims against each potential Opt-In Settlor have merit, I recognize the substantial risks that litigation imposes on the Plaintiffs and the Settlement Class Members, particularly in light of the complexity of this litigation, the numerous parties involved, the uncertainty inherent in litigation, and the adverse financial conditions impacting the real estate broker industry, including the potential Opt-In Settlors. Further, given that the potential Opt-In Settlors have denied the existence of an unlawful conspiracy and demonstrated a willingness to vigorously defend the claims against them, the Opt-In Agreements reached here represent an excellent result for the Settlement Class Members.

20. Class Counsel have diligently prosecuted the Settlement Class Members' claims

and dedicated substantial time and resources to this Litigation. We will continue to dedicate the time and resources necessary to effectuate the Settlement and to advocate on behalf of the Settlement Class Members through final approval.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 23, 2026 in Chicago, Illinois.

*/s/ Paul T. Geske*
Paul T. Geske, Esq.

# Exhibit 4

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI et al., individually and on behalf of similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiffs*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Consolidated with: |
| AT WORLD PROPERTIES, LLC et al., | ) | No. 24-cv-02399<br>No. 24-cv-03160<br>No. 24-cv-3356<br>No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |
| *Defendants*. | ) | |

**Opt-In Agreement**

This Opt-In Agreement is made and entered into by and between Plaintiffs, both individually and on behalf of the Settlement Class, and Anywhere Real Estate Inc. ("Opt-In Settlor") as of the last signature date below.

**A. Recitals**

WHEREAS, Plaintiffs have entered into a Class Settlement Agreement with the Settling Defendants to resolve certain claims stemming from Plaintiffs' allegations that the Settling Defendants participated in a conspiracy to raise, fix, maintain, or stabilize real estate broker commissions in violation of Section 1 of the Sherman Act and certain state laws;

WHEREAS, Plaintiffs, through their counsel, have conducted an investigation into the facts and the law regarding Opt-In Settlor's alleged participation in the alleged conspiracy to raise, fix, maintain, or stabilize real estate broker commissions in violation of Section 1 of the Sherman Act, state antitrust laws, and state consumer protection laws, and have concluded that a settlement

according to the terms set forth below is fair, reasonable, and adequate and in the best interest of Plaintiffs and the other Settlement Class Members;

WHEREAS, Opt-In Settlor denies Plaintiffs' allegations and any charges of wrongdoing or liability of any kind but nevertheless has decided to enter into this Opt-In Agreement to avoid the expense, inconvenience, and the distraction of burdensome and protracted litigation, to obtain the nationwide releases, orders, and judgment contemplated by the Class Settlement Agreement and this Opt-In Agreement, and to put to rest with finality all claims and allegations that Plaintiffs and Settlement Class Members have or could have asserted against Opt-In Settlor; and

WHEREAS, Opt-In Settlor has agreed, in addition to providing the monetary compensation set forth below, to implement certain practice changes, each as set forth in this Opt-In Agreement.

NOW, THEREFORE, in consideration of the agreements and releases set forth herein and other good and valuable consideration, and intending to be legally bound, it is agreed by and between Plaintiffs, individually and on behalf of the Settlement Class, and Opt-In Settlor that certain actual or potential claims be settled, compromised, and dismissed with prejudice as to Opt-In Settlor and, except as hereinafter provided, without costs as to Plaintiffs, the Settlement Class, or Opt-In Settlor, subject to the approval of the Court, on the following terms and conditions:

## B. Definitions

Plaintiffs and Opt-In Settlor agree that the capitalized terms used in this Opt-In Agreement shall be defined and interpreted in accordance with the definitions set forth in the Class Settlement Agreement unless otherwise specified herein. The following terms, as used in this Opt-In Agreement only, have the following meanings:

1. "Class Period" with respect to Opt-In Settlor means:

   i. From January 25, 2006 to date of Class Notice for homes in Puerto Rico;

ii. From January 25, 2011 to date of Class Notice for homes in Rhode Island and Louisiana;

iii. From January 25, 2013 to date of Class Notice for homes in Wyoming;

iv. From January 25, 2015 to date of Class Notice for homes in Alabama, Connecticut, Hawaii, Indiana, Maine, Massachusetts, Michigan, Minnesota, New Jersey, New York, North Dakota, Ohio, Oregon, Pennsylvania, South Dakota, Tennessee, Vermont, and Wisconsin;

v. From January 25, 2016 to date of Class Notice for homes in Arkansas, Kentucky, Illinois, Iowa, Missouri, Utah, and West Virginia;

vi. From January 25, 2017 to date of Class Notice for homes in Arizona, California, Washington D.C., Delaware, Florida, Georgia, Idaho, Nebraska, Nevada, New Hampshire, New Mexico, North Carolina, and Virginia;

vii. from January 25, 2018 to the date of Class Notice for homes in Alaska, Colorado, Kansas, Maryland, Mississippi, Montana, Oklahoma, and South Carolina, and Washington;

viii. from January 25, 2019 to date of Class Notice for homes in Texas and for all other homes across the United States.

2. "Effective" means that all conditions set forth below in the definition of "Effective Date" have occurred.

3. "Effective Date" means the date when both of the following conditions have occurred: (a) the Court has entered a final judgment and order approving the Class Settlement Agreement and this Opt-In Agreement under Rule 23(e) of the Federal Rules of Civil Procedure and dismissing the Litigation with prejudice; and (b) the time for appeal or to seek permission to

appeal from the Court's approval of the Class Settlement Agreement and this Opt-In Agreement and the entry of a final judgment has expired or, if appealed, approval of the Class Settlement Agreement and this Opt-In Agreement and the final judgment have been affirmed in their entirety by the court of last resort to which such appeal has been taken and such affirmance is no longer subject to further appeal or review. It is agreed that neither the provisions of Federal Rule of Civil Procedure 60 nor the All Writs Act, 28 U.S.C. § 1651, shall be considered in determining the above-stated times.

4. "Released Claims" means any and all state and federal claims regardless of the cause of action arising from or related to conduct that was or could have been alleged in the Litigation or against Opt-In Settlor in *Batton v. The Nat'l Assoc. of REALTORS®*, No. 21-cv-00430 (N.D. Ill.) based on any or all of the same factual predicates as those claims, including but not limited to claims based on antitrust laws, consumer protection or other state laws, and/or anticompetitive conduct relating to the commissions negotiated, offered, obtained, or paid to brokerages, or the impact of the foregoing on the purchase price, in connection with the purchase or sale of residential real estate.

5. "Released Parties" means Opt-In Settlor and all of its respective past, present, and future direct and indirect parents (including holding companies), subsidiaries, related entities and affiliates, associates (all as defined in SEC Rule 12b-2 promulgated pursuant to the Securities Exchange Act of 1934), predecessors, and successors, and all of their respective franchisees, sub-franchisors, licensees, officers, directors, managing directors, shareholders, members, managers, employees, agents, contractors, independent contractors, attorneys, legal or other representatives, accountants, auditors, experts, trustees, trusts, heirs, beneficiaries, estates, executors, administrators, insurers, and assigns, and all of their franchisees' and sub-franchisors' and

licensees' officers, directors, shareholders, members, managers, managing directors, employees, agents, and independent contractors. This Opt-In Agreement shall not result in the release of any claims against any other party or non-party not specifically listed herein.

6. "Releasing Parties" means Plaintiffs and any Settlement Class Members, including any of their immediate family members, heirs, representatives, administrators, executors, devisees, legatees, and estates, acting in their capacity as such; and for entities including any of their past, present or future officers, directors, members, shareholders, managers, insurers, general or limited partners, divisions, stockholders, agents, attorneys, employees, legal representatives, trustees, parents, associates, affiliates, joint ventures, subsidiaries, heirs, executors, administrators, predecessors, successors and assigns, acting in their capacity as such solely with respect to the claims based on or derived from claims of the Plaintiffs or the Settlement Class Members.

7. "Settlement" means the settlement of the Released Claims against Opt-In Settlor as contemplated by the Class Settlement Agreement and this Opt-In Agreement.

8. "Settlement Class" means the class of persons that will be certified by the Court for Settlement purposes defined in Paragraph 15 of the Class Settlement Agreement. The Settlement Class shall not include individuals who have separately released the Released Claims against Opt-In Settlor in a court approved class settlement in Burnett, Gibson or Keel, but only as to Opt-In Settlor.

9. "Opt-In Settlor Monetary Amount" shall be [redacted]

## C. <u>Operation of the Settlement</u>

10. Plaintiffs and Opt-In Settlor agree that Opt-In Settlor has delivered to Settlement Class Counsel within 180 days after the entry of an order granting preliminary approval to the Class Settlement Agreement an executed version of this Opt-In Agreement (as modified herein) in

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES TUCCORI, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AT WORLD PROPERTIES, LLC, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-00150<br><br>Judge Lindsay C. Jenkins |

**NON-PARTY BATTON PLAINTIFFS' MOTION TO INTERVENE WITH RESPECT TO PROPOSED CLASS ACTION SETTLEMENT WITH NON-PARTY OPT-IN SETTLOR ANYWHERE REAL ESTATE**

Homebuyers alleging injury as a result of the same conspiracy alleged in this action have been litigating class-action claims in this District against Anywhere Real Estate, Inc. ("Anywhere") before Judges Wood and Hunt for over five years. *See Batton, et al. v. Nat'l Ass'n of Realtors, et al.*, 21-cv-00430 (N.D. Ill.).[1] *Batton* Plaintiffs and their counsel ("*Batton* Counsel") have defeated several motions to dismiss, engaged in extensive fact discovery, sat for depositions, briefed class certification, obtained vast troves of home purchase information and multiple listing service data, and spent millions of dollars to develop evidence and expert opinions analyzing the impact and harm to homebuyers as a result of anticompetitive commissions. *Batton* Counsel has served as de facto counsel for homebuyers in all respects.

[1] Plaintiffs in *Batton* are referred to as "*Batton* Plaintiffs" and their undersigned counsel are referred to as "*Batton* Counsel."

Recently, the *Batton* Plaintiffs settled their claims against Anywhere' co-conspirator, Keller Williams Realty, LLC, for $20 million and were appointed as class counsel in connection with the settlement.

Now—after years of litigation and after the *Batton* Court appointed *Batton* as class counsel—Plaintiffs and Anywhere in this action, which has never included Anywhere and has not progressed beyond motion to dismiss briefing, seek to end-run the *Batton* litigation, the *Batton* court's order, Fed. R. Civ. P. 23, and LR 40.4 to release *Batton* Plaintiffs' claims against Anywhere on the cheap at the expense of class members. ECF No. 98-1 at 77 ¶ 4 (specifically referencing *Batton* in released claims).

Accordingly, *Batton* Plaintiffs now move to intervene in this case to be heard with respect to the proposed class action settlement between Plaintiffs and "Opt-In Settlor" Anywhere Real Estate and to prevent the release of their valuable claims against Anywhere. If this motion to intervene is granted, *Batton* Plaintiffs intend to submit a motion for a temporary restraining order and preliminary injunction to enjoin Plaintiffs and Anywhere from proceeding with their Motion for Preliminary Approval as to Anywhere.

## BACKGROUND

In 2021, *Batton* Counsel brought the first-filed case on behalf of homebuyers. *Batton*, ECF No. 1. *Batton* is pending in the Northern District of Illinois and alleges that the National Association of Realtors, Anywhere, and a number of the other largest real estate brokerages in the country agreed to implement and enforce anticompetitive rules that inflated broker commissions and, in turn, home prices across the United States. *Id.* Thereafter, the *Batton* Plaintiffs filed an amended complaint (*id.* ECF No. 84), defeated several motions to dismiss (*see*, *e.g.*, *id.*, No. 21-CV-00430, 2024 WL 689989, at *1 (N.D. Ill. Feb. 20, 2024); 2024 WL 4871366, at *1 (N.D. Ill.

Nov. 22, 2024)), propounded, responded to, and analyzed voluminous discovery, and engaged industry and economic experts to analyze antitrust impact and damages (*see*, *e.g.*, *id.*, ECF No. 262-1 (setting forth history of the *Batton* litigation). The briefing, analysis, and strategy involved complex issues, including managing the laws of over 30 states and indirect purchaser challenges.

In addition to this extensive work in the Northern District of Illinois, *Batton* Counsel have also continuously advocated on behalf of homebuyers in the Western District of Missouri and the Eighth Circuit. Anywhere and several of Anywhere's co-defendants were first sued by home sellers in late 2019. *Burnett, et al. v. Nat'l Ass'n of REALTORS®, et al.*, 4:19-cv-00332 (W.D. Mo.) ("*Burnett*"). Anywhere and several other brokerages ultimately settled with the home sellers. Anywhere in particular settled for $83.5 million. ECF No. 1192. Anywhere's settlement and others purported to release not only home selling claims, but homebuying claims as well. *Batton* Plaintiffs took immediate steps to protect their homebuying claims, including objecting to the seller settlements. *Burnett*, ECF No. 1447. The settlements were finally approved (*id.*, ECF No. 1490) and *Batton* Counsel appealed to the Eighth Circuit (*id.*, ECF No. 1498). That appeal remains pending.

During this time, not only did Anywhere attempt to release and enjoin the *Batton* Plaintiffs' claims against it as part of its seller settlement, it later successfully moved to stay *Batton* Plaintiffs' motion for class certification based on the seller settlements. *Batton*, ECF No. 246 at 8-9.

*Batton* Counsel's work proved fruitful when, in January 2026, they reached a settlement with Keller Williams Realty LLC for $20 million. The settlement was preliminarily approved on February 13, 2026. *Id.*, ECF No. 269. *Batton* Plaintiffs' carefully crafted plan of distribution is due to be filed on February 26, 2026. *Id.*, ECF No. 262 at Appendix A.

Plaintiffs here filed their homebuyer claim based on the same conduct and same theory as

*Batton* in state court in December 2023, naming only a single defendant that was not a party in *Batton*. *James Tuccori v. At World Properties*, No. 2023CH09928 (Ck. Cty.). The case was then removed to this Court. ECF No. 1. Six months later, before any motion to dismiss briefing or discovery, Plaintiffs informed the Court they had reached settlement. ECF No. 22. That settlement was preliminarily approved, along with Plaintiffs' proposed "opt-in procedure" by which non-parties were invited to "opt-in" by either paying 25% of the settlement amount paid by them in *Burnett*, or some other amount after engaging in a mediation. ECF No. 65. Just yesterday, on February 23, 2026—after years of litigation in *Batton*—Plaintiffs filed a motion for preliminary approval of an "opt-in" class-action settlement with non-party Anywhere (and others). ECF No. 98.

## ARGUMENT

### I. Intervention Is Timely And Is Urgently Needed to Protect *Batton* Plaintiffs and Class Members ' Homebuying Claims

*Batton* Plaintiffs request that the Court permit them to intervene here under Rule 24(a) or Rule 24(b) to prevent Plaintiffs' Counsel and Anywhere from circumventing the Batton litigation and unfairly extinguishing *Batton* Plaintiffs' claims. Rule 24(a)(2) requires the Court to permit intervention upon timely application where the proposed intervenor "has an interest relating to the property or transaction which is the subject of the action and . . . is so situated that disposition of the action, as a practical matter, may impede or impair his ability to protect that interest;" and the proposed intervenor's interest is represented inadequately by the existing parties to the suit. Rule 24(a)(2).

*Batton* Plaintiffs' Motion is timely. Plaintiffs here disclosed their opt-in settlement with Anywhere on February 23, 2026, less than 24 hours ago. Prior to that disclosure, none of the defendants in the *Batton* case had been named as defendants or disclosed as settlement parties in

this case. Moreover, Anywhere continued to actively litigate in *Batton.* As *Batton* Plaintiffs were unaware that Plaintiffs' Counsel here purported to represent homebuyers against Anywhere prior to yesterday's filing, *Batton* Plaintiff's motion one day later is timely. *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 880–81 (7th Cir. 2000) (rejecting the argument that an intervenor should have moved upon filing of an overlapping case because "[u]nnamed members of the class rarely will suspect a shortfall in the adequacy of representation before learning of the terms of a (potentially inadequate) settlement or problems in the class definition.").

*Batton* Plaintiffs also unquestionably have an interest in the property or transaction that is the subject of this action, namely claims arising out of home purchases. Both actions are brought on behalf of homebuyers and both actions allege that various brokerages conspired with each other and NAR to create, implement, and enforce anticompetitive rules that artificially inflated broker commissions and home prices. The two actions therefore share common facts and legal theories on behalf of substantially the same group of purchasers. This Action now purports to release the very claims that the *Batton* Plaintiffs have been pursuing for more than five years. It is hard to envision a *greater* interest.

Not only *might* disposition of this seller settlement with Anywhere impair *Batton* Plaintiffs' ability to protect their interests, as Rule 24 requires, such an eventuality is virtually guaranteed if Plaintiffs' Opt-In Motion is granted. Plaintiffs' settlement with Anywhere purports to release the homebuying claims being litigated in *Batton* despite failing to meet Fed. R. Civ. P. 23's requirements pertaining to adequacy and superiority and in exchange for a questionably small sum relative to strength of *Batton* Plaintiffs' claims. This unfairness impedes *Batton* Plaintiffs' ability to prosecute and obtain fair compensation for their homebuying claims in several ways.

First, *Batton* Plaintiffs have not only an interest, but a right, to adequate representation under Fed R. C. Civ. P. 23. Rule 23 requires that in order for a settlement to be approved, class counsel must be adequate considering, among other things, their work in the case. Plaintiffs' counsel here only engaged in very brief preliminary discovery with respect to Anywhere, but has otherwise never named Anywhere as a defendant, never briefed a contested motion as to Anywhere, and, except for in connection with their proposed Settlement, never assessed the strength of homebuyers' claims against Anywhere.

In contrast, *Batton* Plaintiffs' counsel have spent the last five years doing all of that and much more. They have also sought the appointment of *Batton* Counsel as class counsel in *Batton* since Batton's inception and were recently appointed Class Counsel for a class of purchasers of residential real estate in connection with their settlement with Anywhere's alleged co-conspirator, Keller Williams. Now that there are two groups of counsel seeking to represent the same class asserting the same claims against the same defendant, Rule 23(g)(2) requires a comparative analysis to "appoint the applicant best able to represent the interests of the class." Based on their deep familiarity with homebuyer claims against Anywhere and extensive work prosecuting those claims over the last five years, *Batton* Counsel, Lowey Danneberg and Korein Tillery, are clearly the best able to represent the interests of *Batton* Plaintiffs and class members, as well as members of the Anywhere settlement class.

Second, *Batton* Plaintiffs have an interest in ensuring a settlement that releases their claims is proper under Rule 23's superiority requirement. Rule 23's superiority prong requires this Court to consider "the extent and nature of any litigation concerning the controversy already begun by or against class members." Fed. R. Civ. P. 23(b)(3)(B). As discussed herein and upon which *Batton* Counsel can elaborate in much greater detail, *Batton* Plaintiffs had already begun

litigation against Anywhere years before this action was filed, have a much more procedurally advanced case, and have already obtained favorable settlements for the class. Neither of Plaintiffs' motions for preliminary approval address this requirement.

Third, *Batton* Plaintiffs have a strong interest in obtaining fair compensation for their claims. Although the specific amount that Anywhere has agreed to pay is under seal, it is apparently a sum less than $10.78 million. Even charitably assuming the majority of that is from Anywhere, it is less than 10% of the $83.5 million Anywhere paid in *Burnett*, less than the 25% benchmark set by Plaintiffs own opt-in procedure, and less than the 28.57% benchmark set by the *Batton* Plaintiffs in their settlement with Anywhere's alleged co-conspirator, Keller Williams. Indeed, when parallel class action cases are pending against the same defendant, the circumstances demand "close scrutiny" to determine whether the "settlement agreement is the product of a 'reverse auction,' the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002). The questionable settlement amount here further underscores Plaintiffs' counsel's inadequate representation of homebuyer claims against Anywhere.

Fourth, should Plaintiffs' proposed settlement with Anywhere be finally approved, *Batton* Plaintiffs intend to appeal that approval. In the Seventh Circuit, "it is vital that district courts freely allow the intervention of unnamed class members who object to proposed settlements and want an option to appeal an adverse decision." *Crawford*, 201 F.3d at 88. In these circumstances, even if intervention were to cause delay, intervention is justified because of this Court's "fiduciary-like duty to protect the interests of the class members." *Aliano v. CVS Pharmacy, Inc.*,

No. 16-CV-3372, 2016 WL 11671152, at *1 (N.D. Ill. May 11, 2016).

Finally, *Batton* Plaintiffs' intervention here will help ensure efficient prosecution of homebuying claims against Anywhere for both the parties and the Court. In connection with their motion for preliminary approval, Plaintiffs have moved for leave to file an amended complaint naming Anywhere Real Estate as a party. ECF No. 97. Because Plaintiffs here assert the same claims against Anywhere as in *Batton*, *Batton* Plaintiffs intend to file a motion under LR 40.4. for reassignment of the claim against Anywhere to Judge Hunt as related to *Batton*. While the motion will be filed in *Batton*, the lower-numbered case by virtue of having been filed years earlier, LR 40.4 provides that this Court and the *Batton* court may consult with each other. Intervention will enable *Batton* Plaintiffs to be heard in both courts, and to ensure that Plaintiffs and Anywhere do not circumvent this District's established rules and processes for litigation of parallel cases against the same defendant in the same District by, for example, filing an amended complaint without a cover sheet relating the actions.

All that is left to satisfy Rule 24(a)(2) is that *Batton* Plaintiffs' interests are inadequately represented here. Plaintiffs' Counsel's inadequate representation of the Anywhere settlement class, as outlined above, demonstrates why they would not adequately represent *Batton* Plaintiffs' interests before this Court. *Batton* Plaintiffs must be permitted to intervene.

## II. Intervention Would Not Prejudice Any Party

Should the Court determine that *Batton* Plaintiffs do not meet the requirements of Rule 24(a)(2), *Batton* Plaintiffs undoubtedly meet the requirements for permissive intervention under Rule 24(b). Timeliness and shared issues of law and fact are addressed, *supra*. As to prejudice, there is none. In the Seventh Circuit, the possibility that intervention may lead to denial of a proposed settlement or the reversal of settlement approval on appeal is not prejudice or delay

sufficient to deny intervention. *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877, 881 (7th Cir. 2000).

## CONCLUSION

In order to be heard with respect to Plaintiffs' proposed class-action settlement with Anywhere Real Estate, the reassignment of such claims, the appeal of any approval of the settlement if necessary, the superiority of the *Batton* litigation under Rule 23, and proper class counsel under Rule 23, this Court should grant Aaron Bolton's motion for permissive intervention.

Dated: February 24, 2026

/s/ *Randall P. Ewing, Jr.*
Randall P. Ewing, Jr.
George A. Zelcs
Ryan Z. Cortazar
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney (MO Bar #56091)
Michael E. Klenov
Carol O'Keefe
**KOREIN TILLERY LLC**
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
sberezney@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

Vincent Briganti
Christian Levis
Noelle Forde
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
clevis@lowey.com
nforde@lowey.com

*Attorneys for Aaron Bolton*

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2026, the foregoing was filed electronically with the Clerk of Court of the Northern District of Illinois to be served by the Court's electronic filing system to all Counsel of Record:

/s/ *Randall P. Ewing, Jr.*
Randall P. Ewing, Jr.

**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES TUCCORI, *et al.*, individually and on behalf of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>AT WORLD PROPERTIES, LLC, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-00150<br><br>Honorable Lindsay C. Jenkins<br><br>Consolidated with:<br><br>No. 24-cv-02399<br>No. 24-cv-03160<br>No. 24-cv-03356<br>No. 24-cv-09039<br>No. 24-cv-11735<br>No. 25-cv-04207 |

**NOTICE OF FILING OF ANYWHERE REAL ESTATE INC.'S RESPONSE TO THE *BATTON* PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO REASSIGN**

PLEASE TAKE NOTICE that on February 28, 2026, Anywhere Real Estate Inc. filed the attached Anywhere Real Estate Inc.'s Response to Plaintiffs' Motion for Preliminary Injunction and Motion to Reassign Case in *Batton v. The National Association of Realtors*, No. 1:21-cv-00430 (LAH).

PLEASE TAKE FURTHER NOTICE that counsel for Anywhere will appear in person at the hearing scheduled for March 4, 2026, and will be prepared to address the matters identified in this Court's Minute Order dated February 25, 2026 (ECF No. 103).

A copy of this Notice has been served on all counsel of record in both the *Batton* and *Tuccori* cases via the Court's electronic filing system.

Dated: March 2, 2026

Respectfully Submitted,

*/s/ Kenneth M. Kliebard*
Kenneth M. Kliebard
**MORGAN, LEWIS & BOCKIUS LLP**
110 N. Wacker Drive, Suite 2800
Chicago, IL 60606

Tel: 312.324.1000
Fax: 312.324.1001
kenneth.kliebard@morganlewis.com

Stacey Anne Mahoney (*pro hac vice forthcoming*)
**MORGAN, LEWIS & BOCKIUS LLP**
101 Park Avenue
New York, NY 10178
Tel: 212.309.6000
Fax: 212.309.6001
stacey.mahoney@morganlewis.com

William T. McEnroe (*pro hac vice forthcoming*)
**MORGAN, LEWIS & BOCKIUS LLP**
2222 Market Street
Philadelphia, PA 19103
Tel: 215.963.5000
Fax: 215.963.5001
william.mcenroe@morganlewis.com

Aaron D. Van Oort
Kevin P. Wagner (*pro hac vice forthcoming*)
**FAEGRE DRINKER BIDDLE & REATH LLP**
220 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Tel: (612) 766-7000
Fax: (612) 766-1600
aaron.vanoort@faegredrinker.com
kevin.wagner@faegredrinker.com

***Counsel for Defendant Anywhere Real Estate Inc.***

# Exhibit A

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| MYA BATTON, AARON BOLTON, MICHAEL BRACE, DO YEON KIM, ANNA JAMES, JAMES MULLIS, THEODORE BISBICOS, and DANIEL PARSONS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>THE NATIONAL ASSOCIATION OF REALTORS, ANYWHERE REAL ESTATE, INC. FORMERLY KNOWN AS REALOGY HOLDINGS CORP., RE/MAX LLC, and KELLER WILLIAMS REALTY, INC.,<br><br>Defendants. | Case No. 1:21-cv-00430 (LAH)<br><br>Judge LaShonda A. Hunt |

**ANYWHERE REAL ESTATE INC.'S RESPONSE TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION AND MOTION TO REASSIGN CASE**

## INTRODUCTION

For the second time, Plaintiffs are asking this Court to enjoin defendant Anywhere Real Estate Inc. from participating in a settlement approval process overseen by another, co-equal U.S. District Court. The first time, Judge Wood denied their motion for an injunction *sua sponte*, calling it "neither necessary nor appropriate." (Dkt. 154 at 2.) This time is no different.

As before, Plaintiffs' grievance is that other parties negotiated a class settlement that they think is inadequate. But the way to raise this concern is to object to the settlement's approval under Rule 23 in the court reviewing it. As Judge Wood previously explained, the "very purpose" of the Rule 23 approval process "is for the district court to consider and address challenges to the fairness of the proposed class action settlement." (*Id.* at 1.) No step other than an objection is required. The Supreme Court rejected the need for intervention in *Devlin v. Scardelletti*, 536 U.S. 1 (2002). And because a Rule 23 objection provides a legal remedy, there is no need for an injunction.

The settlement at issue was reached in *Tuccori v. At World Properties, LLC*, No. 1:24-cv-00150 (N.D. Ill.), one of seven related cases pending before Judge Jenkins. Judge Jenkins preliminarily approved ten indirect-purchaser (home buyer) class settlements in those cases last October and authorized a mediation process through which additional, potential defendants could opt in to the settlements. Plaintiffs call this procedure "bizarre." (Dkt. 271 at 1.) But the same procedure was approved by the federal court overseeing the previous direct-purchaser (home seller) class actions and was successfully used for a large number of settlements. (*See Burnett, et al. v. Nat'l Ass'n of Realtors, et al.*, No. 4:19-cv-00332-SRB (W.D. Mo.) Dkt. 1460.) Plaintiffs did not object to the procedure then. And here, Judge Jenkins approved the procedure and appointed former Northern District of Illinois Chief Judge James Holderman, now a mediator, to oversee it.

Anywhere participated in the court-approved *Tuccori* mediation process after it was acquired by Compass Real Estate. The acquisition made Anywhere a sister company to At World Properties—one of the ten *Tuccori* defendants whose settlements were preliminarily approved in October. Anywhere had previously been subpoenaed by the *Tuccori* plaintiffs as an unnamed co-conspirator but had not yet been named a defendant. Unlike the Plaintiffs here, who are trying to represent indirect-purchaser home buyers who already released their claims in the direct-purchaser litigation (an attempt this Court rejected), the *Tuccori* plaintiffs represent homebuyers not already covered by a release. In an arm's length mediation overseen by former Chief Judge Holderman, Anywhere and plaintiffs reached a final agreement, and plaintiffs presented the settlement (along with three others) to Judge Jenkins for preliminary approval on February 23.

Plaintiffs now argue that this Court should enjoin that preliminary approval process and reassign all the *Tuccori* cases to this Court. As before, the Court should deny the injunction. On reassignment, Anywhere expects that your Honor and Judge Jenkins will confer on who should handle the *Tuccori* cases. Given that Judge Jenkins already addressed the first ten settlements in October, and these new settlements would be added to the same fund and claims process, it is difficult to see how reassignment would "result in a substantial savings of judicial time and effort." L.R. 40.4(b). Instead, it would create unnecessary work for this Court.

Regardless, Anywhere has no qualms about any court overseeing the settlement approval process. The settlement Anywhere negotiated is fair, reasonable, and adequate, and the Rule 23 review process will show it to be so. As is typical, objecting counsel claim they could get a better deal. But in fact, the settlement they negotiated with Keller Williams obtains almost exactly the same amount for the unreleased claims as the *Tuccori* plaintiffs' settlement with Anywhere—$10

million versus $9.602 million. The extra money in the Keller Williams settlements is for claims that were already released.

In sum, Plaintiffs' procedural emergency is baseless. No one should be enjoined. Plaintiffs should raise their objection in *Tuccori*. Judge Jenkins should probably keep *Tuccori*, but this Court will decide, and Anywhere will defer to its decision.

## FACTUAL AND PROCEDURAL BACKGROUND

**Real-estate broker antitrust litigation.** This action is one of many antitrust actions raising allegations of price fixing against essentially the entire U.S. real estate brokerage industry. The claim is that rules promulgated by the National Associations of Realtors (NAR) and implemented by multiple listing services increased the commissions paid to brokerages when homes are sold.

The direct-purchaser cases (brought by home sellers, who directly paid the commissions) were filed first. *See Burnett v. Nat'l Ass'n of Realtors, et al.*, No. 4:19-cv-00332-SRB (W.D. Mo. 2019); *Moehrl v. Nat'l Ass'n of Realtors, et al.*, No. 1:19-cv-01610-ARW (N.D. Ill. 2019).

The indirect-purchaser cases (brought by home buyers, who allege that higher commissions increased the home prices they paid), including this case, were copycat claims filed years later. (*See, e.g.*, Dkt. 1 (Complaint, filed Jan. 25, 2021); *Tuccori*, No. 1:24-cv-00150 (N.D. Ill.).)

In the fall of 2023, shortly before trial in the direct-purchaser litigation, Anywhere reached the first nationwide settlement, in which it agreed to pay $83,500,000 to settle the direct-purchaser claims, plus the indirect-purchaser claims of people who had both. (*See Burnett* Dkt. 1192; *Burnett* Dkt. 1469 at 5.) RE/MAX soon followed with its own settlement. Trial proceeded against other defendants, including NAR and Keller Williams, and those defendants lost. Keller Williams settled after the trial loss. (*Burnett* Dkt. 1372.) So did NAR. (*Burnett* Dkt. 1460.) The NAR settlement included an opt-in procedure to allow alleged co-conspirator brokerages not named as parties to

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, *et al.*, individually and on behalf of similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiffs*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Consolidated with: |
| AT WORLD PROPERTIES, LLC, *et al.*, | ) | No. 24-cv-02399<br>No. 24-cv-03160 |
| *Defendants*. | ) | No. 24-cv-3356<br>No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO NON-PARTY *BATTON* PLAINTIFFS' MOTION TO INTERVENE WITH RESPECT TO PROPOSED CLASS ACTION SETTLEMENT WITH NON-PARTY OPT-IN SETTLOR ANYWHERE REAL ESTATE**

The *Tuccori* Plaintiffs state as follows in opposition to Non-Party *Batton* Plaintiffs' Motion to Intervene With Respect to Proposed Class Action Settlement With Non-Party Opt-In Settlor Anywhere Real Estate. (Dkt. 100, the "Motion to Intervene" or "Motion").

## INTRODUCTION

After this Court granted preliminary approval to the Class Settlement Agreement on October 16, 2025 and appointed *Tuccori* counsel as Class Counsel (Dkt. 65), Class Counsel did exactly what the Court directed and sought further agreements with unnamed co-conspirators. They successfully reached multiple agreements and presented them for preliminary approval. (Dkt. 98 at 1-4). The *Batton* Plaintiffs take issue with just one of those agreements—the agreement with Anywhere Real Estate Inc. ("Anywhere"). Under Rule 23, however, the proper procedure to challenge a class settlement is to object following approval. Intervention would be unnecessary, untimely, and prejudicial. It should be denied.

To clarify at the outset, Anywhere is **not** involved in any settlement in *Batton v. The Nat'l Ass'n of Realtors*, 21-cv-430 (N.D. Ill.) ("*Batton*"). It is a defendant in *Batton*, as the *Tuccori* Plaintiffs expressly stated in their motion for preliminary approval of opt-in settlements filed concurrently with their motion for leave to file an amended complaint. (Dkt. 98 at 6); (Dkt. 98-1, Ex. 4 to Geske Decl. ¶ 4). As Plaintiffs also stated, a different *Batton* defendant, Keller Williams Realty LLC ("Keller Williams"), reached a proposed settlement in *Batton*. (Dkt. 98 at 6 n.5). But that settlement does **not** involve Anywhere or any of the other Settling Parties here and entails certification of a materially different settlement class that purports to include claims that have already been released in other real estate brokerage settlements. (*Id.*).[1]

[1] Because Plaintiffs' Motion for Leave to Amend (Dkt. 97) and Motion for Preliminary Approval (Dkt. 98) are interrelated, reference one another, and were filed simultaneously, it was Plaintiffs' intent that they would be considered together. Plaintiffs sincerely apologize if the separate filings caused any confusion. Although there is no longer any opposition to Plaintiffs' Motion for Leave to Amend among the Parties (Dkt. 104), Plaintiffs will file a renewed Motion for Leave to Amend should the Court so require.

The settlements with Anywhere and the other Opt-In Settlors before this Court were reached through the Court-approved opt-in procedures in this case, including mediations conducted by the Court-appointed Special Master for Mediation, former Northern District of Illinois Chief Judge James F. Holderman (Ret.). (*Id.*); (Supplemental Declaration of Judge James F. Holderman (Ret.) ¶¶ 5-11, filed herewith as Exhibit 1). Importantly, with respect to Anywhere, Judge Holderman was fully aware of *Batton* and Keller Williams' settlement prior to the mediation. (*Id.* ¶¶ 6-7). But unlike *Batton*, the *Tuccori* Settlement Class is more appropriately defined, as it does not include already-released claims. And this case is the right vehicle for Anywhere's settlement because its sister-company, At World Properties, LLC ("@properties"), is already a participant in the Court-approved Settlement as a Settling Defendant. (Dkt 98 at 3 n.2).

The *Batton* Plaintiffs seek to intervene in an effort to take over and disrupt a settlement that the *Tuccori* Plaintiffs negotiated. But the correct procedure is not to intervene, it is to object under Rule 23, as the *Batton* Plaintiffs were already instructed by another judge in this District. Indeed, this is not the first time the *Batton* Plaintiffs have attempted to block a class settlement that other plaintiffs negotiated. They previously moved for a temporary restraining order ("TRO") before Judge Andrea R. Wood, seeking to enjoin the approval of a settlement with Anywhere in Missouri federal court that included both direct-purchaser (home seller) claims and indirect-purchaser (homebuyer) claims, but Judge Wood soundly denied that motion. (Order Denying Plfs' Mot. for TRO & Preliminary Injunction, *Batton*, 21-cv-430 (N.D. Ill. May 8, 2024), ECF No. 154, filed herewith as Exhibit 2); (Dkt. 107-1 at 4-5).[2]

As Judge Wood explained, Rule 23 already provides a straightforward vehicle for those who wish to challenge the fairness and adequacy of a class settlement: they can file an objection. (*Id.* at 2) ("[*Batton*] Plaintiffs' counsel . . . will have an opportunity to present their concerns

[2] The *Batton* Plaintiffs also objected to Anywhere's Missouri settlement, but their objection was overruled and is now on appeal. *Id.*

about the proposed settlement at the final approval hearing before the [Missouri] court. That proceeding is deemed to provide an adequate remedy at law."). If their objection is overruled, the objector can also seek appellate review. Thus, there is no reason for the procedural mess, delay, and disruption that intervention would cause here.

The *Batton* Plaintiffs tout their settlement with Keller Williams and assert that they could have gotten a better deal from Anywhere. What the *Batton* Plaintiffs fail to mention, however, is that nearly **80%** of the claims in the Keller Williams settlement have *already been released* through other court-approved settlements in prior, direct-purchaser (home seller) real estate brokerage antitrust litigation. In other words, the *Batton* Plaintiffs made the questionable decision to provide superfluous payments to individuals who will already be compensated through other settlements. By contrast, the *Tuccori* Plaintiffs' Settlement Class is expressly limited to homebuyers with unreleased claims. (Dkt. 65 ¶ 7). Under the *Batton* Plaintiffs' Distribution Plan filed on February 26, 2026,[3] only half of the Keller Williams settlement funds ($10 million) will be allocated to those with unreleased claims, which is entirely consistent with the $9.6 million the *Tuccori* Plaintiffs negotiated from Anywhere. To put a finer point on this distinction, the Keller Williams settlement delivers *no greater value* to those with actual claims and thus provides no reason to doubt the fairness of the Settlement here.

Importantly, the *Batton* Plaintiffs' Motion to Intervene does not take issue with any aspect of the *Tuccori* Settlement's opt-in procedure nor any of the payments from the initial Settling Defendants or the other Opt-In Settlors—all of which are entirely consistent with Anywhere's contribution when accounting for each brokerage's relative size. Instead, the *Batton* Plaintiffs baselessly assert that the settlement with Anywhere was the result of a "reverse auction." It was not. Class Counsel and Anywhere followed the exact procedure outlined in the Court's

[3] *See* Distribution Plan at 4-5, No. 1:21-cv-00430 (N.D. Ill. Feb. 26, 2026), ECF No. 276-2.

Preliminary Approval Order and mediated with the Court-appointed Special Master, Judge Holderman, the former Chief Judge of this District. (Dkt. 65 at 6). The *Batton* Plaintiffs do not deny—nor could they—that Plaintiffs and Anywhere abided by the terms of the Class Settlement Agreement and the Court's Preliminary Approval Order.

Lastly, the Motion to Intervene should also be denied as untimely. The *Batton* Plaintiffs admit that they were well aware of the *Tuccori* Settlement and its opt-in procedure—approved months ago on October 16, 2025—which expressly directs Class Counsel to pursue settlements with non-party opt-in settlors and even identifies the National Association of Realtors® ("NAR"), one of the central *Batton* defendants, as one such potential opt-in settlor. (Dkt. 58-1 ¶ 36). If the *Batton* Plaintiffs thought the Settlement in this case threatened their purported interests, they took no action to protect those interests and failed to make any attempt to intervene earlier. Instead, they only seek to intervene now in an attempt to enable their own counsel to recover fees from Anywhere's Settlement with the *Tuccori* Plaintiffs.

As explained more fully below, the *Batton* Plaintiffs have no basis to intervene, and their Motion should be denied in its entirety.[4]

## <u>BACKGROUND</u>

### A. The *Tuccori* Homebuyer Settlement.

Although plaintiffs in numerous cases have brought antitrust claims against residential real estate brokerages, the *Tuccori* Plaintiffs are the first nationwide to have achieved a settlement on behalf of home*buyers*. *Tuccori* was initiated in December 2023, and the *Tuccori* Plaintiffs' counsel reached the first-ever homebuyer settlement with @properties (Anywhere's sister-company) following a mediation conducted by Judge Holderman in May 2024. (Dkt. 58 at

[4] Plaintiffs will also be filing a separate response to the *Batton* Plaintiffs' Motion for Reassignment under L.R. 40.4 before Judge Hunt. Many of the defects in the *Batton* Plaintiffs' Motion to Intervene also support the denial of their Motion for Reassignment.

5). The *Tuccori* Class Counsel subsequently reached additional settlements with nine other defendants to join with @properties in a landmark homebuyer settlement preliminarily approved by this Court on October 16, 2025. (Dkt. 65). The negotiations that preceded these settlements spanned many months and numerous mediation sessions, and were successful due to Class Counsel's tireless efforts on behalf of the Settlement Class Members and their significant investment of time and resources. (Dkt. 58 at 5-6, 20-21).

As explained in prior filings, the *Tuccori* Settlement includes an opt-in procedure that allows brokerages and real estate companies to opt into the Settlement by contributing a payment to the Settlement's Global Settlement Fund to provide additional relief for the Settlement Class Members. (Dkt. 58 at 8); (Dkt 58-1 ¶¶ 35-36) (summarizing the Settlement's opt-in procedure). This mechanism is modeled off a similar framework that has been approved and successfully employed in other real estate brokerage antitrust litigation. *See generally* Order, *Burnett v. The Nat'l Ass'n of Realtors*, 4:19-cv-00332 (W.D. Mo. Nov. 27, 2024), ECF No. 1622. The opt-in structure has proved successful here as well. The *Tuccori* Plaintiffs have sought approval of opt-in agreements with five additional brokerages who have collectively agreed to pay $10,787,500.00 following mediations with Judge Holderman. (*See generally* Dkt. 98).

**B. The Missouri Home Seller Settlements Resolve Most Homebuyer Claims.**

The *Tuccori* homebuyer litigation was filed on the heels of other cases brought on behalf home sellers. *See, e.g., Burnett*, No. 4:19-cv-0332 (W.D. Mo.). The Missouri home seller litigation led to settlements with numerous brokerages in 2023 and 2024 (including most of the Defendants in *Batton* and *Tuccori*), ultimately culminating in a settlement with the NAR. As stated above, the NAR settlement includes an opt-in procedure like the one approved here.

Importantly, the releases in these home seller settlements cover *all* of the home seller class members' claims arising out of the alleged conspiracy among real estate brokerages,

including claims related to home sales *and* any home purchases those individuals made during the same period. Because most individuals who sell a home also simultaneously buy a new one to relocate to, the majority of homebuyers are also sellers. Indeed, the *Batton* Plaintiffs have asserted that as many as 79% of all homebuyers have also sold a home and thus fall within the scope of the releases in this home seller settlements. (Dkt. 107-1 at 7). This means that only approximately 21% of homebuyers still have unreleased, "buyer-only" claims. (*Id.*).

**C. The *Batton* Case.**

Despite being filed in 2021, *Batton* is currently mired in discovery because the *Batton* Plaintiffs have hit multiple stumbling blocks. All of their claims were initially dismissed under Rule 12(b)(6) in 2022. *Leeder v. The Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301 (N.D. Ill. 2022) (Wood, J.). And although they attempted to replead their claims, the *Batton* Plaintiffs received a mixed ruling after another round of motion to dismiss briefing. 2024 WL 689989 (N.D. Ill. Feb. 20, 2024) (Wood, J.) (dismissing the *Batton* Plaintiffs' Sherman Act claims under Rule 12(b)(6) and dismissing claims against another group of defendants under Rule 12(b)(2)).

To date, *Batton* has yet to proceed to summary judgment, and the *Batton* Plaintiffs' first and only attempt to move for class certification was stricken when they sought to certify an overbroad class that included already-released homebuyer claims—just as their settlement with Keller Williams does. The *Batton* Court agreed this was improper, struck both the *Batton* Plaintiffs' class certification motion and their motion to be appointed interim class counsel, and stayed all further class certification proceedings pending resolution of the appeals involving the released claims. (Minute Entry, *Batton*, 1:21-cv-00430 (N.D. Ill. Nov. 13, 2025, ECF No. 257).

**D. The Keller Williams Settlement.**

In February 2026, the *Batton* Plaintiffs moved for preliminary approval of a class settlement with Keller Williams. Unlike the *Tuccori* Settlement, the Keller Williams settlement

includes *all* homebuyer claims, including the nearly 80% of homebuyer claims already released through settlements in the Missouri litigation. Under the *Batton* Plaintiffs' Plan of Allocation for distributing the Keller Williams settlement funds, only half of the $20 million settlement, or $10 million, will go to individuals with unreleased buyer-only claims, (Dkt. 107-1 at 13-14), which is well in line with the $9.6 million payment the *Tuccori* Plaintiffs negotiated with Anywhere.

**LEGAL STANDARD**

A non-party can seek to intervene as of right under Rule 24(a) or permissively under Rule 24(b). Where non-parties seek to intervene as of right, they must "establish[ ] that: (1) their motions to intervene were timely; (2) they possess an interest related to the subject matter of the . . . action; (3) disposition of the action threatens to impair that interest; and (4) the [parties] fail to represent adequately their interest." *Ligas ex rel. Foster v. Maram*, 478 F.3d 771, 773 (7th Cir. 2007) (quoting *United States v. BDO Seidman*, 337 F.3d 802, 808 (7th Cir. 2003)); Fed. R. Civ. P. 24(a)(2). "The burden is on the party seeking to intervene of right to show that all four criteria are met," *Reid L. v. Ill. State Bd. of Educ.*, 289 F.3d 1009, 1017 (7th Cir. 2002), and "[a] failure to establish any of the[ ] elements is grounds to deny the petition." *Ligas*, 478 F.3d at 773.

Permissive intervention under Rule 24(b) is subject to "the discretion of the district court where the applicant's claim and the main action share common issues of law or fact and where there is independent jurisdiction." *Ligas*, 478 F.3d at 775; Fed. R. Civ. P. 24(b)(1)(B). However, a motion for permissive intervention will be denied if "the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(1), (3).

Regardless of whether the *Batton* Plaintiffs' Motion is considered under Rule 24(a) or (b), they must show that their request to intervene is "timely." *Mittvick v. State of Ill.*, 672 F. App'x 582, 584 (7th Cir. 2016). The "test for timeliness is essentially one of reasonableness," *Reich v. ABC/York-Estes Corp.*, 64 F.3d 316, 321 (7th Cir. 1995), and courts consider the following four

factors to determine whether a motion to intervene is timely: (1) the length of time the intervenor knew or should have known of his interest in the case; (2) the prejudice caused to the original parties; (3) the prejudice to the intervenor if the motion is denied; (4) any other unusual circumstances. *Sokaogon Chippewa Community v. Babbitt*, 214 F.3d 941, 949 (7th Cir. 2000) (citing *Ragsdale v. Turnock*, 941 F.2d 501, 504 (7th Cir. 1991)).

## ARGUMENT

### A. The *Batton* Plaintiffs Do Not Have The Right To Intervene Under Rule 24(a).

#### 1. Denying the *Batton* Plaintiffs' Request to Intervene Will Neither Impair Nor Impede Their Rights.

Even if the *Batton* Plaintiffs did have a legally protectable interest in the *Tuccori* Plaintiffs' settlement with Anywhere, denying their request for intervention would not threaten to impair that interest. "When a court denies a motion to intervene by an absent class member opposing settlement, that class member's ability to protect [her] interest in opposing the Settlement is not impair[ed] or impede[d]. That is because the putative intervenor, as an absent class member who stays in [the] action, has the opportunity, vis-à-vis the settlement process, to object to the Proposed Settlement." *T.K. ex. rel. Leshore v. ByteDance Tech. Co., Ltd.*, No. 19 CV 7915, 2021 WL 1172767, at *5 (N.D. Ill. March 29, 2021) (cleaned up); *see also Sokaogon*, 214 F.3d at 948 (holding that intervenor could not "use alleged legal problems with the Settlement Agreement to bootstrap itself into this litigation.").

As explained above, the *Batton* Plaintiffs' criticisms of Class Counsel's settlement with Anywhere are unfounded. But even if the *Batton* Plaintiffs did have some basis to challenge the settlement, intervention is not the proper way to do so. Rule 23 already provides a well-established avenue to object to the Settlement, illustrated by Judge Wood's order denying the *Batton* Plaintiffs' motion for a TRO. There, as here, the *Batton* Plaintiffs sought to "challenge the adequacy of the consideration" paid by Anywhere, and they "fear[ed] that the releases in the

[Missouri] settlement agreements would preclude" certain homebuyer plaintiffs from continuing to litigate their claims in *Batton*. (Ex. 2 at 1). Judge Wood denied the *Batton* Plaintiffs' motion because their counsel would "have an opportunity to present their concerns about the proposed settlement at the final approval hearing before the [Missouri] court. That proceeding is deemed to provide an adequate remedy at law." (*Id.* at 2). Indeed, "[t]he very purpose of a final approval hearing . . . is for the district court to consider and address challenges to the fairness of the proposed class action settlement." (*Id.* at 1). Importantly, Judge Wood also emphasized that the *Batton* "Plaintiffs' goal" of "prevent[ing] the fairness hearing duly set by the [Missouri] court from going forward according to that court's orders" was an "extraordinary action" that "would be inappropriate." (*Id.* at 2). The same is true here.

The *Tuccori* Plaintiffs are confident that their settlement with Anywhere is fair, reasonable, and adequate. The *Tuccori* Plaintiffs followed the Court-approved process for negotiations with opt-ins and secured Anywhere's commitment to make a substantial monetary contribution to the Court-approved Settlement following an arm's-length mediation conducted by Judge Holderman. Anywhere's payment is entirely consistent with the payment amounts of the Settling Defendants that this Court has already preliminarily approved when taking into account each brokerage's relative size and the separate payments each brokerage has already made to resolve its liability to home sellers in the Missouri litigation. (Dkt. 107-1 at 13).

The *Batton* Plaintiffs' settlement with Keller Williams does not show otherwise. As explained above, the Keller Williams settlement includes at least four times as many people, nearly 80% of whom have already released their claims, and only half of the Keller Williams settlement fund ($10 million) will be allocated to individuals with unreleased, buyer-only claims, which is well in line with Anywhere's $9.6 million payment here.

Regardless, because the *Batton* Plaintiffs retain the ability to object to any Court-

approved settlement here, they will not be prejudiced, nor will any of their purported interests be impaired, if their request for intervention is denied. *Shakman v. City of Chi.*, No. 69 C 2145, 2007 WL 1468721, at *2 (N.D. Ill. May 18, 2007) ("Burke will not be prejudiced if intervention is denied. He will remain free, if he chooses, to object to the settlement agreement . . . [I]f Burke actually does disagree with the views of the settling parties, that dissent can be dealt with in the same ways that dissent in any large class is usually accommodated."). And if the *Batton* Plaintiffs' objection is overruled, they will also have the ability to appeal that ruling. *Zbaraz v. Madigan*, 572 F.3d 370, 377 (7th Cir. 2009) ("unnamed class members who are bound by the terms of a settlement and have objected to the settlement at a fairness hearing have a right to appeal the settlement without formal intervention" (citing *Devlin v. Scardelletti*, 536 U.S. 1 (2002))). There is no reason to deviate from the ordinary Rule 23 procedures here. Intervention is neither appropriate—nor necessary—for the *Batton* Plaintiffs to protect their purported interests.

**2. Allowing the *Batton* Plaintiffs to Intervene Would Substantially Prejudice <u>All</u> Parties in *Tuccori*.**

The risk of prejudice to the existing parties is the "most important consideration" for intervention. *Nissei Sangyo Am., Ltd. v. United States*, 31 F.3d 435, 439 (7th Cir. 1994).[5] Where an intervenor seeks to undo or renegotiate a settlement among the parties, the prejudice is "manifest." *State v. City of Chi.*, 912 F.3d 979, 986 (7th Cir. 2019). As the Seventh Circuit has repeatedly recognized, "[o]nce parties have invested time and effort into settling a case it would be prejudicial to allow intervention." *Id.* at 986-87 (quoting *Ragsdale*, 941 F.2d at 504); *Sokaogon*, 214 F.3d at 950 ("To allow a tardy intervenor to block the settlement agreement after all the effort would result in the parties' combined efforts being wasted completely.").

Here, the *Batton* Plaintiffs seek to undo the *Tuccori* Plaintiffs' meritorious Settlement

[5] Prejudice is relevant for both intervention as of right and permissive intervention. Fed. R. Civ. P. 24(b)(3).

with Anywhere so they can force Anywhere to unwillingly renegotiate a new settlement with *Batton* Plaintiffs' counsel. This would be incredibly wasteful and manifestly prejudicial. The *Tuccori* Plaintiffs and Anywhere have already invested substantial time, effort, and resources into achieving a strong settlement that the *Batton* Plaintiffs now baselessly attack. The process leading up to the execution of Anywhere's opt-in agreement involved complex negotiations, robust confirmatory discovery, and an arm's-length mediation conducted by Judge Holderman. (Dkt. 98 at 2-6) (Holderman Decl. ¶¶ 4-12). If the Court were to allow the *Batton* Plaintiffs to impede a settlement that is now close to approval, the "negotiation process in which the present parties participated would be wasted." *City of Bloomington v. Westinghouse Elec. Corp*., 824 F.2d 531, 536 (7th Cir. 1987); *Ragsdale*, 941 F.2d at 504 ("A case may never be resolved if another person is allowed to intervene each time the parties approach a resolution of it.").

As part of their effort to take over the settlement the *Tuccori* Plaintiffs negotiated, the *Batton* Plaintiffs also intend to file a motion to supplant the *Tuccori* Plaintiffs' counsel as class counsel, even though the Court already appointed the *Tuccori* Plaintiffs' counsel to this role. (Dkt. 65). This would only compound the prejudice to the *Tuccori* Plaintiffs and Anywhere. *Shakman*, 2007 WL 1468721, at *2 (finding that the parties' "negotiation efforts would be prejudiced by the addition of a new party who seeks to substitute himself as class representative at [a] late date" following "months of difficult negotiations"); *see Planned Parenthood of Wis., Inc. v. Kaul*, 942 F.3d 793, 801 (7th Cir. 2019) ("An intervenor must meet [a] high standard before it can subject the district court to the intractable procedural mess that would result from the extraordinary step of allowing a single entity . . . to have two independent parties simultaneously representing it.").

Apart from delaying approval of Plaintiffs' settlement with Anywhere, intervention would also disrupt the proceedings relating to the other settlements reached with the Settling

Defendants and the Opt-In Settlors, causing prejudice to *all* other Parties in *Tuccori*. In connection with their Motion to Intervene, the *Batton* Plaintiffs also seek to relate and reassign this matter to *Batton*. However, the structure of the *Tuccori* settlement was established and approved before this Court, and the Court has at all times overseen proceedings relating to the Settlement. It would be needlessly inefficient to reassign this case to another court that would then have to spend time and effort familiarizing itself with the details of a complex, multi-party class settlement. Among the ten Settling Defendants and five prospective Opt-In Settlors in *Tuccori*, none wish to have their settlement disrupted or upended by the *Batton* Plaintiffs.

The *Batton* Plaintiffs cite *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877 (7th Cir. 2000) (Dkt. 100 at 8-9), but that case is inapplicable because it was decided before the Supreme Court's decision in *Devlin*. In *Crawford*, the court allowed an objector to a class settlement to intervene so that he could take an appeal if his objection were overruled. 201 F.3d at 881. After *Crawford*, however, the Supreme Court clarified in *Devlin* that an unnamed class member who objects to the approval of a class settlement has a right to appeal an adverse decision without intervening. 536 U.S. at 14. Accordingly, *Crawford* is outdated and neither supports the *Batton* Plaintiffs' arguments as to prejudice nor gives them a right to intervene here.

**3. The *Batton* Plaintiffs' Request to Intervene is Untimely.**

Returning to the first timeliness factor—the length of time the intervenor knew or should have known of its interest in the case—the *Batton* Plaintiffs could have, and indeed should have, sought to intervene far earlier if they believed their interests could be impaired in *Tuccori*.

The *Batton* Plaintiffs have known about the *Tuccori* action at least as far back as February 2024. (Dkt. 107-1 at 5). And they admit that they were aware of the *Tuccori* Settlement and this Court's Preliminary Approval Order entered on October 16, 2025, including the Settlement's preliminarily-approved opt-in structure. (Dkt. 102-1 at 1). Yet, they took no action to intervene

previously, instead waiting until after the *Tuccori* Plaintiffs moved for approval of the opt-in agreement with Anywhere.

Because the *Batton* Plaintiffs "waited until settlement was imminent" to intervene, their actions "strongly suggest[ ] that [they are] not interested in intervening in the *litigation* but in blocking a settlement between the parties . . . ." *Sokaogon*, 214 F.3d at 948 (emphases in original). If the *Batton* Plaintiffs were "concerned about settlement negotiations not taking [their] interests into account, [they] should have moved to intervene at such a time when it would have been able to participate in them. As it now stands, intervention . . . serves no conceivable purpose other than to block a settlement agreement that [the *Batton* Plaintiffs' counsel] does not like." *Id.*

The *Batton* Plaintiffs assert that their Motion is timely because it was filed one day after the *Tuccori* Plaintiffs filed their motion to approve their agreement Anywhere. (Dkt. 100 at 4). But "[t]he relevant inquiry in determining timeliness [ ] is not on the time between the settlement and the motion to intervene, but instead is on the time between the [proposed intervenors'] knowledge that the suit could impact their interests and the motion to intervene." *Heartwood, Inc. v. U.S. Forest Serv., Inc.*, 316 F.3d 694, 701 (7th Cir. 2003); *State*, 912 F.3d at 985 ("we measure [timeliness] from when the [intervenor] has reason to know its interests *might* be adversely affected, not from when it knows for certain that they will be."). Thus, the clock began running for the *Batton* Plaintiffs at least as early as October 2025, when the Court entered its Preliminary Approval Order—and directed the *Tuccori* Plaintiffs to pursue opt-in agreements with non-parties—not upon the subsequent filing of Plaintiffs' motion for approval of opt-ins.

The fact that the *Batton* Plaintiffs waited nearly five months after the Court entered its Preliminary Approval Order, and long after the *Batton* Plaintiffs knew that their interests might be affected, demonstrates that their Motion to Intervene is untimely and merely an opportunistic attempt to take over a settlement that other parties negotiated. *See Collier v. BrightPoint, Inc.*,

2013 WL 1840509, at *3 (S.D. Ind. May 1, 2013).

#### 4. *Tuccori* Class Counsel Will Continue to Adequately Protect the Rights of Homebuyers.

As to the third and fourth Rule 24(a) elements, the *Batton* Plaintiffs do not possess any unique interests in the *Tuccori* action that are not already protected by the existing Parties. "Intervention as of right requires a 'direct, significant[,] and legally protectable' interest in the question at issue in the lawsuit." *Wis. Educ. Ass'n Council v. Walker*, 705 F.3d 640, 658 (7th Cir. 2013) (quoting *Keith v. Daley*, 764 F.2d 1265, 1268 (7th Cir. 1985)). Additionally, that interest "must be unique to the proposed intervenor." *Id.*; *Zbaraz*, 572 F.3d at 377.

The *Batton* Plaintiffs claim a purported interest in claims brought on behalf of putative homebuyer class members, but the Court has already found that the *Tuccori* Plaintiffs' counsel have—and will continue to—fairly and adequately represent those interests. (Dkt. 65 ¶¶ 8, 10-11). The results achieved to date support this finding. The *Tuccori* Plaintiffs' litigation and settlement efforts have led to settlements with the ten initial Settling Defendants and five potential Opt-In Settlors despite challenges with the merits of the underlying claims and the fact that most homebuyer claims (80%) have already been released through other class settlements, which caps potential recoveries and strains the Defendants' ability and incentive to pay.

The *Batton* Plaintiffs attempt to attack the *Tuccori* Plaintiffs' counsel's adequacy, but they have no ground to stand on. "Although intervention requires only a 'minimal' showing of inadequate representation, when the prospective intervenor and the named party have the same goal, a 'presumption [exists] that the representation in the suit is adequate." *Walker*, 705 F.3d at 659 (citations omitted). "The prospective intervenor then must rebut that presumption and show that some conflict exists." *Id.*

The *Batton* Plaintiffs cannot overcome this presumption here. They offer no evidence of a conflict, instead relying solely on the settlement with Keller Williams. As explained above,

however, that settlement is fundamentally different from the Settlement here because the settlement class is at least four times as large and 80% of the class members have already released their claims. The *Tuccori* Plaintiffs were not obligated to seek additional compensation for already-released claims, nor could any of the Settling Defendants be required to pay for such claims. In essence, the *Batton* Plaintiffs' challenges to the *Tuccori* Plaintiffs' counsel's adequacy amount to "quibbles with [a party's] litigation strategy," which aren't sufficient to show that an intervenor's interests are not being adequately represented. *Kaul*, 942 F.3d at 801. To the extent the *Batton* Plaintiffs do intend to intervene solely for the purpose of seeking to represent the interests of those with released claims, they lack Article III standing to do so. This, too, precludes intervention. *Town of Chester, N.Y. v. Laroe Estates, Inc.*, 581 U.S. 433, 439 (2017).

In sum, the *Batton* Plaintiffs fail to point to any "divergent interests that only they can adequately represent," *Zabaraz*, 572 F.3d at 378, so there are no interests that would be furthered by allowing them to intervene. To the extent they wish to raise other challenges to the *Tuccori* Plaintiffs' counsel's adequacy, those challenges can—and must—be brought as an objection following preliminary approval, not through a request to intervene.

**5. Permissive Intervention Should Also Be Denied.**

As with intervention as of right under Rule 24(a), a non-party's request for permissive intervention under Rule 24(b) will be denied if it is untimely or poses a risk of undue prejudice to the rights of the existing parties. Fed. R. Civ. P. 24(b)(3). As explained above in Plaintiffs' discussion of the Rule 24(a) factors, the *Batton* Plaintiffs fail to meet both of these requirements. Their request for permissive intervention should therefore also be denied. *Kaul*, 942 F.3d at 803 (affirming denial of permissive intervention "for many of the same reasons [the trial] found that the proposed intervenor failed to demonstrate a right to intervene.")

## CONCLUSION

For the foregoing reasons, the *Batton* Plaintiffs' Motion to Intervene should be denied.

Dated: March 2, 2026

Respectfully submitted,

JAMES TUCCORI, COURTNEY FOREGGER, KEVIN CWYNAR, DAWID ZAWISLAK, MICHAEL D'ACQUISTO, and ALEJANDRO LOPEZ A/K/A ALEANDRO LOPEZ, individually and on behalf of similarly situated individuals

By: */s/ Paul T. Geske*
One of Plaintiffs' attorneys

Myles McGuire
Evan Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

Jonathan M. Jagher
FREED KANNER LONDON
& MILLEN LLC
923 Fayette Street
Conshohocken, PA 19428
Tel: (610) 234-6487
jjagher@fklmlaw.com

Matthew W. Ruan
FREED KANNER LONDON
& MILLEN LLC
100 Tri-State International, Ste. 128
Lincolnshire, IL 60069
Tel: (224) 632-4500
mruan@fklmlaw.com

*Counsel for Plaintiffs and the Settlement Class*

## CERTIFICATE OF SERVICE

I, the undersigned, hereby certify that on March 2, 2026 I caused the foregoing *Plaintiffs' Response in Opposition to Non-Party* Batton *Plaintiffs' Motion to Intervene With Respect to Proposed Class Action Settlement With Non-Party Opt-In Settlor Anywhere Real Estate* to be electronically filed with the Clerk of the Court using the CM/ECF system. A copy of said document will be electronically transmitted to all counsel of record.

/s/ *Paul T. Geske*

**UNITED STATES DISTRICT COURT**
**FOR THE Northern District of Illinois − CM/ECF NextGen 1.8 (rev. 1.8.5)**
**Eastern Division**

James Tuccori, et al.

Plaintiff,

v.

Case No.: 1:24−cv−00150
Honorable Lindsay C. Jenkins

At World Properties, LLC, et al.

Defendant.

## NOTIFICATION OF DOCKET ENTRY

This docket entry was made by the Clerk on Wednesday, March 4, 2026:

MINUTE entry before the Honorable Lindsay C. Jenkins:In person status hearing and telephone conference held. Plaintiffs' partially opposed motion for leave to file instanter a first amended consolidated class action complaint [97] is granted. Plaintiff shall file the first amended consolidated class action complaint as a freestanding docket entry by March 6, 2026. Plaintiffs' unopposed motion for preliminary approval of settlements with Brokerages opting into the Court approved class settlement agreement [98] is granted. The motions for leave to appear pro hac vice [108] [109] [111] and [112] are granted. Mailed notice. (jlj, )

**ATTENTION:** This notice is being sent pursuant to Rule 77(d) of the Federal Rules of Civil Procedure or Rule 49(c) of the Federal Rules of Criminal Procedure. It was generated by CM/ECF, the automated docketing system used to maintain the civil and criminal dockets of this District. If a minute order or other document is enclosed, please refer to it for additional information.

For scheduled events, motion practices, recent opinions and other information, visit our web site at ***www.ilnd.uscourts.gov***.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| JAMES TUCCORI, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AT WORLD PROPERTIES, LLC, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-00150<br><br>Judge Lindsay C. Jenkins |

## NOTICE OF APPEAL

Notice is hereby given that Aaron Bolton,[1] individually and on behalf of all those similarly situated, hereby appeals to the United States Court of Appeals for the Seventh Circuit from the district court's Order denying his motion to intervene entered on March 4, 2026 (ECF No. 118), and all other orders adverse in whole or in part to Mr. Bolton and those similarly situated.

[1] Mr. Bolton is a named plaintiff in *Batton v. Nat'l Ass'n of Realtors, et al.*, 21-cv-430 (N.D. Ill.), and sought to intervene in the above-captioned matter on behalf of himself and similarly situated putative class members.

Respectfully submitted,

Dated: March 11, 2026

/s/ *Randall P. Ewing, Jr.*

Randall P. Ewing, Jr.
George A. Zelcs
Ryan Z. Cortazar
**KOREIN TILLERY, LLC**
205 North Michigan Avenue, Suite 1950
Chicago, IL 60601
Telephone: 312-641-9750
Facsimile: 312-641-9751
gzelcs@koreintillery.com
rewing@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney (MO Bar #56091)
Michael E. Klenov
Carol O'Keefe
**KOREIN TILLERY LLC**
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
Telephone: (314) 241-4844
sberezney@koreintillery.com
mklenov@koreintillery.com
cokeefe@koreintillery.com

Vincent Briganti
Margaret MacLean
Noelle Forde
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
Telephone: (914) 997-0500
Facsimile: (914) 997-0035
vbriganti@lowey.com
mmaclean@lowey.com
nforde@lowey.com

*Attorneys for Aaron Bolton*

## CERTIFICATE OF SERVICE

I hereby certify that on March 11, 2026, the foregoing was filed electronically with the Clerk of Court of the Northern District of Illinois to be served by the Court's electronic filing system to all Counsel of Record:

/s/ *Randall P. Ewing, Jr.*
Randall P. Ewing, Jr.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES TUCCORI, *et al.*, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>AT WORLD PROPERTIES, LLC, *et al.*,<br><br>Defendants. | Case No. 1:24-cv-00150<br><br>Judge Lindsay C. Jenkins |

## MOTION FOR STAY OF PROCEEDINGS PENDING APPEAL

Aaron Bolton, a plaintiff and class representative in *Batton*,[1] sought to intervene in this action ("*Tuccori*") to prevent a proposed settlement with Anywhere Real Estate, Inc. ("Anywhere") from being preliminarily approved.[2] ECF No. 100. Mr. Bolton argued that the proposed settlement was both procedurally and substantively unfair because it resulted from an often criticized "reverse auction" process which minimizes a defendant's payout instead of maximizing results for the class. *Id.* at 4-7. The result is an inferior settlement that prioritizes the interests of defendants and lawyers over the class members the case is supposed to help. *Reynolds v. Ben. Nat'l Bank*, 288 F.3d 277, 282, 284 (7th Cir. 2002) (defining a reverse auction as the situation where a "defendant in a series of class actions picks the most ineffectual class

[1] "*Batton*" refers to *Batton et al. v. Nat'l Assoc. of REALTORS®* ("NAR") *et al.*, No. 21-cv-00430 (N.D. Ill. Jan. 25, 2021) ("*Batton I*"). "*Batton II*" refers to *Batton, et al v. Compass, Inc., et al.*, 23-cv-15618 (N.D. Ill.).

[2] *Tuccori* refers to the above-captioned action.

lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant.”).

This Court denied Mr. Bolton’s motion, reasoning that his interests, and the interests of like-minded class members, may be vindicated by objecting to or opting out of the Anywhere settlement. Accordingly, Mr. Bolton has appealed to the Seventh Circuit. *See* ECF Nos. 124–25. Because courts have repeatedly found that Fed. R. Civ. P. 23’s objection and opt-out procedures do not suffice to protect litigants from the harms that flow from settlements bearing the very features of the settlement here (*see* pp 14-15, *infra*), Mr. Bolton’s appeal has a high likelihood of success. Should the Seventh Circuit agree with Mr. Bolton that he and the homebuyer class he represents have suffered, and will continue to suffer, irreparable injury if the Anywhere settlement in *Tuccori* is permitted to proceed, this Court will have protected the class via the stay. If the Seventh Circuit affirms the Court’s decision, this Court can lift the stay and proceed without the uncertainty of the pending appeal and without prejudice to the parties. Indeed, the *Tuccori* Plaintiffs have already indicated that they intend to postpone class notice (*see* ECF No. 98 at 7) such that a stay will not cause any undue delay.

## INTRODUCTION AND FACTUAL BACKGROUND

### A. Reverse Auctions Are Inherently Unfair and Dangerous

Settlements that result from reverse auctions are highly unfair because they severely undervalue class members’ claims. Instead of sellers lowering prices (like a normal reverse auction) which benefits consumers, in the class action context, rival firms compete by offering the cheapest settlement to a defendant, thereby causing injury to the very consumers to whom lawyers owe fiduciary duties of care, loyalty, good faith, and the duty to remain conflict-free. Under these conditions, “lawyers for the class [] may, in derogation of their professional and

fiduciary obligations, place their pecuniary self-interest ahead of that of the class," and accept a quick settlement for less than their clients' claims are truly worth. *Reynolds*, 288 F.3d at 279. Such collusive settlements "extinguish[] the claims against the defendant and enrich[] class counsel" but do "not provide commensurate or adequate benefit for the class." *Douglas v. Western Union Company*, 328 F.R.D. 204, 216 (N.D. Ill. 2018). If a settlement generated by reverse auction is permitted to proceed, its inadequacy cannot be undone because "the first team to settle with the defendants in effect precludes the others (who may have originated the action and litigated it with sufficient skill and zeal that the defendants were eager to settle with someone else))." John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1370 (1995).

Reverse auctions not only award counsel with "fees disproportionate to the effort they actually invested in the case", they impose substantial costs on society, litigants and class members: "lost opportunities for deterrence (if class counsel settled too quickly and too cheaply) [and] wasted resources (if defendants settled simply to get rid of the lawsuit at an attractive price, rather than because the case was meritorious)." S. Rep. 109–14, at 32, U.S. Code Cong. & Admin. News 2005, pp. 3, 3. And for defendants wishing to limit their liability by obtaining a first-to-settle discount, reverse auctions make it impossible for them to have any faith that they will not be undermined by later-settling defendants seeking a cheaper release from competing plaintiffs' counsel. And all of this is to say nothing of the ethical questions implicated in a defendant's choice to negotiate the release of litigants' claims against the defendant without including the counsel prosecuting those claims in the negotiations.

What transpired here is a real-life illustration of why the Seventh Circuit condemns reverse auctions—and why this Court should stay this case pending appeal to prevent any further

injury to Mr. Bolton and the remaining homebuyer class. Anywhere faces substantial liability in the *Batton* litigation that Mr. Bolton's counsel has been pressing against them for the past five years. To give a sense of the scale, the *Batton* plaintiffs' class certification expert estimated $2.6 billion in damages for just an exemplar segment of the class. Anywhere thus had a powerful incentive to "find a … lawyer willing to sell out the class." *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 839 (7th Cir. 1999). And this is exactly what Anywhere found in *Tuccori*'s invitation for real estate brokerages to "opt-in" and settle homebuyer claims at a fraction of their value.

Just a few months after mediating with Plaintiffs in *Batton*, and failing to reach a resolution on settlement, it was announced that Anywhere had "opted-in" to *Tuccori* for purposes of settling the homebuyers' claims for $9.6 million, less than half of the $20 million settlement Anywhere's co-defendant Keller Williams recently entered in *Batton*. *Batton*, ECF No. 269. Now Mr. Bolton and his fellow class members face the imminent prospect of having their valuable homebuying claims against non-settling defendants in *Batton* being bargained away in inferior "sweetheart deals" through *Tuccori's* opt-in procedure. This result is good for Anywhere, its co-defendants, and the wallets of *Tuccori* plaintiffs' counsel, but bad for the homebuyer class.

**B. Batton and its Counsel's Five-Year Push to Compensate Injured Homebuyers**

In 2021, *Batton* counsel and plaintiffs filed the first case on behalf of homebuyers alleging that a conspiracy among NAR and several large brokerages inflated real estate commissions, and, in turn, home prices. *Batton*, ECF No. 1.[3] After the *Batton* court initially held

[3] The *Batton* plaintiffs and their counsel simultaneously championed homebuyer claims in multiple other fora. *Batton* counsel's additional investigation led to the filing of *Batton II* in this District which added Compass Inc., eXp World Holdings, Inc., Redfin Corporation, Weichert Realtors, United Real Estate Group, Howard Hanna Real Estate Servies, and Douglass Elliman Inc. Subsequently, the *Batton* court

that homebuyers are indirect purchasers (*Batton*, ECF No. 81), *Batton* plaintiffs added new plaintiffs, developed additional facts, and researched the laws of more than 30 states to replead their complaint as indirect purchasers bringing claims under state antitrust and consumer protection laws. *Id.*, ECF No. 84. *Batton* plaintiffs went on to defeat the defendants' second and third motions to dismiss. *Id.*, ECF No. 185. Thereafter, they propounded discovery requests, obtained and analyzed hundreds of thousands of documents and 40 gigabytes of nationwide real estate data, and spent millions on world-class experts who opined that the NAR rules caused inflated home prices on a class-wide basis and provided a model for measuring those damages.

*Batton* counsel has also fought for its class members impacted by earlier, related litigation on behalf of home-sellers damaged by the same conspiracy *Batton* challenges.[4] The home-sellers' cases were successfully litigated to verdict by different class counsel against certain defendants in *Batton,* resulting in post-verdict settlements. Within days of the final fairness approval hearing of the first round of the home-seller settlements, and weeks after class notice had been completed, the home-sellers took the position for the first time that the release they had negotiated with the settling defendants was meant to release not only the home-selling claims that had been litigated all along, but also any home-*buying* claims held by home-seller

---

found that it lacked personal jurisdiction over defendant HomeServices of America, Inc. *Batton* plaintiffs thereafter dismissed their claims against HomeServices, Douglas Elliman, and Howard Hanna (who had similar jurisdictional defenses to HomeServices) and refiled against those defendants in districts where personal jurisdiction may be found. *See Lutz et al. v. HomeServices of America, Inc. et al.*, No. 24-cv-10040 (S.D. Fla.) ("*Lutz*"); and *Davis et al. v. Hanna Holdings, Inc.*, No. 2:24-cv-2374-WB (E.D. Pa.) ("*Davis*"). Plaintiffs have defeated *five* motions to dismiss in *Davis*, briefed three rounds of motions to dismiss in *Lutz*, and are engaging in voluminous discovery in both cases. In *Davis*, Mr. Bolton and the class's counsel also coordinated with the Department of Justice, Antitrust Division, for it to submit a statement in support of plaintiffs' allegations of a horizontal conspiracy, *Davis*, ECF No. 115 (Dec. 19, 2025), allegations the court credited in denying defendant Hanna Holding, Inc.'s motion to dismiss in relevant part. *Id.*, ECF No. 123.

[4] *Burnett et al. v. Nat'l Ass'n of REALTORS®, et al.*, No. 4:19-cv-00332 (W.D. Mo.) ("*Burnett*") and *Moehrl, et al. v. Nat'l Ass'n of REALTORS®, et al.*, No. 1:19-cv-01610 (N.D. Ill.) ("*Moehrl*").

class members, including those prosecuted in *Batton*. *See Burnett*, ECF No. 1469; *see also Batton*, ECF No. 152. *Batton* counsel immediately objected on the grounds that the seller settlements released their claims without additional compensation, let alone adequate notice and representation for the unique claims held by homebuyers, evidenced by numerous facts, including: (1) the seller cases did not allege any harm to homebuyers; (2) defendants' counsel stated their seller settlements would not impact the homebuying cases; (3) the initial class notice did not mention *Batton* or homebuyer claims; and (4) the claim form did not request any information relating to homebuying transactions. *Burnett*, ECF No. 1447 at 8-11. The district court overruled the objection in granting final approval of the settlements (*id.*, ECF No. 1487) and the *Batton* plaintiffs appealed to the Eighth Circuit. *See Rhonda Burnett et al. v. James Mullis*, No. 24-2143 (8th Cir. Oct. 9, 2024). That appeal has been fully briefed and argued and awaits decision.

In September 2025, the *Batton* plaintiffs moved for class certification. *Id.* ECF Nos. 236, 243. Following filing of Plaintiffs' opening class certification brief and expert reports, Defendant Anywhere moved to stay, arguing that the *Batton* Plaintiffs' class certification motion should await resolution of their Eighth Circuit appeal. The district court granted the stay over the objection of the *Batton* Plaintiffs. ECF No. 257.

On February 2, 2026, following more than six months of adversarial and arms' length negotiations, and with the assistance of renowned mediator Gregory P. Lindstrom, the *Batton* plaintiffs announced they had reached a $20 million icebreaker settlement with Keller Williams. *Batton*, ECF No. 262. This settlement was preliminarily approved on February 12, 2026. *Id.*, ECF No. 269. In approving the settlement, the court appointed *Batton* counsel as Class Counsel.

*Id.* ¶ 7 (appointing *Batton* counsel, finding "the requirements of Rule 23(g) of the Federal Rules of Civil Procedure [] fully satisfied by this appointment.").

**C. The Copycat *Tuccori* Action**

In December 2023, almost three years into *Batton*, Plaintiff Tuccori filed his "copycat" action in state court against a single defendant not named in *Batton*, alleging the same conspiracy and the same theory of harm to the same homebuyer class. Thereafter, several other cases were filed and related to *Tuccori*, all naming regional brokerages with small market share compared to the defendants named in *Batton*. Three months later—before any motion to dismiss decision or discovery—*Tuccori* was stayed to allow the parties to engage in mediation. Six months after that, the parties announced their first set of settlements for a total of $3,202,000. ECF No. 58. As part of its motion for preliminary approval of those settlements, *Tuccori* plaintiffs outlined an "opt-in" procedure pursuant to which any brokerage could opt-in to the settlement and either mediate, or pay 25% of what that brokerage paid in resolving the homesellers' *Burnett* litigation. *Id.* This opt-in procedure is an extremely unusual feature in Fed. R. Civ. P. 23(b) "opt-out" class actions such as *Tuccori*. Indeed, to counsel's knowledge, the only other example of such a procedure is in *Burnett* itself. But the *Burnett* opt-in mechanism was intended as a "monitoring and enforcement mechanism" to ensure industry practice changes were widely implemented, and to quiet homeseller litigation brought by the same *Burnett* counsel that had originated the homeseller claims and tried them to verdict, not to encourage reverse auctions that result in inferior settlements that harm class members. *Burnett*, ECF No. 1458 at 14.

**D. The Anywhere Reverse Auction Settlement**

On February 23, 2026, the *Tuccori* plaintiffs moved for preliminary approval of a settlement with Anywhere (alongside several other small brokerages) that expressly released the

claims in *Batton*. ECF No. 98. The motion disclosed for the first time to *Batton* plaintiffs and the *Batton* court that *Tuccori* plaintiffs and Anywhere were separately negotiating a release of the *Batton* claims. The $9.6 million settlement amount that resulted from this negotiation is less than half of Keller Williams' $20 million *Batton* settlement, despite Anywhere's much larger market share.

The *Tuccori* plaintiffs and Anywhere relied heavily on their mediation before Judge Holderman to argue that the settlement was proper. But the mere presence of a mediator does not make a settlement presumptively fair, procedurally or substantively. *See*, *e.g.*, *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 399-400 (C.D. Cal. 2007) (rejecting settlement negotiated with assistance of mediator due to procedural unfairness where, *inter alia*, settlement provided inadequate relief to a select group of class members and plaintiffs' counsel conducted insufficient and deficient discovery). Notwithstanding Judge Holderman's skill and good faith as a mediator, the settlement here was inherently tainted by the structure under which it arose. John C. Coffee, Jr., *Class Wars: The Dilemma of the Mass Tort Class Action*, 95 COLUM. L. REV. 1343, 1372 (1995) ("No explicit agreement among [defendants and plaintiffs' counsel] is needed; all that is necessary is that each team of plaintiffs' attorneys sees that it can be divested of any participation in the action unless it reaches a settlement with the defendants first.").

*First*, the *Tuccori* Plaintiffs had no credible leverage to bring Anywhere to the settlement table other than by offering it a means to settle homebuyer claims at a substantial discount to the liability Anywhere faced in *Batton* as a result of five years of hard-fought litigation. The *Tuccori* plaintiffs had not sued Anywhere, and any threat to sue Anywhere in *Tuccori* for duplicative claims being litigated in *Batton* carried no weight. In other words, no matter how hard *Tuccori* Plaintiffs' counsel may have pressed during mediation, they were hamstrung from the start

because they had no means to hold the very substantial costs of continued litigation over Anywhere's head. That leverage only existed in *Batton*. This is exactly why the Supreme Court has rejected the use of "[c]lass counsel confined to settlement negotiations" who "could not use the threat of litigation to press for a better offer." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 621 (1997).

The *Tuccori* Plaintiffs did not litigate against Anywhere, let alone with the skill and zeal of Mr. Bolton, the *Batton* plaintiffs, and their counsel. It is no wonder that Anywhere—after first trying and failing to settle with the *Batton* plaintiffs—later sought to negotiate with the *Tuccori* Plaintiffs who were disarmed from the start, a classic reverse auction process. That *Tuccori* extended the Anywhere settlement class period to be coextensive with the period in *Batton*, despite the fact that *Tuccori* necessarily could not assert claims covering as long a period because they filed their action three years later, demonstrates the purpose of their settlement was not to resolve claims in *Tuccori,* but to provide Anywhere with a cheap escape from *Batton.*

Second, on March 6, 2026, *Tuccori* counsel amended their complaint to add Anywhere for the first time such that now both *Tuccori* and *Batton* assert claims against Anywhere on behalf of overlapping classes for harm arising from the same conspiracy. This duplicative litigation is another hallmark of the reverse auction process. *Blair*, 181 F.3d at 839 (defendants facing overlapping class actions are incentivized to tr[y] to use [the later-filed suit] as a way to thwart parallel [class] actions where the class had more vigorous champions.").

Additionally "troubling" is *Tuccori* plaintiffs' and Anywhere's decision to exclude the *Batton* plaintiffs and their counsel from their settlement negotiations. *See Litty v. Merrill Lynch & Co.*, No. CV 14-0425 PA (PJWX), 2015 WL 4698475, at *10 (C.D. Cal. Apr. 27, 2015) (denying preliminary approval where settling parties "swe[pt] into the settlement two separate

cases without involving plaintiffs' counsel in those cases"); *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1125 (7th Cir. 1979) (explaining "settlement negotiations with less than all class counsel weaken the class' tactical position", finding the exclusion of certain counsel "from the settlement negotiations should weigh heavily against approval of the settlement"). However competent *Tuccori* counsel may be, they have been rendered ineffectual negotiators and advocates by the highly objectionable practices surrounding the proposed Anywhere settlement.

**E. Batton Plaintiffs' Efforts to Prevent and Mitigate The Reverse Auction Harm**

To prevent any impending harm to the overlapping proposed classes in these cases, the *Batton* plaintiffs immediately moved to: (1) intervene in *Tuccori* to object to the motion to amend the complaint to add Anywhere as a defendant; (2) reassign *Tuccori* under the Local Rules to Judge Hunt in earlier filed *Batton*; (3) preliminarily enjoin Anywhere from proceeding with settlement approval in *Tuccori*; and (4) be appointed interim class counsel for the homebuyer class. ECF No. 100; *Batton*, ECF Nos. 271, 273, 292. The *Tuccori* court held a hearing on March 4, 2026, and thereafter denied the motion to intervene, granted preliminary approval of the Anywhere settlement, and granted Plaintiffs' motion to amend their complaint to add Anywhere as a defendant in *Tuccori*. ECF Nos. 117-119. The *Batton* court held a hearing on March 5, 2026, and denied the motion for preliminary injunction and motion to transfer. *Batton*, ECF No. 294.

Armed with the approval of the Anywhere settlement, the remaining *Batton* defendants now have the green light to pit the two sets of plaintiffs' counsel against each other in a problematic "race to the bottom" scenario.

## STANDARD OF REVIEW

In considering a motion for a stay of proceedings, the Court considers whether (1) the applicant "is likely to succeed on the merits"; (2) "will be irreparably injured absent a stay"; (3) issuance of the stay will substantially injure the other parties"; and (4) "where the public interest lies." *Castanon-Nava v. U.S. Dep't of Homeland Sec.*, 161 F.4th 1048, 1055 (7th Cir. 2025). The Court uses a "sliding scale" approach whereby a higher or lower likelihood of success requires a correspondingly lesser or greater showing on the balance of equities factor. *Cavel Intern. v. Madigan*, 500 F.3d 544, 546–47 (7th Cir. 2007).[5]

## ARGUMENT

***Likelihood of Success.*** Mr. Bolton and the class are highly likely to succeed in demonstrating that they satisfied the requirements to intervene in this action. Under Rule 24(a)(2), this Court must grant a motion to intervene if the intervenor can demonstrate: "(1) timely application; (2) an interest relating to the subject matter of the action; (3) potential impairment, as a practical matter, of that interest by the disposition of the action; and (4) lack of adequate representation of the interest by the existing parties to the action." *Bost v. Illinois State Bd. of Elections*, 75 F.4th 682, 686 (7th Cir. 2023). The Court "focuse[d] on the third factor." ECF No. 118 at 1. Specifically, the Court reasoned that the interests of Mr. Bolton and the class are not impaired or impeded absent intervention because they can challenge the adequacy and fairness of Anywhere's settlement by objection to or opting-out of the settlement under Fed. R. Civ P. 23. ECF No. 118 at 1–2.[6] For the reasons discussed herein, we believe this ruling is error.

---

[5] Mr. Bolton and the *Batton* plaintiffs must first bring their motion in the district court before seeking a stay in the appellate court. Fed. R. App. P. 8(a)(2) (a party must ordinarily move for a stay in the district court first unless doing so would be impracticable).

[6] Although the Court focused on the third prong of Rule 24, Mr. Bolton and *Batton* plaintiffs satisfied prongs (1)-(2) and (4) as well for the reasons set forth in their motion. *See* ECF No. 100 at 4-8. In

*First*, the Supreme Court has recognized that "[m]embers of a class have a right to intervene if their interests are not adequately represented by existing parties." *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 594 (2013) (quoting 5 Alba Conte & Herbert Newberg, Newberg on Class Actions § 16:7, at 154 (4th ed. 2002)). The advisory committee notes to Rule 24 similarly state that a class member "should, as a general rule, be entitled to intervene in the action," unless the current parties adequately represent him. *Id.*; Fed. R. Civ. P. 24 advisory committee's note to the 1966 amendment. This law is squarely contrary to the Court's finding that the possibility of objecting to or opting out under Rule 23 was enough protection for Mr. Bolton's interests. If Rule 23 alone were the answer, "class members could *never* intervene in a class action because they would always have recourse to Rule 23 procedural protections and would therefore always fail to satisfy the third prong." *Tech. Training*, 874 F.3d at 696 (emphasis added). Instead of relying on Rule 23, this Court was required to assess whether Mr. Bolton and the homeowner class were in fact adequately represented by the *Tuccori* parties. It did not do so, and this alone is sufficient basis to reverse.

*Second*, the nature of the harm Mr. Bolton and the class are suffering itself demonstrates why Rule 23 cannot protect them. As set forth in the motion to intervene and above, the reverse auction Anywhere settlement has impaired Mr. Bolton's and the class's interests in obtaining fair and adequate settlements for claims they have been vigorously pursuing for five years. The $20 million Keller Williams settlement should have set the benchmark in *Batton*. Instead, since

---

addition to the arguments set forth in their motion, Mr. Bolton submits that his motion was timely because it was filed the day after plaintiffs in *Tuccori* moved to amend their complaint to add Anywhere and for approval of their Anywhere settlement. "Timeliness of motions for intervention by unnamed class members is [] measured from the time when class members suspect that the representative is not acting in their best interest—*e.g.*, when learning of the terms of a (potentially inadequate) settlement." *Newman v. Metro. Life Ins. Co.*, No. 16 C 3530, 2018 WL 3239722, at *2 (N.D. Ill. July 3, 2018) (citing *Crawford v. Equifax Payment Servs.*, 201 F.3d 877, 880 (7th Cir. 2000)).

Anywhere successfully obtained a settlement through its reverse auction tactics, the remaining *Batton* defendants are now empowered to likewise threaten to opt in to *Tuccori* if *Batton* plaintiffs insist on their higher benchmark. As a result, Mr. Bolton and the *Batton* plaintiffs are forced into a Hobson's choice: settle in *Batton* at the reduced, inadequate benchmark amounts established by the Anywhere settlement or risk having their claims released by *Tuccori* for potentially even less. Thus, the Anywhere settlement "regardless of its inadequacies" has "the practical effect of limiting and hindering settlement of" *Batton*. *Managed Care Litig.*, 236 F. Supp. 2d 1336, 1344 (S.D. Fla. 2002).

Mr. Bolton and the class are also suffering and will continue to suffer from inadequate representation, a crucial due process requirement in class action litigation. *Helfand v. Cenco, Inc.*, 80 F.R.D. 1 (N.D. Ill. 1977) ("adequate representation embodies a crucial due process requirement" in a class action suit). *Tuccori* counsel has now been appointed class counsel with respect to the homebuyer claims against Anywhere. But *Tuccori* counsel did not have a case on file against Anywhere, did not invest any time or resources in prosecuting the claims against Anywhere, and had no information with which to evaluate the value of homebuyers' claims against Anywhere. They thus had no litigation leverage to use against Anywhere. Supreme Court precedent precludes the appointment of counsel who are confined to settlement and cannot threaten litigation. *Amchem*, 521 U.S. at 621.[7] Such disarmed counsel is well positioned to sell a

[7] Plaintiffs have suggested that *Batton* counsel are somehow inadequate because they objected to the release of a large portion of their claims and, when their objection was overruled, appealed to the Eighth Circuit. *See* p. 5-6, *supra*. But this objection and appeal only underscore why *Batton* counsel are the best representatives for the class. Both Plaintiffs and *Batton* counsel initially brought claims on behalf of all homebuyers. *Supra* p. 4. Once *Batton* plaintiffs discovered that the seller settlements intended to release a large portion of homebuying claims, *Batton* counsel took immediate action to protect the homebuyers' claims by moving for an injunction, objecting to the settlement, and ultimately appealing, all on a wholly contingent basis. *Supra* pp. 5-6. *Tuccori* plaintiffs, in contrast, simply dropped those claims from their case. *Supra* p. 9. Whatever the ultimate outcome in the Eighth Circuit, counsel that choose not to

low-cost release to the defendant in exchange for fees despite doing little or no work—exactly what happened here. John C. Coffee, Jr., *Class Action Accountability: Reconciling Exit, Voice, and Loyalty in Representative Litigation*, 100 COLUM. L. REV. 370, 392 (2000). This representation is not adequate. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) (the standard of adequacy for class counsel "does not permit even the *appearance* of divided loyalties of counsel."). Moreover, counsel that does not invest time or resources in a case is "almost certainly inadequate" under Rule 23. *Reynolds*, 288 F.3d at 284 (finding representation inadequate where "lawyers efforts between the filing of the complaint and the settlement negotiations were singularly feeble"); Rule 23. Fed. R. Civ. P. 23(g)(1)(A) (courts consider the work counsel has done and the resources that counsel commits to representing the class). *Acosta v. Trans Union, LLC*, 243 F.R.D. 377, 397 (C.D. Cal. 2007) ("the stark contrast between the depth of Plaintiffs' investigation and that conducted by the Objectors casts considerable doubt on the sufficiency of the effort the *Acosta/Pike* plaintiffs have invested in this litigation.").

***Irreparable Harm.*** Denying Mr. Bolton and the *Batton* plaintiffs' motion and permitting the Anywhere settlement to proceed not only impairs these interests, it *irreparably harms* them. *See*, *e.g.*, *Reynolds*, 288 F.3d at 282, 284 (finding inadequate Rule 23 representation in reverse-auction context); *In re Bank of Am. Wage & Hour Emp. Litig.*, 740 F. Supp. 2d 1207, 1218 (D. Kan. 2010) ("plaintiffs have shown irreparable harm by virtue of the fact that the *Lopez* settlement will establish a lower baseline for future settlement negotiations in this case"); *Managed Care Litig.*, 236 F. Supp. 2d at 1344-45 (enjoining settlement in related litigation, finding that permitting settlement to proceed would "clearly cause irreparable harm to all

advocate for a large portion of their clients cannot credibly claim to be more adequate representatives than those who do.

Plaintiffs and class members" where future "settlements reached [might] be woefully inadequate" and "nothing would stop every other Defendant from following suit"). That is why courts enjoin unfair and inadequate class-action settlements regardless of any ability to object against final approval or to opt out. *Bank of Am.*, 740 F. Supp. 2d at 1218; *Managed Care,* 236 F. Supp. 2d at 1336; *Checking Account Overdraft Litig.*, 859 F. Supp. 2d 1313, 1322–24 (S.D. Fla. 2012.

By the time the objection and opt-out period are over months from now, it will be too late to turn back the clock and begin negotiations again without any reverse auction pressures. The only way to protect Mr. Bolton and the class from this harm is to pause the clock and determine the (in)adequacy and (un)fairness of the Anywhere settlement now, *before* future negotiations follow the same path. Accordingly, Mr. Bolton and the homebuyer class have a high likelihood of success in appealing the Court's denial of their motion to intervene.

***Prejudice and Public Interest***. There is also no prejudice to the parties in granting a stay. The *Tuccori* plaintiffs' preliminary approval motion made clear they intended to postpone notice while they attempted to collect other settlements. *See* ECF No. 98 at 7. The stay here will thus not add any further delay. Even if it did, "[t]he fact that intervention may inhibit, disrupt or destroy settlement negotiations or agreements does not demonstrate prejudice to the original parties sufficient to deny intervention." *In re Discovery Zone Sec. Litig.,* 181 F.R.D. 582, 596 (N.D. Ill. 1998). In contrast, preserving the status quo while the appellate court evaluates Mr. Bolton and the *Batton* plaintiffs' right to intervene to challenge the propriety of the Anywhere settlement ensures that the class-action mechanism remains a fair and reliable vehicle for resolving complex disputes.

Dated: March 18, 2026

Respectfully submitted,

/s/ *Vincent Briganti*

Vincent Briganti (pro hac vice)
Margaret MacLean (pro hac vice)
Noelle Forde (pro hac vice)
**LOWEY DANNENBERG, P.C.**
44 South Broadway, Suite 1100
White Plains, NY 10601
(914) 997-0500
vbriganti@lowey.com
mmaclean@lowey.com
nforde@lowey.com

Randall P. Ewing, Jr. (pro hac vice)
George A. Zelcs (pro hac vice)
Ryan Z. Cortazar (pro hac vice)
**KOREIN TILLERY, LLC**
205 N. Michigan Avenue, Suite 1950
Chicago, IL 60601
(312) 641-9750
rewing@koreintillery.com
gzelcs@koreintillery.com
rcortazar@koreintillery.com

Steven M. Berezney (pro hac vice)
**KOREIN TILLERY, LLC**
505 N. 7th Street, Suite 3600
St. Louis, MO 63101
(314) 241-4844
sberezney@koreintillery.com

*Attorneys for Plaintiffs and the Proposed Class*

**CERTIFICATE OF SERVICE**

I hereby certify that on March 18, 2026, a true and correct copy of the foregoing was served upon counsel of record by electronic filing.

/s/ *Noelle Forde*
Noelle Forde

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| James Tuccori, individually and on behalf of all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>At World Properties,<br><br>*Defendant*. | No. 24 CV 150<br><br>Judge Lindsay C. Jenkins |

**ORDER**

In March 2026, the court denied Aaron Bolton's motion to intervene in this action. [Dkt. 118.][1] He now moves to stay proceedings pending his appeal of that order. [Dkt. 130.] For the reasons below, the court declines to issue a stay.

## I. Background

James Tuccori filed this putative class action in the Circuit Court of Cook County on December 8, 2023, bringing antitrust claims against Defendant At World Properties arising from an alleged conspiracy to artificially increase home prices. [Dkt. 1 at 1–2.] Defendant removed the action to federal court in January 2024, and the court preliminarily-approved a class settlement agreement in October 2025. [*Id.*] Several additional defendants have since opted-in to the preliminary settlement agreement. [Dkt. 119.]

Of relevance here, the present lawsuit was preceded by a class action alleging antitrust violations based on the same conspiracy in the Western District of Missouri, *Burnett v. NAR*, No. 19-cv-332 (W.D. Mo.). The *Burnett* action resulted in a jury verdict for the plaintiffs. And in the wake of the *Burnett* jury verdict, plaintiffs across the country, including Tuccori, filed putative class actions raising similar antitrust claims.

Aaron Bolton, a plaintiff in one of those similar class actions, *Batton v. Nat'l Ass'n of Realtors, et al.*, 21-cv-00430 (N.D. Ill.), filed a motion to intervene in this case. [Dkt. 100.] Bolton's motion to intervene came after the defendant in his case, Anywhere Real Estate, sought to opt-in to the preliminary-approved class settlement agreement reached by the parties in this case. [Dkt. 98.] Bolton argued that, without his intervention in this case, the *Batton* Plaintiffs and class members are

[1] Citations to docket filings generally refer to the electronic pagination supplied by CM/ECF, which may not be consistent with page numbers in the underlying documents.

inadequately represented and would be inadequately compensated by the class settlement agreement that this court preliminarily approved. He also urged the court to grant his motion because, should the court grant final approval of the settlement agreement, he plans to appeal the approval.

The court denied Bolton's motion to intervene[2] concluding that he had neither a right nor a reason to intervene at this point in the proceedings. [Dkt. 118.] As the order made clear, the disposition of this action does not threaten to impair Bolton's interests. As a class member who would be bound by the settlement agreement reached by the parties in this case, the court explained, Bolton has a right to raise any and all concerns about inadequate representation and compensation at the required fairness hearing. Allowing him to intervene *after* preliminary approval but *before* a fairness hearing, moreover, would prejudice the existing parties by needlessly delaying the very hearing where Bolton can properly raise his fairness arguments.

Bolton then filed a notice of appeal regarding the court's order denying his motion to intervene, dkt. 124, and not long after, filed a motion in this court to stay proceedings until the Seventh Circuit decides his appeal, dkt. 130.

## II. Analysis

The grant of a motion to stay is an exercise of judicial discretion and the burden of demonstrating its necessity lies with the moving party. See *Nken v. Holder*, 556 U.S. 418, 433–34 (2009). In ruling on a motion to stay pending appeal, a court considers: "(1) whether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* (cleaned up). Factors one and two "are the most critical" in this determination. *Id.*

Here, factors one and two feed off each other. As the court explained in its order denying Bolton's motion to intervene, the relief Bolton requests—to avoid a settlement that inadequately compensates him and his fellow class members for their injuries—can be raised at the court's fairness hearing. Because Bolton has every right to opt-out of the class settlement agreement and the fairness hearing provides him with a full opportunity to raise his objections, the denial of his motion to intervene causes neither him nor any other class member irreparable harm.

After all, following the Supreme Court's decision in *Devlin v. Scardelletti*, 536 U.S. 1 (2002)—which held that "class action procedure allows nonnamed class members to object to a settlement at the fairness hearing" and appeal denial of that objection "without first intervening," *id.* at 14—the Seventh Circuit has explained

[2] The court's order denying intervention erroneously referred to the proposed intervenor as Aaron Batton even though Aaron Bolton is the proposed intervenor.

time and again that a class member has a right to raise objections at a fairness hearing and to appeal a court's approval of a class settlement agreement in the same way as a named party, see, *e.g.*, *S.E.C. v. Enter. Tr. Co.*, 559 F.3d 649, 651 (7th Cir. 2009). Intervention is not a prerequisite. The Seventh Circuit case Bolton relied on for such a proposition predated *Devlin*. [Dkt. 100 (citing *Crawford v. Equifax Payment Servs., Inc.*, 201 F.3d 877 (7th Cir. 2000).]

As for likelihood of success, the court stands by its decision denying Bolton's motion to intervene. To be sure, this court is not the first to deny a nonparty, class member's motion to intervene at this stage in proceedings under analogous circumstances. See, *e.g.*, *Cohorst v. BRE Props., Inc.*, 2011 WL 3489781, at *5 (S.D. Cal. July 19, 2011), *report and recommendation adopted*, 2011 WL 3475274 (S.D. Cal. Aug. 5, 2011) ("Other lower courts since *Devlin* was decided in 2002 have recognized that where the right to object to the settlement at the Fairness hearing or to opt out of the settlement exists, intervention is simply unnecessary to protect a putative class member's interests."); *T.K. through Leshore v. ByteDance Tech. Co.*, 2021 WL 1172767, at *5 (N.D. Ill. Mar. 29, 2021) ("When a court denies a motion to intervene by an absent class member opposing settlement, that class member's ability to protect her interest in opposing the Settlement is not impaired or impeded.") (cleaned up); *1925 Hooper LLC v. Nat'l Ass'n of Realtors*, 2025 WL 3567286, at *10 (N.D. Ga. Mar. 28, 2025) ("Finally, the Court is mindful that there is no need for the Proposed Intervenors to intervene as parties in this case in order to protect their stated interests when they can lodge any objection they have to the proposed settlements as a part of the Rule 23 class action fairness hearing."); *Hibler v. Santander Consumer USA, Inc.*, 2013 WL 12137716, at *4 (C.D. Cal. Nov. 21, 2013) ("Here, Intervenor and any other proposed class members will have the ability to object at a fairness hearing."); *Izzio v. Century Partners Golf Mgmt., L.P.*, 2015 WL 5472845, at *5 (N.D. Tex. Sept. 15, 2015) ("As a class member, Metzger can raise objections to the settlement without formal intervention."). See also *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002) (rejecting, on an appeal from a final settlement agreement, "reverse auction" argument brought by objectors during a Rule 23 class action fairness hearing).

Indeed, the Northern District of Georgia faced an almost identical motion to intervene in one of the similar class actions. In *1925 Hooper LLC v. National Association of Realtors*, the plaintiffs sued the National Association of Realtors, alleging that the association engaged in a conspiracy to raise home prices. 2025 WL 3567286, at *1. The plaintiffs settled their claims with several defendants and then filed a motion for preliminary approval of the settlements and settlement class. *Id.* at *2. Class representatives in a parallel nationwide class action, *Gibson,* filed a motion to intervene. *Id.* The *Gibson* action brought the same antitrust claim against at least five entities that were also defendants in *1925 Hooper*. *Id.*

The court denied the proposed intervenors' motion. *Id.* at *11. It held that all the proposed intervenors' concerns regarding the settlement agreement's fairness,

including their allegations of "reverse auction" tactics, are proper subjects for the Rule 23 class action fairness hearing. *Id.* at *8. The court also found that there was "no question that permitting intervention [would] thwart, or at least delay, the settlements reached between Plaintiffs and the Settling Defendants, resulting in prejudice to the existing parties." *Id.* at *9.[3]

The same is true here.

Issuing a stay, moreover, would do nothing to promote judicial economy. When deciding Bolton's appeal, the Seventh Circuit will not consider his fairness arguments because those arguments have not yet been decided by this court (or any other district court). Instead, the Seventh Circuit's decision would only address whether the court erred in denying the motion to intervene—a procedural issue distinct from Bolton's merits argument. See *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 716 (7th Cir. 2001) ("A decision reversing an order denying intervention usually leads to a remand, not to a decision on the merits."). Put differently, placing these proceedings on hold and awaiting the Seventh Circuit's decision would not provide any guidance on the merits of Bolton's argument and there is no risk that both this court and the Seventh Circuit would decide the fairness issue in tandem.

## III. Conclusion

For these reasons, Bolton's motion to stay is denied.

Enter: 24-cv-150
Date: May 7, 2026



Lindsay C. Jenkins

[3] To no one's surprise, those intervenors did raise their reverse auction concerns as objections at the fairness hearing and the court considered and then rejected the arguments, ultimately approving the class settlement agreement. See *1925 Hooper LLC et al v. The National Association of Realtors et al.*, 23-cv-5392, dkt. 245 (N.D. Ga. Mar. 31, 2026). And the law firm representing Bolton here is no doubt aware of the possibility of raising reverse auction concerns as a nonparty objector at a class action fairness hearing since it represented a nonparty objector in *1925 Hooper*.

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI, COURTNEY FOREGGER, KEVIN CWYNAR, DAWID ZAWISLAK, MICHAEL D'ACQUISTO, and ALEJANDRO LOPEZ a/k/a ALEANDRO LOPEZ, individually and on behalf of similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiffs*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Consolidated with: |
| AT WORLD PROPERTIES, LLC, BAIRD & WARNER, INC., REAL ESTATE ONE, INC., SILVERCREEK REALTY GROUP LLC, EQUITY REALTORS, L.L.C. d/b/a EQUITY REAL ESTATE, HOMESMART INTERNATIONAL, LLC, FATHOM REALTY, LLC, NEXTHOME, INC., REALTY EXECUTIVES INTL. SVCS. LLC, SHOREWEST REALTORS, INC., ENGEL & VOLKERS GMBH, ENGEL & VOLKERS AMERICAS, INC., SIDE, INC., THE KEYES COMPANY, ILLUSTRATED PROPERTIES, LLC, ANYWHERE REAL ESTATE INC., THE REAL BROKERAGE INC., REAL BROKER, LLC, and VANGUARD PROPERTIES, INC., | ) | No. 24-cv-02399<br>No. 24-cv-03160<br>No. 24-cv-3356<br>No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |
| *Defendants.* | ) | |

**STIPULATION AS TO SECOND AMENDED CONSOLIDATED COMPLAINT**

Plaintiffs and Defendants hereby stipulate and agree as follows:

WHEREAS, on October 16, 2025, the Court granted preliminary approval to a class settlement with a number of the Defendants in this action (Dkt. 65);

WHEREAS, the preliminarily approved settlement includes an opt-in procedure by which

other real estate brokerages and real estate companies can elect to participate in the settlement in exchange for contributing a payment to the settlement's global settlement fund, among other things (Dkt. 58 at 8) (summarizing the settlement's opt-in procedure);

WHEREAS, on March 4, 2026, the Court granted preliminary approval to settlements with five opt-in settlors (Dkt. 119);

WHEREAS, the opt-in period ended on April 13, 2026 (Dkt. 62), and Plaintiffs have secured agreements from additional entities to opt into the settlement, including the remaining non-settling Defendants in this action and a number of non-party opt-in settlors;[1]

WHEREAS, although Plaintiffs' operative First Amended Consolidated Class Action Complaint already references the non-party opt-in settlors as co-conspirators (*see, e.g.*, Dkt. 123 ¶¶ 51-54), Plaintiffs seek to amend their First Amended Consolidated Class Action Complaint to name the non-party opt-in settlors as defendants to procedurally facilitate bringing those entities into the case and the settlement;

WHEREAS, Plaintiffs do not intend for their amendment to substantively change their claims or allegations against the existing Defendants; and

WHEREAS, Defendants consent to the filing of the proposed Second Amended Consolidated Class Action Complaint for settlement purposes, but do not intend to waive or forfeit,

---

[1] The proposed Second Amended Consolidated Class Action Complaint adds the following non-party opt-in settlors as defendants: Realty ONE Group Inc., Kempa and Associates LLC d/b/a Realty ONE Group Excel, and Umro Realty Corp d/b/a The Agency, which are defendants in an action filed by Plaintiffs' counsel captioned *Cwynar v. The Real Brokerage, Inc. et al.*, 25-cv-07289 (N.D. Ill.) (Alexakis, J.); Hanna Holdings, Inc. which is a defendant in *Davis v. Hanna Holdings, Inc.*, 24-cv-02374 (E.D. Pa.) (Beetlestone, J.); Douglas Elliman Inc., HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates LLC which are defendants in *Lutz et al. v. HomeServices of America, Inc. et al.*, 24-cv-10040 (S.D. Fl.) (Moore, J.); eXp World Holdings, Inc., Compass, Inc., and United Real Estate Holdings, LLC d/b/a United Real Estate Group which are defendants in *Batton et al. v. Compass, Inc. et al.*, No. 1:23-cv-15618 (N.D. Ill.) (Hunt, J.); and The National Association of REALTORS® which is a defendant in *Batton v. The Nat'l Ass'n of Realtors*, No. 21-cv-00430 (N.D. Ill.) (Hunt, J.).

and hereby expressly preserve, any argument or defense, including any argument or defense pertaining to lack of personal jurisdiction.

NOW, THEREFORE, the Stipulating Parties stipulate and agree that:

1. Pursuant to Fed. R. Civ. P. 15(a)(2), Defendants consent to Plaintiffs filing their Second Amended Consolidated Class Action Complaint.
2. Defendants do not waive or forfeit any argument or defense, including without limitation any argument or defense based on lack of personal jurisdiction.
3. The case remains stayed and suspended as to certain Defendants pursuant to ECF 65, 95, and 119, including any deadline to answer or otherwise respond to the Second Amended Consolidated Class Action Complaint.

Dated: May 18, 2026 Respectfully Submitted,

JAMES TUCCORI, COURTNEY FOREGGER, KEVIN CWYNAR, DAWID ZAWISLAK, MICHAEL D'ACQUISTO, and ALEJANDRO LOPEZ A/K/A ALEANDRO LOPEZ, individually and on behalf of similarly situated individuals

By: *<u>/s/ Paul T. Geske</u>*
One of Plaintiffs' attorneys

Myles McGuire
Evan Meyers
Paul T. Geske
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
mmcguire@mcgpc.com
emeyers@mcgpc.com
pgeske@mcgpc.com

AT WORLD PROPERTIES, LLC

By: *<u>/s/ Molly K. McGinley</u>*

Robert J. Palmersheim
Molly K. McGinley
Timothy G. Parilla
Honigman LLP
321 N. Clark Street Suite 500
Chicago, Illinois 60654
(312) 701-9300
rpalmersheim@honigman.com
mmcginley@honigman.com
tparilla@hongiman.com

*Counsel for At World Properties, LLC*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES TUCCORI *et al.*, individually and on behalf of similarly situated individuals, | ) | No. 1:24-cv-00150 |
| *Plaintiffs*, | ) | Hon. Lindsay C. Jenkins |
| v. | ) | Consolidated with: |
| AT WORLD PROPERTIES, LLC *et al.*, | ) | No. 24-cv-02399<br>No. 24-cv-03160 |
| *Defendants.* | ) | No. 24-cv-3356<br>No. 24-cv-9039<br>No. 24-cv-11735<br>No. 25-cv-04207 |

**PLAINTIFFS' SECOND *UNOPPOSED* MOTION AND MEMORANDUM IN SUPPORT OF PRELIMINARY APPROVAL OF SETTLEMENTS WITH PARTIES OPTING INTO THE COURT APPROVED CLASS SETTLEMENT AGREEMENT**

Plaintiffs, James Tuccori, Courtney Foregger, Kevin Cwynar, Dawid Zawislak, Michael D'Acquisto, and Alejandro Lopez a/k/a Aleandro Lopez, by and through their undersigned counsel, and pursuant to Section G of the Court-approved Class Settlement Agreement in this matter, respectfully move for preliminary approval of the Opt-In Agreements being filed herewith. In support of this Motion, Plaintiffs state as follows:

## I. INTRODUCTION

The Court-approved Settlement[1] in this matter has succeeded in providing outstanding compensation for the Settlement Class Members. On October 16, 2025, the Court entered its Preliminary Approval Order (Dkt. 65), granting preliminary approval to the Class Settlement and establishing an opt-in mechanism by which "[t]he National Association of REALTORS®, and any real estate brokerage, franchisor, or real estate company that is not a Party to th[e] Settlement Agreement" could elect to opt into the Settlement in exchange for fulfilling certain conditions and making a monetary contribution to the Settlement's Global Settlement Fund, among other things. (Dkt. 58-1 ¶ 36).

The Settlement's Opt-In Period closed on April 13, 2026, and Plaintiffs are pleased to report that they have reached settlements with eleven more Opt-In Settlors,[2] adding to the prior

[1] Unless stated otherwise, capitalized terms used in this Motion are intended to be interpreted in accordance with the definitions in the Court-approved Class Settlement Agreement. (Dkt. 58-1).

[2] The eleven Opt-In Settlors whose settlements are presented in this Motion are Defendant HomeSmart International, LLC; Defendant Fathom Realty, LLC; Realty ONE Group Inc., Kempa and Associates LLC d/b/a Realty ONE Group Excel, and Umro Realty Corp d/b/a The Agency, which are defendants in an action filed by Plaintiffs' counsel captioned *Cwynar v. The Real Brokerage, Inc. et al.*, 25-cv-07289 (N.D. Ill.) (Alexakis, J.); Hanna Holdings, Inc. which is a defendant in *Davis v. Hanna Holdings, Inc.*, 24-cv-02374 (E.D. Pa.) (Beetlestone, J.); Douglas Elliman Inc., HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates LLC which are defendants in *Lutz et al. v. HomeServices of America, Inc. et al.*, 24-cv-10040 (S.D. Fl.) (Moore, J.); eXp World Holdings, Inc., Compass, Inc., and United Real Estate Holdings, LLC d/b/a United Real Estate Group which are defendants in *Batton et al. v. Compass, Inc. et al.*, No. 1:23-cv-15618 (N.D. Ill.) (Hunt, J.); and The National Association of REALTORS® which is a defendant in *Batton v. The Nat'l Ass'n of Realtors*, No. 21-cv-00430 (N.D. Ill.) (Hunt, J.).

Court-approved settlements with the ten initial Settling Defendants and the five prior Opt-In Settlors. (Dkt. Nos. 58, 98). These 26 Settling Parties have collectively agreed to contribute a total of $120,334,500 to the Global Settlement Fund. By any measure, this is an exceptional result for the Settlement Class.

As the Court is aware, this homebuyer antitrust Litigation was preceded by other class actions brought on behalf of people who sold homes. (Dkt. 162 at 1). That litigation led to settlements that released all home seller claims and most homebuyer claims, leaving only a small sliver of "buyer-only" claims remaining. This Settlement favorably resolves those remaining claims for amounts that are entirely consistent with the existing settlements. As explained below, the settlements here capture just as much per claim as the home seller plaintiffs negotiated after they prevailed at trial. This result is especially noteworthy since the homebuyer claims here are "indirect purchaser" claims involving merits challenges and problems of proof that the direct purchasers (home sellers) did not have to contend with.

The opt-in procedures established here were modeled off a similar opt-in mechanism employed in the *Burnett* home seller settlement. *See Burnett v. Nat'l Ass'n of Realtors*, No. 4:19-CV-00332-SRB, 2024 WL 2842222, at *5 (W.D. Mo. May 9, 2024) ("The NAR settlement also provides opportunities for various multiple listing services and brokerages to opt-in to the settlement, which may provide still further financial compensation to the Settlement Class."). The opt-in process succeeded there and has proven successful here as well. Indeed, the opt-in settlements in the aggregate are even stronger than those the Court approved previously—both in terms of the total dollar amount and as a percentage of the corresponding home seller settlements—demonstrating that the Settlement's opt-in process helped encourage further settlements that, if approved, will grow the Global Settlement Fund for the benefit of the Settlement Class. *Id.*

briefs, robust confirmatory discovery, and financial information bearing on ability-to-pay issues where applicable. Class Counsel also evaluated each potential settlement against relevant benchmarks, such as each Opt-In Settlor's respective home seller settlement.

## III. SUMMARY OF SETTLEMENT TERMS SPECIFIC TO OPT-IN SETTLORS

The terms of the Class Settlement Agreement have already been presented and discussed at length in prior filings. (*See generally* Dkt. Nos. 58, 58-1). To avoid repetition, this Motion focuses solely on settlement terms bearing on the settlements with the prospective Opt-In Settlors.

### A. The Settlement Class.

In its Preliminary Approval Order, the Court preliminarily certified the Settlement Class defined as follows:

> All persons who purchased a home that was listed on an MLS anywhere in the United States where a commission was paid to any brokerage in connection with the transaction during the Class Period.

(Dkt. 65 ¶¶ 5-6); (*see also id.* ¶ 7) (listing certain exclusions). None of the Opt-In Agreements alter the Class Definition itself, but they do extend the Class Period to be consistent with the Class Period in the Court-approved Opt-In Agreement with Anywhere Real Estate Inc. ("Anywhere") (Dkt. 98 at 6). This is to account for the various limitations periods applicable to the Class Members' claims and to encompass all time periods at issue in this case and other homebuyer antitrust litigation.

### B. Relief To The Settlement Class Members.

The Settlement established a Global Settlement Fund to pool all payments from the Settling Defendants and Opt-In Settlors. (Dkt. 58-1 ¶¶ 6, 42, 69-73). The prospective Opt-In Settlors have agreed to the following payments subject to Court approval:

| **Prospective Opt-In Settlor(s)** | **Total Contribution to Settlement Fund** |
|---|---|
| HomeSmart International, LLC | $600,000 |
| Fathom Realty, LLC | $250,000 |
| Realty ONE Group Inc. and Kempa and Associates LLC d/b/a Realty ONE Group Excel | $500,000 |
| Umro Realty Corp d/b/a The Agency | $300,000 |
| Douglas Elliman Inc. | $2,041,250 |
| Hanna Holdings, Inc. | $8,250,000 |
| HomeServices of America, Inc., BHH Affiliates, LLC, and HSF Affiliates LLC | $30,000,000 |
| The National Association of REALTORS® | $52,250,000 |
| eXp World Holdings, Inc. | $4,335,000 |
| Compass, Inc. | $7,331,250 |
| United Real Estate Holdings, LLC d/b/a United Real Estate Group | $487,500 |
| **Total** | **$106,345,000** |

These contributions, coupled with the $13,989,500 in payments from Court-approved settlements with the initial Settling Defendants and the other Opt-In Settlors (Dkt. 98 at 4), bring the Settlement's total monetary relief to $120,334,500. (Geske Decl. ¶ 25). Each Opt-In Settlor's payment is non-reversionary; that is, no amount will revert if the Settlement is approved. Following final approval, the Global Settlement Fund—including all contributions from both the initial Settling Defendants and all Opt-In Settlors—will be fully distributed pursuant to the Court-approved plan of allocation after deductions for Court-approved administrative costs, litigation expenses, and attorney fees in accordance with the Settlement Agreement. (Dkt. 58-1 ¶¶ 69-71). When Plaintiffs submit their plan of allocation, they will propose a formula under which each individual payment will be determined equitably according to a pro rata formula that takes into account the commissions each claimant paid as part of their home purchase.

In addition to monetary relief, the Opt-In Agreements also provide non-monetary,

to remain available to the Parties and the Court should they require his assistance. (*Id.* ¶ 13); *Manual for Complex Litigation (Fourth)* § 21.632 ("the judge can have a court-appointed expert or special master review the proposed settlement terms, gather information necessary to understand how those terms affect the absent class members, and assist the judge in determining whether the fairness, reasonableness, and adequacy requirements for approval are met.").

**E. Releases.**

The release terms in the Opt-In Agreements presented for approval mirror those that the Court has already preliminarily approved. (*Compare* Dkt. 58-1 ¶¶ 29-31 *with* Ex. 1 to Geske Decl. ¶¶ 24-26). The release provision in NAR's Opt-In Agreement, however, is modified to reflect its status as a trade association comprised of individual members, brokers, local associations, and REALTOR® boards.[11] Consistent with the NAR's settlement agreement in *Burnett*, and as more fully set forth in NAR's Opt-In Agreement, the NAR's release provision encompasses the NAR and its affiliates as well as the following entities provided they meet certain conditions, including that they agree to abide by the practice changes set forth in the NAR's Opt-In Agreement: (i) NAR Members, Associate Members, and Member Boards that do not operate an unincorporated Multiple Listing Service ("MLS"); (ii) Realtor MLSs and non-Realtor MLSs, as described in the Opt-In Agreement; and (iii) real estate brokerages that have a REALTOR® as a Principal with membership in the NAR on the date of Class Notice and a Principal who was a Participant in any MLS during the Class Period. (Ex. 4 to Geske Decl. ¶ 8).

[11] "NAR is a membership organization whose membership dues are paying for the Settlement, at least in part. The record supports that NAR would not have settled if the release did not include, at a minimum, its small agent and broker members—and certainly would not have settled for the amount it did[.]" (*Burnett* Final Approval Order at 45).

between 1/10 (10%) and 1/8 (12.5%) of the direct purchaser settlements before accounting for any other factors.

The settlements here exceed these guideposts, demonstrating that they are an excellent outcome for the Settlement Class. As stated above, the total monetary contributions from the Settling Defendants and Opt-In Settlors is $120,334,500. The total amount these entities committed to pay in their direct purchaser settlements (where applicable) is $957,023,154.[12] The settlements here are thus equal to 12.57% (120,334,500/957,023,154) of the direct purchaser settlements. Accordingly, the Settlement delivers immediate monetary relief commensurate with what the Settlement Class Members could realistically hope to achieve after a complete victory at trial with basically no discounts for the merits of their indirect purchaser claims, litigation risks, and the early procedural posture of the Litigation. *Isby*, 75 F.3d at 1199 (affirming approval of class settlement that "represented an outcome at least comparable, if not far superior, to that which plaintiffs might achieve by proceeding to trial."). The Settlement's relief is therefore highly reasonable and more than adequate.

Beyond the adequacy of the relief itself, Rule 23(e)(2)(C) also includes four express considerations to take into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of

---

[12] *See generally Burnett*, ECF No. 1192 ($83.5m settlement with Anywhere); *Burnett*, ECF No. 1458 ($418m settlement with the NAR); *Burnett*, ECF No. 1518 ($250m settlement with HomeServices entities); *Burnett*, ECF No. 1538 ($2.95m settlement with Fathom Realty, $6.923m settlement with Shorewest Realtors, $350,000 settlement with Silvercreek Realty, $2m settlement with Vanguard, and $3.75m settlement with The Agency); *Gibson*, ECF No. 161 ($57.5m settlement with Compass, $9.25m settlement with Real Brokerage, $5m settlement with Realty ONE, $6.5m settlement with @properties, and up to $17.75m from Douglas Elliman); *Gibson*, ECF No. 294 ($6.9m settlement with Engel & Volkers); *Gibson*, ECF No. 303 ($3.75m settlement with United Real Estate and $4.7m settlement with HomeSmart); *Gibson*, ECF No. 531 ($600,000 settlement NextHome and $2.4m with Keyes Company and Illustrated Properties); *Gibson*, ECF No. 655 ($1.5m settlement with Real Estate One and $2.2m settlement with Baird & Warner); *Gibson*, ECF No. 808 ($32m settlement with Hanna Holdings); *Keel*, ECF No. 2 ($5.5m settlement with Side); *Hooper* Final Approval Order at 10 ($34m settlement with eXp Realty).

## CERTIFICATE OF SERVICE

I hereby certify that on July 15, 2026, Proposed Intervenor-Appellant's Additional Appendix was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the appellate CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: July 15, 2026

*/s/ Eric F. Citron*

Eric F. Citron
*Counsel for Appellant*